**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No.: _____ - Civ-

| | |
|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| HUNTER WISE COMMODITIES, LLC, HUNTER WISE SERVICES, LLC, HUNTER WISE CREDIT, LLC, HUNTER WISE TRADING, LLC, LLOYDS COMMODITIES, LLC, LLOYDS COMMODITIES CREDIT COMPANY, LLC, LLOYDS SERVICES, LLC, C.D. HOPKINS FINANCIAL, LLC, HARD ASSET LENDING GROUP, LLC, BLACKSTONE METALS GROUP, LLC, NEWBRIDGE ALLIANCE, INC., UNITED STATES CAPITAL TRUST, LLC, HAROLD EDWARD MARTIN, JR., FRED JAGER, JAMES BURBAGE, FRANK GAUDINO, BARIS KESER, CHADEWICK HOPKINS, JOHN KING, and DAVID A. MOORE, | : |
| | : |
| Defendants. | : |

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF AND PENALTIES
UNDER THE COMMODITY EXCHANGE ACT**

The Plaintiff U.S. Commodity Futures Trading Commission ("Commission" or "CFTC"), by its attorneys, alleges as follows:

**I.      SUMMARY**

1.      Effective July 16, 2011, Section 742 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), Public Law 111-203, 124 Stat. 1376 (2010), broadened the scope of the CFTC's jurisdiction to include financed commodity transactions with retail customers.  Specifically, this broadened jurisdiction required that these

transactions be executed on an exchange and subjected these transactions to anti-fraud provisions as set forth in Sections 4(a) and 4b of the Commodity Exchange Act ("Act"), as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008 ("CRA")), §§ 13101-13204, 122 Stat. 1651 (enacted June 18, 2008), and by the Dodd-Frank Act, to be codified at 7 U.S.C. §§ 6(a), 6b, 9, and 15, and the Commission Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 et seq. (2012).  In addition, effective August 15, 2011, Section 753 of the Dodd Frank Act amended Section 6(c) of the Act, 7 U.S.C. §§ 9 and 15, broadening the CFTC's anti-fraud jurisdiction as set out in Commission Regulation 180.1, 17 C.F.R. § 180.1.

2.      Since the day Section 2(c)(2)(D) of the Act became effective, July 16, 2011 to the present (the "relevant period"), Defendants have engaged in illegal, off-exchange, financed commodity transactions with retail customers.  In addition, Defendants have engaged in extensive fraud while doing so.  The scope of Defendants' illegal operation is significant: between July 16, 2011 and August 31, 2012 alone, Defendant Hunter Wise Commodities, LLC, the orchestrator of the scheme described in this complaint, received more than $46,000,000 in retail customer funds.

3.      Defendants claim to sell physical commodities, including gold, silver, platinum, palladium and copper, in off-exchange transactions to retail customers throughout the United States.  The investment product touted is physical metal, not stocks in metal companies or exchange–traded commodity futures.  Defendants make three highly material misrepresentations to customers.  Defendants claim to: (1) sell and transfer ownership of physical metals to customers; (2) make loans to customers to purchase the physical metals; and (3) arrange for storage and store customers' physical metals in independent depositories.  In fact, Defendants do

not deal in physical metal.  In their financed transactions, Defendants do not sell or transfer ownership of any physical metals; they do not disburse any funds as loans; and they do not store physical metals in any depositories for or on behalf of customers.  In effect, Defendants charge customers commissions for purchasing metal, charge interest on loans to buy metal, and charge storage and insurance fees for metal in connection with paper transactions that only provide retail customers a way to speculate on the price direction of metals.

4.      By virtue of this conduct and the conduct further described herein, Defendants have engaged, are engaging, or are about to engage in conduct in violation Sections 4(a), 4b, 4d, and 6(c) of the Act, as amended, 7 U.S.C. §§ 6(a), 6b, 6d, 9, 15, and Commission Regulation 180.1(a), 17 C.F.R. § 180.1(a).

5.      Unless restrained and enjoined by this Court, Defendants are likely to continue engaging in the acts and practices alleged in this complaint or in similar acts and practices.

6.      Accordingly, the CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, to enjoin Defendants' unlawful practices and to compel their compliance with the Act and the regulations promulgated thereunder.  In addition, the CFTC seeks restitution, rescission, civil monetary penalties, and such other equitable relief as this Court may deem appropriate.

## II.      JURISDICTION AND VENUE

7.      Section 6c(a) of the Act authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the Act or any rule, regulation, or order thereunder.

8.      The Commission has jurisdiction over the conduct and transactions at issue in this case pursuant to Section 2(c)(2)(D) of the Act, as amended by the Dodd-Frank Act, 7 U.S.C. § 2(c)(2)(D).

9.      Venue properly lies with the Court pursuant to Section 6c(e) of the Act, because Defendants transact business in this District and certain transactions, acts, practices, and business alleged in this Complaint occurred, are occurring, and/or are about to occur within this District.

### III.      PARTIES

10.      Plaintiff **United States Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with administering and enforcing the Act and the Commission Regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.* (2012).

11.      This Complaint alleges activities by three types of entities that work together to offer and execute the illegal transactions at issue in this Complaint: Hunter Wise, which executes and confirms the execution of the transactions; Lloyd's Commodities, which serves as an intermediary between Hunter Wise and approximately thirty telemarketing firms based in Florida by accepting orders and relaying them to Hunter Wise; and four telemarketing firms (referred to as the "Dealer Defendants") in the Hunter Wise network that solicit retail customers.

**A.  The Hunter Wise Defendants**

12.      Defendant **Hunter Wise Commodities, LLC** was formed as a California company in July 2007 and has been registered as a Nevada company since October 2010.  It maintains business addresses in Las Vegas, Nevada and Irvine, California.  Hunter Wise Commodities, LLC holds itself out as "a physical commodity trading company, wholesaler, market maker, back-office support service provider, and finance company" that offers off-exchange financed commodity trading in physical metals.

13.     Hunter Wise Commodities, LLC has several wholly owned subsidiaries, including: **Hunter Wise Credit, LLC** (a Nevada registered LLC), **Hunter Wise Trading, LLC** (a Nevada registered LLC) and **Hunter Wise Services, LLC** (a California registered LLC). Together, these companies operate as a common enterprise under common ownership and control, and are referred to in this complaint collectively as Hunter Wise.  Hunter Wise has never been registered with the Commission in any capacity.

14.     Defendants **Harold Edward Martin** and **Fred Jager** are the two principal owners of Hunter Wise.  Jager resides in Laguna Niguel, California, and Martin resides in Las Vegas, Nevada.  Jager is the Chief Executive Officer of Hunter Wise.  Martin is the President and Chief Operating Officer of Hunter Wise.  Martin and Jager control the operations of Hunter Wise, including executing contracts on behalf of Hunter Wise, controlling its bank accounts, and making hiring and firing decisions.

**B.  The Lloyds Commodities Defendants**

15.     Defendant **Lloyds Commodities, LLC** ("Lloyds Commodities") is a Florida limited liability company with its principal place of business at 4880 Donald Ross Road, Suite 225, Palm Beach Gardens, Florida 33418.  During the relevant period, Lloyds Commodities functioned as an intermediary between Hunter Wise and approximately thirty telemarketing firms, most of which were located in southern Florida.

16.     Lloyds Commodities has several corporate affiliates which operate as a common enterprise under common ownership and control, and are referred to in this complaint collectively as Lloyds Commodities.  These affiliates include Defendant **Lloyds Commodities Credit Company LLC**, a Nevada limited liability company with a business address of 4966 South Rainbow Boulevard, Suite 110, Las Vegas, Nevada 89118; and Defendant **Lloyds**

**Services, LLC,** a Florida limited liability company with its principal office at 4880 Donald Ross Road, Suite 225, Palm Beach Gardens, Florida 33418.

17.     Defendants **James Burbage** ("Burbage") and **Frank Gaudino** ("Gaudino") own Lloyds Commodities, and direct and control its operations.  Gaudino and Burbage are identified as the Managers of Lloyds Commodities on its 2011 annual report filed with the state of Florida.  Guadino and Burbage sign contracts on behalf of Lloyds Commodities.  Burbage identifies himself as the President of Lloyds Commodities on contracts executed on behalf of the company.  Gaudino and Burbage are authorized signatories on the Lloyds Commodities bank accounts.  Gaudino and Burbage make hiring and firing decisions for Lloyds Commodities.  Guadino resides in Palm Beach Gardens, Florida.  Burbage resides in Santa Monica, California.

**C.  The Dealer Defendants**

18.     Defendant **C.D. Hopkins Financial, LLC d/b/a C.D. Hopkins Metals Division** ("CD Hopkins") is a telemarketing firm that solicited retail customers to execute retail commodity transactions with Hunter Wise through Lloyds Commodities.  CD Hopkins was organized as a California limited liability company which had offices in in West Palm Beach, Florida and Los Angeles, California.  CD Hopkins operated between July 2011 and May 2012, when it transferred all of its customer accounts to Defendant Blackstone Metals Group, LLC.

19.     Defendant **Chadewick Hopkins** ("Chad Hopkins") was the sole member of CD Hopkins.  Chad Hopkins owned, directed and controlled the operations of CD Hopkins.  He controlled the CD Hopkins bank accounts, made hiring and firing decisions for the company, and had control over the content of the CD Hopkins website.  On a daily basis, he personally performed market research, reviewed customer account activity, discussed customer performance with CD Hopkins staff, and monitored his staff's phone communications with customers.  Chad Hopkins resides in California.

20.     Defendant **Hard Asset Lending Group, LLC** ("Hard Asset") is a corporate affiliate of CD Hopkins and operated as a part of the same common enterprise.  Chad Hopkins is the sole member and manager of Hard Asset.  Hard Asset is a Florida limited liability company with its principal office located at 80 Southwest 8th Street, 20th Floor, Miami, Florida, 33130.  Hard Asset purportedly made loans to customers of CD Hopkins for the purchase of physical metals on a financed basis.  Chad Hopkins received payments for commissions, fees and mark ups on the price of metals sold to CD Hopkins customers from Lloyds Commodities in a bank account in the name of Hard Asset.

21.     Defendant **Blackstone Metals Group, LLC** ("Blackstone") is a telemarketing firm that solicits retail customers to execute retail commodity transactions with Hunter Wise through Lloyds Commodities.  Blackstone is a Florida limited liability company with its principal address at 801 Northpoint Parkway, Suite 75, West Palm Beach, Florida 33407.

22.     Defendant **Baris Keser** ("Keser") is the managing member of Blackstone.  Keser owned, directed and controlled the operations of Blackstone during the relevant period.  Keser controlled the bank accounts of Blackstone.  Keser is responsible for paying Blackstone's employees and contractors, and he made hiring and firing decisions for Blackstone.  Keser either personally approved or authored the content of Blackstone's website, and he approved all of Blackstone's promotional materials.  Keser also runs the Compliance Department for Blackstone.  Keser resides in West Palm Beach, Florida.

23.     Defendant **Newbridge Alliance, Inc.** ("Newbridge") is a telemarketing firm that solicits retail customers to execute retail commodity transactions with Hunter Wise through Lloyds Commodities.  Its office is located at 2161 Palm Beach Lakes, West Palm Beach, Florida.

24.     Defendant **John King** ("King") is the sole member and manager of Newbridge. King had sole control over Newbridge's bank accounts.  King made hiring and firing decisions for Newbridge.  King administers and is responsible for the content of the Newbridge website. King is also responsible for compliance functions at Newbridge, including creating compliance policies.  King resides in West Palm Beach, Florida.

25.     Defendant **United States Capital Trust, LLC** ("USCT") is a telemarketing firm that solicits retail customers to execute retail commodity transactions with Hunter Wise through Lloyd's Commodities.  USCT is a Florida limited liability company with is principal address at 660 Federal Highway, Pompano Beach, Florida.

26.     Defendant **David A. Moore** ("Moore") is the managing member of USCT. Moore owned, directed and controlled the operations of USCT during the relevant period. Moore runs the day to day operations of USCT, including general supervision of the firm's operations and sales solicitations.  He personally sends out information to customers using the email address: info@uscaptrust.com.  Moore is the compliance department at USCT.  Moore controlled the bank accounts of USCT.  Moore made hiring and firing decisions for USCT. Moore created and had control over the content on USCT's website.  Moore resides in Staten Island, New York.

## IV.     STATUTORY BACKGROUND

27.     Section 2(c)(2)(D) of the Act, as amended by the Dodd-Frank Act, 7 U.S.C. § 2(c)(2)(D), applies to "any agreement, contract, or transaction in any commodity" that is entered into with, or offered to, a non-eligible contract participant ("ECP") "on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis," with respect to conduct occurring on or after July 16, 2011, subject to certain exceptions not applicable here.  Such retail commodity

transactions are subject to Sections 4(a), 4(b), and 4b of the Act, 7 U.S.C. §§ 6(a), 6(b), 6b, "as if" they are a contract of sale of a commodity for future delivery.  7 U.S.C. § 2(c)(2)(D)(iii).

28.     The Act defines an ECP, in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual enters into the transaction to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual.  7 U.S.C. § 1a(18)(xi).

29.     Section 4(a) of the Act, 7 U.S.C. § 6(a), in relevant part, makes it unlawful for any person to offer to enter into, execute, confirm the execution of, or conduct any office or business anywhere in the United States for the purpose of soliciting, accepting any order for, or otherwise dealing in any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery unless the transaction is conducted on or subject to the rules of a board of trade that has been designated or registered by the Commission as a contract market.

30.     Section 4b(a)(2) of the Act, 7 U.S.C. § 6(a)(2), in relevant part, makes it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery that is made, or to be made, for, on behalf of, or with any other person, other than on or subject to the rules of a designated contract market:  (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement, or willfully to enter or cause to be entered for the other person any false record; or (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contact for, on behalf of, or with the other person.

V.      FACTS

**A.  The Defendants' Illegal Retail Commodity Transactions**

     **i.     Overview of the Defendants' Retail Commodity Transactions**

     31.    Defendants offer retail customers two types of transactions: (1) the purchase or sale of physical metals such as coins and bars after full payment for actual delivery, and (2) off-exchange trading of gold, silver, platinum, palladium and copper on a leveraged, margined or financed basis ("Retail Commodity Transactions") in which a retail customer purportedly purchases physical commodities and pays only a portion of the purchase price.  Retail Commodity Transactions constitute the vast majority of Defendants' business.  It is only Defendants' Retail Commodity Transactions that are at issue in this complaint.

     32.    The Dealer Defendants' marketing materials and websites represent that: (1) retail customers can purchase physical commodities, including gold, silver, copper, platinum, and palladium, by paying as little as 20-to-25% of the purchase price; (2) the Dealer Defendants will lend the customer the remaining portion of the purchase price and charge the customer interest on the loan; (3) the customer receives title to the physical commodity after the purchase; and (4) the Dealer Defendants will store the physical commodities at an independent depository on the customer's behalf.

     33.    After depositing funds with the Dealer Defendants, customers can place either long (buy) or short (sell) trades to speculate on the price movement of metals.  Customers are charged a commission (up to 38% of the funds sent to Defendants), a price spread (a 3-5% mark-up or mark-down from the current price of the metal), interest on the purported loan (at an annual rate of approximately 9.5%) and other fees (such as a "service fee" of approximately 7% annually on the total market value of the account) until the long or short trading position is offset.

-10-

34.     The retail customer's equity increases or decreases as prices of metals fluctuate, while also subject to depletion on a daily basis by interest and service fees.  When a customer's equity falls below 15% of the value of the total trading position, the customer receives a margin call, requiring the customer to deposit additional funds in order to maintain the trading position.  If the customer's equity drops to 9%, any open trading positions are liquidated.

ii.     **CD Hopkins, Blackstone, Newbridge and USCT Solicit Customers for Illegal Retail Commodity Transactions**

35.     The four Dealer Defendants contact prospective customers by telephone and through their websites and market Retail Commodity Transactions as a safe, secure and profitable investment.

36.     After the Dealer Defendants convince a retail customer to open an account, they then solicit the customer to enter into a Retail Commodity Transaction.  In turn, once the customer agrees to place an order to purchase or sell metals, the Dealer Defendants contact Hunter Wise through Lloyds Commodities to enter a trade for the customer.

37.     The Dealer Defendants collect the customer's funds, and send them to Hunter Wise through Lloyds Commodities.  The Dealer Defendants receive commissions from Hunter Wise and Lloyds Commodities based on the dollar value of the transactions entered for customers.  Hunter Wise also compensates the Dealer Defendants with a portion of the price spread, interest, and service fees charged to retail customers for Retail Commodity Transactions.

38.     The Dealer Defendants never have possession of, or title to, any physical metals in connection with Retail Commodity Transactions.

39.     The principals of the four Dealer Defendants manage and run the day-to-day operations of the firms, including communicating with Lloyds Commodities about Retail Commodity Transactions.  In addition, Chad Hopkins, King, and Moore each signed contracts

with Lloyds Commodities relating to the Retail Commodity Transactions on behalf of CD Hopkins, Newbridge, and USCT respectively.  Keser was responsible for managing Blackstone's relationship with Lloyds Commodities.

### iii.   Lloyds Commodities Accepts Orders for Illegal Retail Commodity Transactions

40.     Lloyds Commodities holds itself out to the public on its website as a "leading wholesaler of precious metals" that specializes in the "leveraging of precious metals such as gold, silver, platinum, palladium and copper."  In fact, Lloyds Commodities functions principally to accept orders and retail customer funds for Retail Commodity Transactions from the Dealer Defendants and other similar telemarketing firms, and to transmit the orders and funds to Hunter Wise.  Hunter Wise and Lloyds Commodities refer to these telemarketing firms as "dealers."

41.     Lloyds Commodities enters into contracts with dealers, including the Dealer Defendants, pursuant to which it claims to provide services including the purchase, sale and delivery of physical precious metals, financing, and data processing services.  In reality, Lloyds Commodities is just an intermediary between these dealers and Hunter Wise, which executes, records and tracks the Retail Commodity Transactions.

42.     Lloyds Commodities is compensated by Hunter Wise based on a percentage of the price spread, interest and service fees charged to retail customers for transactions solicited by Lloyds Commodities or the dealers including the Dealer Defendants that funnel Retail Commodity Transactions through Lloyds to Hunter Wise.

43.     Lloyds Commodities never has possession of, or title to, any physical metals in connection with Retail Commodity Transactions.

44.     Burbage signed contracts on behalf of Lloyds Commodities with Hunter Wise relating to the Retail Commodity Transactions.  Gaudino manages the day-to-day communications between Lloyds Commodities and Hunter Wise, frequently accepting orders for

Retail Commodity Transactions by telephone and relaying these orders by telephone to Hunter Wise.

### iv.   Hunter Wise Executes Illegal Retail Commodity Transactions

45.    Hunter Wise claims to supply physical metals to, and provide financing for, Retail Commodity Transactions marketed by dealers, including the Dealer Defendants.

46.    Hunter Wise does not actually buy, sell, loan, store, or transfer physical metals in connection with Retail Commodity Transactions.  Instead, Hunter Wise records and tracks customer orders and trading positions, and then manages its exposure to these retail customer trading positions by trading derivatives such as futures, forwards and rolling spot contracts in its own margin trading accounts.

47.    Hunter Wise allows retail customers to take "long" trading positions through purported purchases of metals, and "short" trading positions through what it calls "commodity loans."  When it receives an order from the Dealer Defendants and the necessary retail customer funds through Lloyds Commodities, Hunter Wise makes a book entry in a database reflecting the retail customer's transaction.

48.    Hunter Wise aggregates the funds it receives from Lloyds Commodities, the Dealer Defendants and similar intermediaries and telemarketing firms and deposits them in its own bank accounts.  Hunter Wise then deposits a portion of those funds in margin trading accounts in the name of Hunter Wise at one or more of the following: (1) A-Mark Precious Metals, Inc.; (2) Standard Bank Plc; (3) Natixis Commodity Markets Ltd.; (4) R.J. O'Brien; and (5) OANDA.  Either Martin, Jager, or both of them signed each of the trading account agreements with these firms on behalf of Hunter Wise.

49.    Hunter Wise does not have an inventory of physical metal that it sells or loans to customers in connection with Retail Commodity Transactions.  Hunter Wise does not pay in full

for the purchase of commodities through its margin trading accounts. Instead, Hunter Wise deposits funds with these trading institutions as margin in order to trade metals futures or forward contracts. Hunter Wise trades in its margin accounts to manage its exposure to customer orders.

50.     Hunter Wise's trading in its margin accounts does not involve the shipment, receipt or storage of physical metals. The trading firms with which Hunter Wise places its margin trades do not actually deliver any physical commodities to Hunter Wise.

51.     Hunter Wise does not own, possess, or have title to any metals as a result of its margin trades, and neither do Hunter Wise's customers.

52.     Hunter Wise does not actually deliver any physical commodities to any of its intermediaries (including but not limited to Lloyds Commodities), dealers (including but not limited to the Dealer Defendants), or any retail customers in connection with Retail Commodity Transactions.

**B.  Material Misrepresentations Made to Retail Customers**

    **i.     Misrepresentations about the Purchase and Delivery of Physical Metals**

53.     The Dealer Defendants misrepresent that they purchase, sell, loan, store and deliver physical precious metals in connection with Retail Commodity Transactions.

### 1.  <u>Misrepresentations on Websites</u>

54.     On their websites, after identifying themselves as retail dealers of physical precious metals and touting the value of including physical precious metals in investment portfolios, the Dealer Defendants falsely claim to purchase and store physical metals for customers in connection with Retail Commodity Transactions.

55.     The CD Hopkins website (www.cdhopkinsmetals.com) contained the following false statements about the purchase and storage of physical metals:

a.  "CD Hopkins offers high investment financing and secure storage at an independent depository."

b.  "Investment Security: When your purchase is financed or all cash for storage, your goods can be stored at an independent bank or depository on your behalf or you can take personal delivery at any time.  You will receive the title to your precious metals delivered to the depository, giving you ownership."

c.  "Delivery to an independent bank or depository is part of your financed or stored metal purchase."

d.  "You'll have actual ownership of your metal by receiving its legal title."

e.  "Metals held by the bank or depository will remain in your name until sold or until personal delivery is taken."

56.    The Blackstone website (www.blackstonemetals.com) contained the following false statements about the purchase and storage of physical metals:

a.  "Each client who chooses to participate in the financed metals program is provided a financed metal purchase receipt commodity transfer notice in their name as evidence of a legitimate transaction."

b.  "Am I buying a [*sic*] real gold or a certificate?  When you purchase your gold with Blackstone Metals, you will receive a commodity transfer notice and a receipt.  We will deliver the gold to your depository within 72 hours after the purchase is made."

c.  "If clients decide to purchase physical metal, they will receive a warehouse receipt from a Comex regulated establishment; verifying actually [*sic*] bullion has been purchased and is being kept in a precious metals storage facility."

d.  "Investors retain full ownership, and title is held in the client's name to eliminate all counterparty risk."

e.  "The bullion assets are 100% insured by Lloyds of London for replacement value."

f.  "Secured Third-Party Storage [is] [p]rovided by world-class professional vault operators with locations in London, New York, Salt Lake City, Zurich, Hong Kong and Dubai."

57.     Newbridge also misrepresented the existence of physical metals on its website

(www.newbridgealliance.com) and in promotional brochures sent to customers and prospective

customers:

    a.   "Store your precious metal at a federally regulated depository vault."

    b.   "Here's how it Works: You're [*sic*] financed or stored metal is delivered to
an independent bank or depository vault at which time you receive
confirmation of ownership."

    c.   "The amount of metal held by the bank or depository remains in accounted
for until it is sold or you take personal delivery."

    d.   "Furthermore when you trade with Newbridge Alliance you can rest assure
[*sic*] and sleep at night knowing that your metals are being stored safe and
sound."

    e.   "At Newbridge Alliance, our Financing Program allows you to deposit as
little as 25 percent of your purchase, giving you up to four times the
investment financing.  By using credit, the investor gains the ability to
multiply the effect of his or her investment dollars, while still owning the
actual physical metals."

58.     USCT also misrepresented the existence of physical metals on its website

(www.uscaptrust.com) and in promotional brochures sent to customers and prospective

customers:

    a.   "All metals are stored or delivered from internationally known and certified
depositories (such as Delaware Depository Service Company ) in the United
States."

    b.   "Your financed or stored metal is delivered to an independent bank or
depository."

    c.   "Receive the legal title to your metal, giving you actual ownership."

    d.   "Metals held by the bank or depository will remain in your name until it is
sold or you take personal delivery."

## 2.  **Misrepresentations in Account Agreements and Applications**

59.     In addition to the false representations on their websites, the Dealer Defendants falsely claim to sell, deliver and store physical metals in connection with Retail Commodity Transactions in their customer agreements and account applications.

60.     The Dealer Defendants generally require customers to enter into one or two account agreements at the outset of their relationship:  (1) a Customer Purchase & Sale Agreement or Account Application; and (2) a Customer Loan, Security & Storage Agreement.

61.     Pursuant to the Customer Purchase & Sale Agreement, Dealer Defendants CD Hopkins, Blackstone and Newbridge tell customers they are purchasing physical commodities "on credit with financing" provided by the dealer or its affiliate.  Specifically, CD Hopkins, Blackstone and Newbridge promise to deliver to its affiliate all of the commodities purchased by the customer within seven days of receiving the customer's payment of the required portion of the purchase price.  The agreement also provides that ownership of the commodities purchased by the customer "passes to Customer upon delivery to Customer, Customer's appointed designee, or to Bank [defined as "banks or depositories"] to be held for Customer.  Commodities transferred to Bank for Customer will be delivered as an undivided share of a fungible lot and held in safekeeping on a fungible basis with the commodities of other Bank Customers."

62.     The second agreement that Dealer Defendants CD Hopkins, Blackstone and Newbridge enter into with retail customers is the Customer Loan, Security & Storage Agreement.  It "set[s] forth the terms under which [the dealer's affiliate] will lend to Borrower, from time to time…sums of money to purchase physical commodities," which may include "delivery to a depository, costs, fees, storage, collateral, security interest, certain risks and costs associated with each loan transaction," in exchange for a "security interest" in "[a]ll commodities belonging to Borrower and held for Borrower" by the bailee of the dealer's affiliate, "either

directly or in other depositories."  The agreement further states that customers promise to pay interest and fees on the "sums" loaned.

63.     The Customer Loan, Security & Storage Agreement similarly provides that "[c]ommodities transferred to Bank [defined as the bailee of the dealer's affiliate] for Borrower will be delivered as an undivided share of a fungible lot and held in safekeeping on a fungible basis with the commodities of other Bank customers."  The Customer Loan, Security & Storage Agreement further specifies that "[u]pon delivery of commodities on behalf of Borrower to Bank, Borrower will receive a confirmation evidencing that such quantity of commodities has been delivered to the depository and is being and will continue to be held as an undivided share of the commodities so held by the depository, on the purchaser's behalf, free and clear of all liens and encumbrances, other than liens of [the dealer's affiliate]."

64.     The USCT Account Application similarly misrepresents to customers that they are purchasing and will own physical metals by discussing the "various methods of ownership of physical precious metals," by referencing "precious metals products which are also in the non-segregated depository facilities of the lending institution," and by stating that "each transaction made by the customer is a purchase or sale of Physical Metals product for immediate delivery and is not a Futures Contract, Option on a Futures Contract or Securities transaction."

65.     Between July 16, 2011 and the present, CD Hopkins, Blackstone, USCT and Newbridge, have entered into or executed Customer Purchase & Sale Agreements, Account Applications and/or Customer Loan, Security & Storage Agreements with retail customers.

66.     Throughout the time CD Hopkins, Blackstone, Newbridge and USCT entered into these agreements with their retail customers, they knew that they did not deliver commodities to

their affiliate, a bank, or a depository or lend funds to the customer, or they acted in reckless disregard for whether this information was true.

### 3.   Misrepresentations in "Transfer of Commodity" Notices

67.     Defendants continue to lie about the purchase, delivery and storage of physical metals in Retail Commodity Transactions throughout the course of their relationship with their retail customers.  Defendants falsely claim to "ship" or "receive" metals following each trade in what they call a "Transfer of Commodity" notice.

68.     The "Transfer of Commodity" notice is generated by Hunter Wise, and transmitted to retail customers by Hunter Wise directly by email, or indirectly by Lloyds Commodities and the Dealer Defendants by email or mail.

69.     Hunter Wise generates the Transfer of Commodity notices, customer account statements and trade confirmations on the letterhead of the dealers rather than on its own letterhead.  There is no indication on these documents that they are generated and in many cases sent directly to retail customers by Hunter Wise.

70.     The Transfer of Commodity notices sent by Defendants to retail customers include the following representations that mislead customers into believing that precious metals are being held for their account:

   a.   Product Received into your Account

   b.   Product Shipped out of your Account

   c.   [Dealer Defendant] hereby confirms that a depository ("Custodian") authorized by agreements referred to below has received custody of the goods and/or warehouse receipts therefore ("commodities") identified above.

   d.   You are hereby notified of delivery of commodities to the Custodian for your benefit.

   e.   The Custodian has notified [Dealer Defendant] that it will hold such commodities in accordance with the terms and conditions of [Dealer Defendant] Purchase and Sale Agreement….

    f.    The warehouse receipts held by the Custodian represent [Dealer Defendant] customer commodities stored by facilities authorized in the Loan and Security Agreement. Each warehouse receipt is subject to the specific terms and conditions of storage set forth therein.

    g.    The goods held by the Custodian represent [Dealer Defendant] customer commodities stored by facilities authorized in the Loan and Security Agreement. All such goods are subject to the specific terms and conditions of storage set forth therein.

    h.    The customer acknowledges that upon receipt of commodities for customer's account, Custodian will maintain collectively with the commodities held on behalf of all [Dealer Defendant] customers' physical inventories which are held at one or more of several depositories. The Custodian reserves the right at its own expense to move the commodity from one storage facility to another. The Custodian also may at its own direction order [Dealer Defendant] to transfer custody of your commodities to another Custodian provided such Custodian is authorized by the aforementioned Agreements and [Dealer Defendant] is notified of such transfer.

    i.    Delivery of Commodities: You are hereby notified that the Custodian has released the commodities identified above which it has held for you to [Dealer Defendant] pursuant to your order for delivery or transfer of these commodities.

71.    The Transfer of Commodity notices sent to Newbridge customers contained an additional misrepresentation that customers held title to the metals purchased and sold in Retail Commodity Transactions:

    a.    Newbridge Alliance hereby confirms that a depository ("Custodian") authorized by agreements referred to below has received custody of the goods and/or warehouse receipts therefore ("commodities") identified above and to which you hold title.

72.    Each of these statements included in Transfer of Commodity notices is false or materially misleading. No physical metal is purchased, shipped, stored or delivered by any of the Defendants in connection with Retail Commodity Transactions. Retail customers do not own or hold title to any physical metal.

**ii.    Misrepresentations about the Purported Loan**

73.    The Defendants also falsely claim that they loan funds to customers for up to 80 percent of the value of physical metals they claim to purchase.

74.     The Defendants make these misrepresentations to customers in their account applications and agreements, trade confirmations, and account statements.  For example, the retail customer monthly account statements generated by Hunter Wise and transmitted to retail customers by Hunter Wise or the Dealer Defendants tell customers they have a "loan balance." The trade confirmations generated by Hunter Wise and transmitted to retail customers by Hunter Wise or the Dealer Defendants include an "interest" charge for a "loan" for the amounts the customer supposedly "borrows."

75.     None of the Defendants disbursed any funds for the so-called "loan" or "financed" portion of Retail Commodity Transactions.  Instead, Hunter Wise simply makes a book entry in its database corresponding to the purported loan and charges the retail customer interest and a service fee on this amount.

76.     Hunter Wise debited customer accounts approximately 9.5% per annum for "interest" on the purported loan balance.  Hunter Wise paid portions of the interest fee payments charged to retail customer accounts to Lloyds and the Dealer Defendants.

77.     Between January 1, 2010 and March 31, 2012, Hunter Wise charged customers $5,533,401.81 for interest on the purported loans to retail customers in connection with Retail Commodity Transactions.

**iii.     Omissions Relating to Profit and Risk**

78.     When soliciting retail customers through their marketing materials and websites, the Dealer Defendants tout the safety and security and limited risk of Retail Commodity Transactions.  In fact, the vast majority of these defendants' customers lost money in these transactions.

79.     All of the Defendants knew or acted with reckless disregard for the fact that the vast majority of their customers lose and have lost money in connection with Retail Commodity

Transactions.  However, the Dealer Defendants failed to disclose those losses in soliciting new accounts and orders for precious metals.

80.     Hunter Wise maintains account and trading records for all retail customer transactions, and provides all other Defendants with access to this information through its web "portal."  Defendants have access to reports reflecting the performance of retail customer accounts at their fingertips on a daily basis.

81.     Based on a report generated by Hunter Wise, between July 7, 2011 and March 31, 2012, over 98% of customers who engaged in Retail Commodity Transactions with CD Hopkins during that time period lost money.  The net loss suffered by CD Hopkins customers who engaged in Retail Commodity Transactions during this time period was $2,406,731.

82.     Based on a report generated by Hunter Wise, between July 2011 and March 31, 2012, over 77 % of Blackstone customers lost money in Retail Commodity Transactions.  The net loss suffered by Blackstone customers during this time period was $605,839.19.

83.     Based on reports generated by Hunter Wise, between October 21, 2010 and March 31, 2012, over 97% of Newbridge customers lost money in Retail Commodity Transactions.  The net loss suffered by Newbridge customers during this time period was $452,924.66.

84.     Based on a report generated by Hunter Wise, between September 27, 2011 and March 31, 2012, 100% of USCT customers lost money in Retail Commodity Transactions.  The net loss suffered by USCT customers during this time period was $460,411.49.

85.     Each of the Defendants failed to disclose these massive losses to customers and prospective customers when soliciting them to open accounts and when entering into, executing, and confirming the execution of Retail Commodity Transactions.

**C. Hunter Wise and Lloyds Commodities Aided and Abetted the Dealer Defendants**

86.     Defendants Hunter Wise and Lloyds Commodities provide the foundation that allows the Dealer Defendants to offer Retail Commodity Transactions to customers.

87.     Hunter Wise records and stores all customer funding and trading activity in a database.  Hunter Wise provides Lloyds Commodities, the Dealer Defendants, and retail customers with various levels of access to account information in the Hunter Wise database through web access that it calls the "portal."

88.     Hunter Wise creates usernames and passwords to allow retail customers to log in to the portal to view their account information.  Hunter Wise provides internet links to its Lloyds Commodities and the Dealer Defendants to allow retail customers to log in to the Hunter Wise portal through their individual websites.

89.     For example, the Dealer Defendants' websites contain a link entitled "Client Login." When a retail customer enters a username and password and logs in, the retail customer is redirected to a website controlled and operated by Hunter Wise including the domain "clientsportals" in the web address.  The domain "clientsportals.com" is owned by Beacon Hill Partners, LLC, which is in turn owned by Defendant Martin.

90.     Hunter Wise also allows its intermediaries and dealers access to reports and data about retail customers' accounts, including, but not limited to: (a) Equity Runs; (b) Firm Volume Reports; (c) Salesman Volume Reports; (d) Commission Listings; (e) Active Salesman Lists; and (f) Revenue Reports.

91.     The Hunter Wise database records and stores all retail customer transactional information.  It also calculates daily interest and service fees on each retail customer's account while monitoring fluctuations in market value.  All account statements, trade confirmations, and

Transfer of Commodity forms sent to retail customers are generated by Hunter Wise and stored on its portal.

92.     Hunter Wise provides its intermediaries, including Lloyds Commodities, and dealers with standard form contracts and documents to use in their operations or provide to retail customers, including: (a) Restricted State List; (b) Corporate Resolution; (c) Limited Power of Attorney; (d) Revocation of Power of Attorney; (e) Compliance Manual; (f) Anti Money Laundering Policies and Procedures; (g) Order Taping Scripts; (h) Customer Application & Signature Page; (i) Customer Loan Security & Storage Agreement; (j) Customer Purchase & Sale Agreement; (k) Truth-In-Lending Statement; (l) Risk Disclosure Statement; (m) Supplemental Risk Disclosure; and (n) Statement of Estimated Costs and Break Even.

93.     Lloyds Commodities provides these same form documents to dealers including the Dealer Defendants.

94.     Hunter Wise also provided Lloyds Commodities with sample telemarketing scripts, which were in turn provided to dealers including CD Hopkins.  These scripts provide guidance to solicitors on how to employ sales tactics to convince retail customers to engage in Retail Commodity Transactions.

95.     Hunter Wise also provides its intermediaries and dealers, including Lloyds Commodities and the Dealer Defendants, with training videos that explain various aspects of Retail Commodity Transactions.  These training videos include: (a) Course Introduction; (b) Available Products; (c) Basic Terminology and Fundamental Concepts; (d) Overview of the Leverage Transaction / Fully-Paid vs. Leverage Comparison; (e) How Much Can I Buy on Leverage with $X? / Calculating the Degree of Leverage; (f) Leverage Transaction Costs / Estimating the Breakeven Point; (g) Estimating the Equity Call and Force Liquidation Levels on

Long Positions; (h) Adjusting the Equity Call Level to Fit the Client's Risk Tolerance; (i) Estimating the Equity Call Amount on a Long Position / Minimum Liquidation Calculation; (j) Leverage Transaction Risk Analysis / Non-Recourse Loan; and (k) Overview of Commodity Loan ("Short") Transactions.

96.     On March 22, 2010, Lloyds Commodities and Hunter Wise entered into a contract which recognized that Lloyds Commodities contracts with retail dealers to provide services "substantially identical" to those offered by Hunter Wise and that those services would be "outsourced by Lloyds to Hunter Wise." Those services were "trading, financing and data processing."

97.     Burbage signed the contract as Chief Executive Officer of Lloyds Commodities and initialed the paragraphs that described the services that Hunter Wise provided.

98.     Notably, the contract did not provide for the purchase and storage of physical metal.

99.     Nevertheless, Lloyds Commodities used a contract with its dealers, based upon the template contracts that Hunter Wise provided to Lloyds Commodities, which represented that the services it provided included the purchase, sale and delivery of physical precious metals. Specifically the contract between Lloyds Commodities and its dealers, including the Dealer Defendants, states that:

      a.  The purpose of the agreement was to establish an account for Dealer with Lloyds Commodities "for the purchase and sale of physical commodities".

      b.  "Upon receipt of good funds in partial payment equal to the minimum down payment required by Credit (Lloyds Asset Lending, LLC) for commodities purchased on credit, Trading (Lloyds Commodities, LLC) shall deliver to

Depository within seven (7) days, or such lesser period as required by law, all of the commodities purchased to be held for Dealer."

    c.  "Ownership of Commodities purchased by dealer, subject to any security interests therein shall pass to Dealer upon delivery to…Depository to be held for Dealer."

    d.  Commodities transferred to Depository for Dealer will be delivered as an undivided share of a fungible lot and help in safekeeping on a fungible basis with commodities of other Depository Dealers."

100.    Lloyds Commodities gave this contract to its client dealers knowing that the above referenced clauses were false because it had not purchased or delivered any precious metals.

101.    Once Lloyds Commodities recruited a retail dealer, it arranged for it to have access to the fraudulent Hunter Wise documents, including form contracts, trade confirmations, account statements, and Transfer of Commodity notices referred to in paragraphs 59-77 of this Complaint.

102.    Under the terms of the agreement between Hunter Wise and Lloyds Commodities, Lloyds Commodities was required to use Hunter Wise exclusively for the "trading, financing and data processing" needs of itself and its dealers until January 5, 2012. On information and belief, Lloyds did not have contracts with any other suppliers to obtain precious metals for its dealers who sold precious metals on a leveraged or financed basis between March 22, 2010 and the present.

103.    In addition, in conversations with retail dealers, Gaudino misrepresented the nature of Lloyds Commodities' Retail Commodity Transactions.  For example, in a taped call on

October 27, 2011, Gaudino told a prospective dealer that Lloyds Commodities does not use "OTC contracts" which he admitted is "now illegal." He stated that Lloyds Commodities did business differently: "metal is actually purchased . . . metal is actually transferred into people's names . . . it's not somebody going out and buying forward contracts . . ." At the time of this conversation, Gaudino knew that statement was false or acted with reckless disregard for its truth.

104.     Burbage also directly works with dealers to ensure their success. In particular, Burbage maintained a business address in the office of CD Hopkins. Burbage communicated with Chad Hopkins daily in person and by phone about how to manage the operations of CD Hopkins.

105.     Both Lloyds Commodities and Hunter Wise provided critical assistance to the Dealer Defendants that enabled them to offer Retail Commodity Transactions. Lloyds Commodities also provided Hunter Wise with critical assistance that enabled Hunter Wise to execute Retail Commodity Transactions and to defraud customers in doing so.

## V.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND THE COMMISSION'S REGULATIONS

### COUNT ONE
### VIOLATIONS OF SECTION 4(a) OF THE ACT:
### ILLEGAL, OFF-EXCHANGE TRANSACTIONS
### AGAINST ALL DEFENDANTS

106.     Paragraphs 1 through 105 are re-alleged and incorporated herein.

107.     Between July 16, 2011 and the present, the Retail Commodity Transactions described in this Complaint were offered and entered into (a) on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or

counterparty on a similar basis, and (b) with persons who are not eligible contract participants or eligible commercial entities as defined by the Commodity Exchange Act.

108.    The commodities that are the subjects of the Retail Commodity Transactions are commodities as defined by Section 1a(4) of the Act, 7 U.S.C. § 1a(4) (2012).

109.    During the relevant period, the Retail Commodity Transactions were not made or conducted on, or subject to, the rules of any board of trade, exchange or contract market.

110.    During the relevant period, all Defendants, individually and/or through their employees and agents, violated and/or are violating Section 4(a) of the Act by offering to enter into, entering into, executing, confirming the execution of, or conducting an office or business in the United States for the purpose of soliciting or accepting orders for, or otherwise dealing in, transactions in, or in connection with, Retail Commodity Transactions.

111.    Each offer to enter into, entrance into, execution, confirmation, solicitation or acceptance of an order for a Retail Commodity Transaction made during the relevant time period is alleged as a separate and distinct violation of Section 4(a) of the Act.

112.    The acts, omissions and failures of the officials, agents, or persons acting for defendants Hunter Wise, Lloyds Commodities, CD Hopkins, Blackstone, Newbridge and USCT described in this Complaint occurred within the scope of their employment, agency, or office with these entity defendants, and are deemed to be the acts, omissions and failures of these entity defendants under  Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (2011) and Section 1.2 of the Regulations, 17 C.F.R. § 1.2 (2012).

113.    Martin and Jager failed to act in good faith or knowingly induced the acts constituting the violations of Hunter Wise described in this Count.  Pursuant to Section 13(b) of

the Act, therefore, Martin and Jager are liable as Controlling Persons for the violations by Hunter Wise of Section 4(a) of the Act.

114.    Burbage and Gaudino failed to act in good faith or knowingly induced the acts constituting the violations of Lloyds Commodities described in this Count.  Pursuant to Section 13(b) of the Act, therefore, Burbage and Gaudino are liable as Controlling Persons for the violations by Lloyds Commodities of Section 4(a) of the Act.

115.    Chad Hopkins failed to act in good faith or knowingly induced the acts constituting the violations of CD Hopkins described in this Count.  Pursuant to Section 13(b) of the Act, therefore, Chad Hopkins is liable as a Controlling Person for the violations by CD Hopkins of Section 4(a) of the Act.

116.    Keser failed to act in good faith or knowingly induced the acts constituting the violations of Blackstone described in this Count.  Pursuant to Section 13(b) of the Act, therefore, Keser is liable as a Controlling Person for the violations by Blackstone of Section 4(a) of the Act.

117.    King failed to act in good faith or knowingly induced the acts constituting the violations of Newbridge described in this Count.  Pursuant to Section 13(b) of the Act, therefore, King is liable as a Controlling Person for the violations by Newbridge of Section 4(a) of the Act.

118.    Moore failed to act in good faith or knowingly induced the acts constituting the violations of USCT described in this Count.  Pursuant to Section 13(b) of the Act, therefore, Moore is liable as a Controlling Person for the violations by USCT of Section 4(a) of the Act.

**COUNT TWO**
**VIOLATIONS OF SECTION 4b OF THE ACT**
**AGAINST HUNTER WISE, MARTIN AND JAGER**

119.     Paragraphs 1 through 118 of this Complaint are realleged and incorporated herein by reference.

120.     Defendants Hunter Wise Commodities, LLC, Hunter Wise Services, LLC, Hunter Wise Credit, LLC, Hunter Wise Trading, LLC (together acting as a common enterprise and collectively referenced as "Hunter Wise"), through their agents and employees, cheated or defrauded, or attempted to cheat or defraud, retail customers in or in connection with Retail Commodity Transactions.

121.     Hunter Wise did so by misrepresenting and omitting facts that are material to the investment decisions of customers and prospective customers in documents generated and sent to retail customers, including the Transfer of Commodity Notices, trade confirmations, and account statements described in paragraphs 67-77.

122.     Hunter Wise misrepresented that it purchased, sold, loaned, stored and delivered physical metals in Retail Commodity Transactions.

123.     Hunter Wise misrepresented that it loaned funds for the purchase and sale of physical metals in Retail Commodity Transactions.

124.     Hunter Wise made these representations knowingly or with a reckless disregard to their truth or falsity.

125.     Each material misrepresentation or omission made during the relevant period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4b(a) of the Act.

126.     The acts, omissions and failures of Martin, Jager and other officials, agents or persons acting for Hunter Wise described in this Complaint occurred within the scope of their employment, agency, or office with Hunter Wise, and are deemed to be the acts, omissions and failures of Hunter Wise by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (2011) and Section 1.2 of the Regulations, 17 C.F.R. § 1.2 (2012).

127.     Martin and Jager failed to act in good faith or knowingly induced the acts constituting the violations of Hunter Wise described in this Count.  Pursuant to Section 13(b) of the Act, therefore, Martin and Jager are liable as Controlling Persons for the violations by Hunter Wise of Section 4b(a) of the Act.

**COUNT THREE**
**VIOLATIONS OF SECTION 6(c)(1) OF THE ACT AND RULE 180.1**
**AGAINST HUNTER WISE, MARTIN AND JAGER**

128.     Paragraphs 1 through 118 of this Complaint are realleged and incorporated herein by reference.

129.     Defendants Hunter Wise Commodities, LLC, Hunter Wise Services, LLC, Hunter Wise Credit, LLC, Hunter Wise Trading, LLC (together acting as a common enterprise and collectively referenced as "Hunter Wise"), through their agents and employees, directly and indirectly, employed a scheme or artifice to defraud in connection with contracts of sale of commodities in interstate commerce.

130.     Hunter Wise created and perpetuated a scheme to defraud customers into believing that Hunter Wise, Lloyds Commodities and the Dealer Defendants CD Hopkins, Blackstone, Newbridge and USCT purchased and stored physical precious metals for or on behalf of retail customers.

131.    Hunter Wise also engaged in misrepresentations and omissions concerning facts that are material to the investment decisions of customers and prospective customers. Specifically, Hunter Wise generated each of the Transfer of Commodity notices, trade confirmations, and account statements sent to retail customers in connection with the Retail Commodity Transactions.  Each of these documents contains the material misrepresentations and omissions identified in paragraphs 67-77.

132.    Hunter Wise made these representations and omissions knowingly or with a reckless disregard for their truth or falsity.

133.    The acts, practices, and the course of business of Hunter Wise as described in Paragraphs 31-105 operated as a fraud upon the retail customers of all of the Defendants.

134.    Each material misrepresentation or omission made between August 15, 2011 and the present, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 6(c)(1) of the Act and Rule 180.1.

135.    The acts, omissions and failures of Martin, Jager and other officials, agents or persons acting for Hunter Wise described in this Complaint occurred within the scope of their employment, agency, or office with Hunter Wise, and are deemed to be the acts, omissions and failures of Hunter Wise by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (2011) and Section 1.2 of the Regulations, 17 C.F.R. § 1.2 (2012).

136.    Martin and Jager failed to act in good faith or knowingly induced the acts constituting the violations of Hunter Wise described in this Count.  Pursuant to Section 13(b) of the Act, therefore, Martin and Jager are liable as Controlling Persons for the violations by Hunter Wise of Section 6(c)(1) of the Act and Rule 180.1.

**COUNT FOUR**
**VIOLATIONS OF SECTION 4b OF THE ACT - FRAUD**
**AGAINST CD HOPKINS, HARD ASSET AND CHAD HOPKINS**

137.    Paragraphs 1 through 118 of this Complaint are realleged and incorporated herein by reference.

138.    Defendants C.D. Hopkins Financial, LLC and Hard Asset Lending, LLC (acting as a common enterprise and together referred to as "CD Hopkins"), through their agents and employees, cheated or defrauded, or attempted to cheat or defraud, retail customers in or in connection with Retail Commodity Transactions.

139.    CD Hopkins knowingly or recklessly made misrepresentations and omissions concerning facts that are material to the investment decisions of its customers and prospective customers.  Specifically, CD Hopkins made the material misrepresentations on its website as set forth in paragraphs 53-55, and in account statements and documents sent to customers as set forth in paragraphs 59-74.  In addition, CD Hopkins failed to disclose information material to the investment decisions of its customers and prospective customers as set forth in paragraphs 78, 79, 81 and 85.

140.    The acts, omissions and failures of Chad Hopkins and other officials, agents or persons acting for CD Hopkins described in this Complaint occurred within the scope of their employment, agency, or office with CD Hopkins, and are deemed to be the acts, omissions and failures of CD Hopkins by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (2011) and Section 1.2 of the Regulations, 17 C.F.R. § 1.2 (2012).

141.    Each material misrepresentation or omission made during the relevant period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4b(a) of the Act.

142.    Chad Hopkins failed to act in good faith or knowingly induced the acts constituting the violations described in this Count.  Pursuant to Section 13(b) of the Act, therefore, Chad Hopkins is liable as a Controlling Person for the violations by CD Hopkins of Section 4b(a) of the Act.

## COUNT FIVE
## VIOLATIONS OF SECTION 6(c)(1) OF THE ACT AND RULE 180.1
## AGAINST CD HOPKINS, HARD ASSET AND CHAD HOPKINS

143.    Paragraphs 1 through 118 of this Complaint are realleged and incorporated herein by reference.

144.    Defendants C.D. Hopkins Financial, LLC and Hard Asset Lending, LLC (together acting as a common enterprise and referred to as "CD Hopkins"), through their agents and employees, knowingly or recklessly used or employed a manipulative device, scheme or artifice to defraud in connection with contracts of sale of commodities in interstate commerce.

145.    CD Hopkins knowingly or recklessly made untrue or misleading statements of material facts, or omitted to state material facts necessary in order to make the statements made not untrue or misleading, in connection with contracts of sale of commodities in interstate commerce.

146.    Specifically, CD Hopkins made the misleading statements of material facts on its website as set forth in paragraphs 53-55, and in account statements and documents sent to customers as set forth in paragraphs 59-74.  In addition, CD Hopkins failed to disclose information material to the investment decisions of its customers and prospective customers as set forth in paragraphs 78, 79, 81 and 85.

147.     CD Hopkins engaged, or attempted to engage, in acts, practices, and a course of business, which operated or which would operate as a fraud or deceit upon its customers and prospective customers.

148.     The acts, omissions and failures of Chad Hopkins and other officials, agents or persons acting for CD Hopkins described in this Complaint occurred within the scope of their employment, agency, or office with CD Hopkins, and are deemed to be the acts, omissions and failures of CD Hopkins by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (2011) and Section 1.2 of the Regulations, 17 C.F.R. § 1.2 (2012).

149.     Each material misrepresentation or omission made between August 15, 2011 and the present, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 6(c)(1) of the Act and Rule 180.1.

150.     Chad Hopkins failed to act in good faith or knowingly induced the acts constituting the violations described in this Count.  Pursuant to Section 13(b) of the Act, therefore, Chad Hopkins is liable as a Controlling Person for the violations by CD Hopkins of Section 6(c)(1) of the Act and Rule 180.1.

### COUNT SIX
### VIOLATIONS OF SECTION 4b OF THE ACT
### AGAINST BLACKSTONE AND KESER

151.     Paragraphs 1 through 118 of this Complaint are realleged and incorporated herein by reference.

152.     Defendant Blackstone Metals Group, LLC ("Blackstone"), through its agents and employees, cheated or defrauded, or attempted to cheat or defraud, retail customers in or in connection with Retail Commodity Transactions.

153.    Blackstone knowingly or recklessly made material misrepresentations and failed to disclose material facts to its customers and prospective customers.

154.    Specifically, Blackstone made the material misrepresentations on its website as set forth in paragraphs 53, 54 and 56, and in account statements and documents sent to customers as set forth in paragraphs 59-74.  In addition, Blackstone failed to disclose information material to the investment decisions of its customers and prospective customers as set forth in paragraphs 78, 79, 82 and 85.

155.    The acts, omissions and failures of Baris Keser and other officials, agents or persons acting for Blackstone described in this Complaint occurred within the scope of their employment, agency, or office with Blackstone, and are deemed to be the acts, omissions and failures of Blackstone by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (2011) and Section 1.2 of the Regulations, 17 C.F.R. § 1.2 (2012).

156.    Each material misrepresentation or failure to disclose material facts during the relevant period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4b(a) of the Act.

157.    Keser failed to act in good faith or knowingly induced the acts constituting the violations described in this Count.  Pursuant to Section 13(b) of the Act, therefore, Keser is liable as a Controlling Person for the violations by Blackstone of Section 4b(a) of the Act.

**COUNT SEVEN**
**VIOLATIONS OF SECTION 6(c)(1) OF THE ACT AND REGULATION 180.1**
**AGAINST BLACKSTONE AND KESER**

158.    Paragraphs 1 through 118 of this Complaint are realleged and incorporated herein by reference.

159.    Defendant Blackstone Metals Group, LLC ("Blackstone"), through its agents and employees, knowingly or recklessly used or employed, or attempted to use or employ, in connection with contracts of sale of commodities in interstate commerce, a scheme or artifice to defraud in violation of the Commission Regulation 180.1.

160.    Blackstone knowingly or recklessly made or attempted to make untrue or misleading statements of material facts and failed to state material facts necessary in order to make the statements made not untrue or misleading.

161.    Specifically, Blackstone made the material misrepresentations on its website as set forth in paragraphs 53, 54 and 56, and in account statements and documents sent to customers as set forth in paragraphs 59-74.  In addition, Blackstone failed to disclose information material to the investment decisions of its customers and prospective customers as set forth in paragraphs 78, 79, 82 and 85.

162.    Blackstone engaged, or attempted to engage, in acts, practices, and a course of business that operated as a fraud upon the retail customers of Blackstone.

163.    The acts, omissions and failures of Baris Keser and other officials, agents or persons acting for Blackstone described in this Complaint occurred within the scope of their employment, agency, or office with Blackstone, and are deemed to be the acts, omissions and failures of Blackstone by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (2011) and Section 1.2 of the Regulations, 17 C.F.R. § 1.2 (2012).

164.    Each material misrepresentation or  failure to disclose material facts between August 15, 2011 and the present, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 6(c)(1) of the Act and Rule 180.1.

165.    Keser failed to act in good faith or knowingly induced the acts constituting the violations described in this Count.  Pursuant to Section 13(b) of the Act, therefore, Keser is liable as a Controlling Person for the violations by Blackstone of Section 6(c)(1) of the Act and Rule 180.1.

## COUNT EIGHT
## VIOLATIONS OF SECTION 4b OF THE ACT
## AGAINST NEWBRIDGE AND KING

166.    Paragraphs 1 through 118 of this Complaint are realleged and incorporated herein by reference.

167.    Defendant Newbridge Alliance, Inc. ("Newbridge"), through its agents and employees, knowingly or recklessly cheated or defrauded, or attempted to cheat or defraud, retail customers in or in connection with Retail Commodity Transactions.

168.    Newbridge knowingly or recklessly made material misrepresentations and failed to disclose material facts to customers and prospective customers.  Specifically, Newbridge made the material misrepresentations on its website and promotional materials as set forth in paragraphs 53, 54 and 57, and in account statements and documents sent to customers as set forth in paragraphs 59-74.  In addition, Newbridge failed to disclose information material to the investment decisions of its customers and prospective customers as set forth in paragraphs 78, 79, 83 and 85.

169.    The acts, omissions and failures of King and other officials, agents or persons acting for Newbridge described in this Complaint occurred within the scope of their employment, agency, or office with Newbridge, and are deemed to be the acts, omissions and failures of Newbridge by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (2011) and Section 1.2 of the Regulations, 17 C.F.R. § 1.2 (2012).

170.     Each material misrepresentation or omission made during the relevant period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4b(a) of the Act.

171.     King failed to act in good faith or knowingly induced the acts constituting the violations described in this Count.  Pursuant to Section 13(b) of the Act, therefore, King is liable as a Controlling Person for the violations by Newbridge of Section 4b(a) of the Act.

**COUNT NINE**
**VIOLATIONS OF SECTION 6(c)(1) OF THE ACT AND REGULATION 180.1**
**AGAINST NEWBRIDGE AND KING**

172.     Paragraphs 1 through 118 of this Complaint are realleged and incorporated herein by reference.

173.     Defendant Newbridge Alliance, LLC ("Newbridge"), through its agents and employees, knowingly or recklessly used or employed, or attempted to use or employ, in connection with contracts of sale of commodities in interstate commerce, contravention scheme or artifice to defraud in violation of the Commission Regulation 180.1.

174.     Newbridge knowingly or recklessly made or attempted to make untrue or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made not untrue or misleading.

175.     Specifically, Newbridge made the material misrepresentations on its website as set forth in paragraphs 53, 54 and 57, and in account statements and documents sent to customers as set forth in paragraphs 59-74.  In addition, Newbridge failed to disclose information material to the investment decisions of its customers and prospective customers as set forth in paragraphs 78, 79, 83 and 85.

176.     Newbridge engaged, or attempted to engage, in acts, practices, and a course of business operated as a fraud upon the retail customers of Newbridge.

177.     The acts, omissions and failures of King and other officials, agents or persons acting for Newbridge described in this Complaint occurred within the scope of their employment, agency, or office with Newbridge, and are deemed to be the acts, omissions and failures of Newbridge by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (2011) and Section 1.2 of the Regulations, 17 C.F.R. § 1.2 (2012).

178.     Each material misrepresentation or omission made between August 15, 2011 and the present, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 6(c)(1) of the Act and Rule 180.1.

179.     King failed to act in good faith or knowingly induced the acts constituting the violations described in this Count.  Pursuant to Section 13(b) of the Act, therefore, King is liable as a Controlling Person for the violations by Newbridge of Section 6(c)(1) of the Act and Rule 180.1.

## COUNT TEN
### VIOLATIONS OF SECTION 4b OF THE ACT
### AGAINST UNITED STATES CAPITAL TRUST AND MOORE

180.     Paragraphs 1 through 118 of this Complaint are realleged and incorporated herein by reference.

181.     Defendant United States Capital Trust, LLC ("USCT"), through its agents and employees, knowingly or recklessly cheated or defrauded, or attempted to cheat or defraud, retail customers in or in connection with Retail Commodity Transactions.

182.     USCT knowingly or recklessly made material misrepresentations and failed to disclose material facts to customers and prospective customers.  Specifically, USCT made the

material misrepresentations on its website as set forth in paragraphs 53, 54 and 58, and in account statements and documents sent to customers as set forth in paragraphs 59, and 64-70.  In addition, USCT failed to disclose information material to the investment decisions of its customers and prospective customers as set forth in paragraphs 78, 79, 84 and 85.

183.    The acts, omissions and failures of Moore and other officials, agents or persons acting for USCT described in this Complaint occurred within the scope of their employment, agency, or office with USCT, and are deemed to be the acts, omissions and failures of USCT by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (2011) and Section 1.2 of the Regulations, 17 C.F.R. § 1.2 (2012).

184.    Each material misrepresentation or omission made during the relevant period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4b(a) of the Act.

185.    Moore failed to act in good faith or knowingly induced the acts constituting the violations described in this Count.  Pursuant to Section 13(b) of the Act, therefore, Moore is liable as a Controlling Person for the violations by Newbridge of Section 4b(a) of the Act.

## COUNT ELEVEN
## VIOLATIONS OF SECTION 6(c)(1) OF THE ACT AND RULE 180.1 AGAINST UNITED STATES CAPITAL TRUST AND MOORE

186.    Paragraphs 1 through 118 of this Complaint are realleged and incorporated herein by reference.

187.    Defendant United States Capital Trust, LLC ("USCT"), through its agents and employees, knowingly or recklessly used or employed, or attempted to use or employ, in connection with contracts of sale of commodities in interstate commerce, contravention scheme or artifice to defraud in violation of the Commission Regulation 180.1.

188.    USCT  knowingly or recklessly made or attempted to make untrue or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made not untrue or misleading.

189.    USCT knowingly or recklessly made material misrepresentations and failed to disclose material facts to customers and prospective customers.  Specifically, USCT made the material misrepresentations on its website as set forth in paragraphs 53, 54 and 58, and in account statements and documents sent to customers as set forth in paragraphs 59, and 64-70.  In addition, USCT failed to disclose information material to the investment decisions of its customers and prospective customers as set forth in paragraphs 78, 79, 84 and 85.

190.    USCT engaged, or attempted to engage, in acts, practices, and a course of business operated as a fraud upon the retail customers of USCT.

191.    The acts, omissions and failures of Moore and other officials, agents or persons acting for USCT described in this Complaint occurred within the scope of their employment, agency, or office with USCT, and are deemed to be the acts, omissions and failures of USCT by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (2011) and Section 1.2 of the Regulations, 17 C.F.R. § 1.2 (2012).

192.    Each material misrepresentation or omission made between August 15, 2011 and the present, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 6(c)(1) of the Act and Rule 180.1.

193.    Moore failed to act in good faith or knowingly induced the acts constituting the violations described in this Count.  Pursuant to Section 13(b) of the Act, therefore, Moore is liable as a Controlling Person for the violations by USCT of Section 6(c)(1) of the Act and Rule 180.1.

## COUNT TWELVE
## VIOLATIONS OF SECTION 4d OF THE ACT FOR FAILURE TO REGISTER
## AGAINST HUNTER WISE, MARTIN AND JAGER

194.     Paragraphs 1 through 118 of this Complaint are realleged and incorporated herein by reference.

195.     The Dodd Frank Act amended the definition of  "Futures Commission Merchant" in the Act to include any individual, association, partnership, corporation, or trust that, among other things, is engaged in accepting orders for any agreement, contract, or transaction described in Section 2(c)(2)(D)(i) of the Act.

196.     During the relevant period, Defendants Hunter Wise Commodities, LLC, Hunter Wise Services, LLC, Hunter Wise Credit, LLC, Hunter Wise Trading, LLC (collectively "Hunter Wise"), acting together as a common enterprise, through their agents and employees, accepted orders for agreements, contracts, or transactions described in Section 2(c)(2)(D)(i) of the Act.

197.     Section 4d of the Act provides that it shall be unlawful for any person to be a futures commission merchant unless such person shall have registered, under the Act, with the Commission as a futures commission merchant.

198.     During the relevant period, Defendants Hunter Wise Commodities, LLC, Hunter Wise Services, LLC, Hunter Wise Credit, LLC, Hunter Wise Trading, LLC (collectively "Hunter Wise") failed to register with the Commission as a Futures Commission Merchant and therefore violated Section 4d of the Act.

199.     The acts, omissions and failures of Martin, Jager and other officials, agents or persons acting for Hunter Wise described in this Complaint occurred within the scope of their employment, agency, or office with Hunter Wise, and are deemed to be the acts, omissions and

failures of Hunter Wise by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (2011) and

Section 1.2 of the Regulations, 17 C.F.R. § 1.2 (2012).

200.    Martin and Jager failed to act in good faith or knowingly induced the acts

constituting the violations of Hunter Wise described in this Count.  Pursuant to Section 13(b) of

the Act, therefore, Martin and Jager are liable as Controlling Persons for the violations by Hunter

Wise of Section 4d of the Act.

**COUNT THIRTEEN**
**AIDING AND ABETTING UNDER SECTION 13(a) OF THE ACT**
**AGAINST HUNTER WISE, MARTIN, AND JAGER, LLOYDS COMMODITIES,**
**BURBAGE AND GAUDINO**

201.    Paragraphs 1 through 193 of this Complaint are realleged and incorporated herein

by reference.

202.    During the relevant period, Hunter Wise, Martin, and Jager willfully aided,

abetted, counseled, commanded, induced, or procured the commission of, the acts constituting

the violations of the Act committed by CD Hopkins, Blackstone, Newbridge and USCT

described in Count 1, and in Counts 5 through 11 of this Complaint.

203.    Pursuant to Section 13(a) of the Act, therefore, Hunter Wise, Martin and Jager are

liable for the violations by CD Hopkins, Blackstone, Newbridge and USCT of Sections 4(a), 4b,

and 6(c)(1) of the Act, and Rule 180.1.

204.    During the relevant period, Lloyds Commodities, Burbage and Gaudino

willfully aided, abetted, counseled, commanded, induced, or procured the commission of, the

acts constituting the violations of the Act committed by Hunter Wise,  CD Hopkins, Blackstone,

Newbridge and USCT described in Count 1 of this Complaint.

205.    Pursuant to Section 13(a) of the Act, therefore, Lloyds Commodities, Burbage and Gaudino are liable for the violations by Hunter Wise, CD Hopkins, Blackstone, Newbridge and USCT of Section 4(a) of the Act.

## VI.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, as amended, to be codified at 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

A.      An order finding that Defendants violated Section 4(a) of the Act, as amended, to be codified at 7 U.S.C. § 6(a);

B.      An order finding that Defendants Hunter Wise, CD Hopkins, Blackstone, Newbridge and USCT violated Section 4b of the Act, as amended, to be codified at 7 U.S.C. § 6b;

C.      An order finding that Defendants Hunter Wise, CD Hopkins, Blackstone, Newbridge and USCT violated Section 6(c)(1) of the Act, to be codified at 7 U.S.C. §9(c)(1), and Regulation 180.1 (2012);

D.      An order of permanent injunction prohibiting Defendants, and any other person or entity associated with them, from engaging in conduct in violation of Sections 4(a), 4b and 6(c)(1) of the Act;

E.      An order of permanent injunction prohibiting Defendants and any successors from, directly or indirectly:

1)      Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, as amended, to be codified at 7 U.S.C. § 1a);

2)      Entering into commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 32.1(b)(1)), 17 C.F.R. § 32.1(b)(1) (2012)) ("commodity options"), swaps (as that term is defined in Section 1a(47) of the Act, as amended, and as further defined by Commission regulation 1.3(xxx), 17 C.F.R. § 1.3(xxx) (2012)), and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, as amended, to be codified at 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts"), for their own personal accounts or for any accounts in or over which they have a direct or indirect interest;

3)      Having any commodity futures, options on commodity futures, commodity options, swaps, and/or forex contracts traded or executed on their behalf;

4)      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options, commodity options, swaps, and/or forex contracts;

5)      Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, swaps, and/or forex contracts;

6)      Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2012); and

7)      Acting as a principal (as that term is defined in Regulation 3.1(a),

17 C.F.R. § 3.1(a) (2011)), agent, or any other officer or employee of any person

registered, exempted from registration or required to be registered with the CFTC

except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2012).

F.      Enter an order requiring that Defendants, as well as any of their successors,

disgorge to any officer appointed or directed by the Court all benefits received including,

but not limited to, salaries, commissions, loans, fees, revenues and trading profits

derived, directly or indirectly, from acts or practices that constitute violations of the Act,

as amended, and the Regulations, including pre and post-judgment interest;

G.      Enter an order requiring Defendants, as well as any of their successors, to make

full restitution, pursuant to such procedure as the Court may order, to every person or

entity whose funds were received or utilized by them in violation of the provisions of the

Act and/or Commission Regulations, as described herein, plus pre-judgment interest

thereon from the date of such violations, plus post-judgment interest;

H.      Enter an order directing Defendants and any of their successors, to rescind,

pursuant to such procedures as the Court may order, all contracts and agreements,

whether implied or express, entered into between it and any of the customers whose

funds were received by them as a result of the acts and practices, which constituted

violations of the Act, as amended, and the Regulations as described herein;

I.       Enter an order requiring Defendants to pay civil monetary penalties under the Act,

to be assessed by the Court, in amounts of not more than the greater of: (1) triple their

monetary gain for each violation of the Act, as amended, and the Regulations or (2)

$140,000 for each violation committed on or after October 23, 2008;

J.      Enter an order requiring Defendants to pay costs and fees as permitted by

28 U.S.C. §§ 1920 and 2412(a)(2) (2006); and

K.      Enter an order providing such other and further relief as this Court may deem

necessary and appropriate under the circumstances.

Date: December 5, 2012                    Respectfully submitted,

ATTORNEYS FOR PLAINTIFF
U.S. COMMODITY FUTURES TRADING COMMISSION

 /s/ Carlin Metzger
**Carlin Metzger** (cmetzger@cftc.gov)
Bar ID # A5501599
525 West Monroe Street, Suite 1100
Chicago, IL  60661
Telephone: (312) 596-0536
Fax: (312) 596-0714


**Brigitte Weyls** (bweyls@cftc.gov)
Bar ID # A5501826
**Thaddeus Glotfelty** (tglotfelty@cftc.gov)
Bar ID # A5501827
**Joseph Konizeski** (jkonizeski@cftc.gov)
Bar ID # A5501602
**Rosemary Hollinger** (rhollinger@cftc.gov)
Regional Counsel
Bar ID # A5500849
U.S. COMMODITY FUTURES
TRADING COMMISSION
525 W. Monroe, Suite 1100
Chicago, Illinois 60661
(312) 596-0700


**Peter Riggs** (priggs@cftc.gov)
Bar ID # A5501828
**Jeff Le Riche** (jleriche@cftc.gov)
Bar ID # A5501829
U.S. COMMODITY FUTURES
TRADING COMMISSION
4900 Main Street, Suite 500
Kansas City, Missouri 64112
Telephone (816) 960-7700
Fax: (816) 960-7754