# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No.: 12-CV-81311-Middlebrooks/Brannon

UNITED STATES COMMODITY FUTURES
TRADING COMMISSION,

        Plaintiff,

    v.

HUNTER WISE COMMODITIES, LLC,
HUNTER WISE SERVICES, LLC, HUNTER
WISE CREDIT, LLC, HUNTER WISE
TRADING, LLC, LLOYDS COMMODITIES,
LLC, LLOYDS COMMODITIES CREDIT
COMPANY, LLC, LLOYDS SERVICES,
LLC, C.D. HOPKINS FINANCIAL, LLC,
HARD ASSET LENDING GROUP, LLC,
BLACKSTONE METALS GROUP, LLC,
NEWBRIDGE ALLIANCE, INC., UNITED
STATES CAPITAL TRUST, LLC, HAROLD
EDWARD MARTIN, JR., FRED JAGER,
JAMES BURBAGE, FRANK GAUDINO,
BARIS KESER, CHADEWICK HOPKINS,
JOHN KING, and DAVID A. MOORE,

        Defendants.

## PLAINTIFF'S MOTION FOR AN ORDER OF PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT THEREOF

## **TABLE OF CONTENTS**

I.      **INTRODUCTION**.................................................................................................... 1

II.     **DEFENDANTS' ILLEGAL RETAIL COMMODITY TRANSACTIONS FALL
        WITHIN THE CFTC'S JURISDICTION**................................................................ 3

        A.      Overview of Defendants' Illegal Retail Commodity Transactions........................ 3

        B.      Defendants' Roles in the Scheme ........................................................................ 4

        C.      Defendants' Lack of Physical Metals ................................................................... 5

        D.      Defendants' Retail Commodity Transactions Are Within The CFTC's
                Jurisdiction Under Section 2(c)(2)(D) of the Commodity Exchange Act. ............. 7

        E.      The Actual Delivery Exception ............................................................................ 8

        F.      Defendants Do Not Actually Deliver Any Metals In Connection With Their
                Retail Commodity Transactions. ......................................................................... 9

III.    **THE CFTC IS ENTITLED TO A PRELIMINARY INJUNCTION**......................... 10

IV.     **DEFENDANTS HAVE VIOLATED AND CONTINUE TO VIOLATE THE
        COMMODITY EXCHANGE ACT** ..................................................................... 12

        A.      Each of the Defendants Violated Section 4(a) of the Commodity Exchange
                Act........................................................................................................................ 12

        B.      Defendants' Fraud Violates Sections 4b and 6(c)(1) of the Commodity
                Exchange Act, and CFTC Regulation 180.1........................................................ 13

                1.      Defendants Made Misrepresentations And Omissions ............................. 14

                2.      Defendants Acted With Scienter.............................................................. 15

                3.      Defendants' Misrepresentations Were Material ...................................... 17

        C.      The Court Should Issue A Preliminary Injunction Against the Individual
                Defendants ........................................................................................................... 18

                1.      Each Individual Defendant Controlled at Least One Corporate
                        Defendant................................................................................................ 18

                2.      Each Individual Defendant Knowingly Induced the Unlawful
                        Conduct................................................................................................... 19

V.      **CONCLUSION** .................................................................................................. 20

# I.    INTRODUCTION

The sale of commodities, including physical metals such as gold, silver, platinum, palladium and copper, to retail customers[1] in off-exchange financed transactions was made illegal by Section 742 of the Dodd Frank Act of 2010.  Passed in July 2010, and effective July 16, 2011, the Dodd-Frank Act amended the Commodity Exchange Act (the "Act") to prohibit entering into, or offering to, retail customers, any agreement, contract or transaction in any commodity on a leveraged, margined or financed basis ("retail commodity transactions"), unless such a transaction is conducted on a regulated commodities exchange.  Defendants have violated, are violating, and will continue to violate this prohibition because they offer or enter into retail commodity transactions that are not offered or entered into on a regulated, transparent and competitive commodity exchange.

In addition, Defendants make three highly material misrepresentations to retail customers when pitching physical precious metal as an investment.  Defendants claim to: (1) sell and transfer ownership of physical metals to customers; (2) make loans to customers to purchase the physical metals; and (3) store customers' physical metals in independent depositories.  Defendants impress upon retail customers that they are not selling stock in metal companies or exchange-traded commodity futures that exist only on paper, but real, tangible, metal.  In fact, defendants' retail commodity transactions are a sham.  Defendants do not own, possess or store the physical metals they purport to sell to retail customers.  Defendants do not transfer ownership of, or title to, any metals.  Defendants do not make any loans.  Defendants do not store physical metals in any depositories for customers.  In short, there is no metal held in the customers' names, and in the event of Defendants' insolvency the retail customers holding "positions" with Defendants have no recourse.

The scope of Defendants' illegal activity is significant.  Between July 16, 2011 and August 31, 2012 alone, Defendant Hunter Wise[2] took in more than $46 million in retail customer

---

[1] For purposes of this action a "retail customer" is a person that is not an Eligible Contract Participant ("non-ECP") as defined at section 1a(18)(A)(xi) of the Commodity Exchange Act, 7 U.S.C. § 1a(18)(A)(xi).  Defendants' retail customers do not have the $5 million or more invested on a discretionary basis that is required to be an ECP.

[2] Defendants Hunter Wise Commodities, LLC and its subsidiaries, Hunter Wise Credit, LLC, Hunter Wise Trading, LLC, and Hunter Wise Services, LLC, and their principals, Harold Edward Martin and Fred Jager, are described collectively as "Hunter Wise" herein.  Each Hunter Wise entity is commonly controlled by Martin and Jager.  They share resources, including office

funds that it received from dozens of telemarketing firms that hold themselves out as metals dealers, including Defendants CD Hopkins, Blackstone, Newbridge and USCT (the "Dealer Defendants").[3]  Defendant Lloyds, an intermediary between Hunter Wise and numerous dealers, including the Dealer Defendants, was the most significant aggregator for Hunter Wise of retail customer funds from the illegal retail commodity transactions.[4]  Between July 2011 and March 31, 2012 alone, Lloyds funneled nearly $15 million from telemarketing firms to Hunter Wise.

The illegal conduct at issue in this action occurs nationwide, but much of that activity takes place in the Southern District of Florida.  Lloyds is based in Palm Beach Gardens, Florida, and at least 17 telemarketing firms that have sent funds through Lloyds to Hunter Wise solicited customers from offices within the district.  Each of the four Dealer Defendants solicited customers from offices in the Southern District of Florida.

The U.S. Commodity Futures Trading Commission ("CFTC") hereby moves for a preliminary injunction pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), to halt Defendants' offer and execution of illegal retail commodity transactions.  Section 6c(a) authorizes the CFTC to seek injunctive relief in federal court whenever it appears that a person or entity has engaged, is engaging, or is about to engage in any act or practice that violates the Act or the CFTC's regulations.[5]

---

space and employees, and function to achieve a single common purpose.  They are operated as a single common enterprise.

[3] As described in the Complaint filed in this action, "CD Hopkins" includes C. D. Hopkins Financial, LLC d/b/a C. D. Hopkins Metals Division, Hard Asset Lending Group, LLC, and Chadewick Hopkins, the sole principal of those firms.  "Blackstone" includes Blackstone Metals Group, LLC and its principal Baris Keser.  "Newbridge" includes Newbridge Alliance, Inc. and its principal John King.  "USCT" includes United States Capital Trust, LLC and its principal David Moore.  Each of these Dealer Defendants is owned and operated by its principal and has very little capital and few assets. *Johnson Declaration*, ¶¶ 24-35.

[4] Defendants Lloyds Commodities, LLC, and its subsidiaries Lloyds Commodities Credit Company, LLC, and Lloyds Commodities Services, LLC, and their principals, James Burbage and Frank Gaudino are described collectively as "Lloyds" herein.  Each Lloyds entity is commonly controlled by Burbage and Gaudino, shares resources, including office space and employees, and function to achieve a single common purpose. *Johnson Declaration*, ¶¶ 18-20. They are operated as a single enterprise.

[5] The CFTC submits in support of this Motion an Appendix of declarations, exhibits, and testimony.  References to declaration paragraphs appear, for example, as follows: *Johnson Dec.* ¶ _.  References to declaration exhibits appear, for example, as follows: *Johnson* Ex. _. References to transcripts of testimony appear, for example as follows: *Shoemaker* Trans. _.

II.     **DEFENDANTS' ILLEGAL RETAIL COMMODITY TRANSACTIONS FALL WITHIN THE CFTC'S JURISDICTION**

The CFTC conducted a detailed investigation of Defendants' business operations and specifically the financed commodity transactions they offer to retail customers.  The CFTC's staff collected and reviewed thousands of documents, took sworn testimony, and interviewed numerous customers.  The CFTC offered Defendants an opportunity to provide evidence and legal arguments regarding the applicability of the Act to Defendants' transactions.  Only Hunter Wise made a detailed submission.  Hunter Wise argued primarily that the CFTC lacks jurisdiction over Defendants' retail commodity transactions.  Therefore, the CFTC will first explain why Defendants' transactions are subject to its jurisdiction and illegal as of July 16 before addressing the propriety of a preliminary injunction to enjoin Defendants' illegal and fraudulent activities.

A.      **Overview of Defendants' Illegal Retail Commodity Transactions**

Dealer Defendants solicit retail customers through their websites and by phone to enter into financed purchases and sales of what Dealer Defendants describe as "physical" metals.[6] Customers sign account agreements or applications with the Dealer Defendants which say that the dealers will loan funds for the purchase of physical metals, and that the dealers will store these physical metals for the customer.[7]

After opening an account and depositing funds with Dealer Defendants, customers acquire "trading positions" to speculate on the price movement of metals.  Customer accounts are valued on a daily basis, and the equity in their accounts increases or decreases as metals prices fluctuate.  However, the customer's account equity is also reduced on a daily basis by interest and service fees.  Customers typically begin trading with an equity position of 25% of the value of the metals being traded.  When a customer's equity falls below 15%, the customer receives a margin call that requires the customer to deposit additional funds in order to maintain the trading position.  If the customer's equity drops to 9%, any open trading positions are closed out to bring the dollar value of the equity above 15%.[8]

---

[6] *Johnson Dec.* ¶¶ 80, 81, 85 and 90, and Exs. GGG, KKK, OOO; *Christianson Dec.* Exs. A-D.

[7] *Johnson Dec.* ¶¶ 72, 77 and Exs. AAA, EEE; *Wimberly Dec.* Ex. C; *Toll Dec.* Ex. A.

[8] *Johnson Dec.* Ex. PP, Appx p. 581 (references to specific pages of the Appendix are identified as "Appx p._.)

Customers are charged substantial fees, making the likelihood of profit low. The fees include a commission (up to 38% of the initial customer deposit in a single trade), a price spread (a 3-5% mark-up or mark-down from the current price of the metal), interest on the purported loan (at an annual rate of approximately 9.5%) and service fees (approximately 7% annually on the total market value of the account) until the trading position is offset.[9] Dealer Defendants keep the commission, and Hunter Wise and Lloyds split the remaining fees with the Dealer Defendants.[10]

## B.      Defendants' Roles in the Scheme

Each of the Defendants plays a role. The Dealer Defendants collect retail customer funds and send them on to Hunter Wise via Lloyds.[11] Once the dealer successfully solicits a customer's order, that dealer contacts Lloyds, which accepts the customer's order and relays it on to Hunter Wise. Hunter Wise provides Lloyds with a price for the trade along with a trade confirmation number, which Lloyds then relays back to the dealer. Either Lloyds or the dealer then links the trade confirmation number with the customer within the Hunter Wise database system.[12] Hunter Wise maintains the database of transactional information that tracks all customer orders and trading positions.[13] Hunter Wise also maintains retail customer funds in its bank and trading accounts, and accounts for those funds through its database system.

Despite the façade presented by Dealer Defendants that they are metals dealers, and unbeknownst to the retail customer, Hunter Wise orchestrates all aspects of Dealer Defendants' business apart from the telemarketing solicitations.[14] Hunter Wise's elaborate internet-based "portal" system tracks and records all customer transactions, provides its dealers and retail customers with internet-based access to their account and transactional information, and provides dealers with various reports and data on the retail customers' transactions.[15] Customers are able

---

[9] *Johnson Dec.* ¶ 70 and Ex. ZZ.

[10] *Johnson Dec.* ¶ 53 and Ex. CC.

[11] *Johnson Dec.* ¶¶ 4j, 44.

[12] *Shoemaker Trans.* pp. 64-69, Appx pp. 1315-1316; *Morales Trans.*, p. 36-37 and 92-93, Appx pp. 1321-1322 and 1328-1329.

[13] *Johnson Dec.* ¶ 54 and Ex. PP, Appx. p. 559.

[14] *Johnson Dec.* ¶ 53-61 and Exs. CC, and PP-TT.

[15] *Id.* at Ex. PP, Appx. p. 562.

to log in to view their account and transaction information online by following a link on the dealer's website to a separate website that appears to be a part of the dealer's website, but is in fact a website built and maintained by Hunter Wise.[16]  The Dealer Defendants are able to log in to the portal as well to view account and transactional information for the customers they solicited, as well as detailed performance reports relating to these customer accounts.  Hunter Wise generates account documents from its database – including trade confirmations, monthly account statements, and "Transfer of Commodity" forms – all on the Dealer Defendant's letterhead.[17]  Thus, although the customers' account documents are automatically generated by Hunter Wise (and in many cases transmitted electronically directly by Hunter Wise to retail customers), they appear to be generated by the Dealer Defendants.[18]

Lloyds' role is to recruit telemarketing firms (including the Dealer Defendants) to solicit retail customers to execute retail commodity transactions through Hunter Wise, and to relay customer funds and orders between these telemarketing firms and Hunter Wise.[19]  Lloyds makes money by taking a percentage of the price spread, interest, and service fees charged on retail customer accounts.[20]

### C.    Defendants' Lack of Physical Metals

In the end, Defendants operate a multi-tiered scheme involving off-exchange, paper-based speculative trading in commodities.  None of the Defendants possesses or actually delivers physical metals to customers in their retail commodity transactions.  At the top tier of the scheme, Hunter Wise does not actually buy, sell, loan, store, or transfer any physical metals in connection with its retail commodity transactions.[21]  Instead, Hunter Wise simply makes an internal accounting entry on its own books and tracks the value of each retail customer's account on a daily basis.[22]

---

[16] *Christianson Dec.*, ¶ 6 and Ex. E; *Johnson Dec.* ¶ 55.

[17] *Johnson Dec*. Ex. PP, Appx. p. 570.

[18] *Id.* at Appx. p. 559.

[19] *Morales Trans.* pp. 88-94, Appx. p. 1327-29.

[20] *Johnson Dec.* ¶ 68.

[21] *Gjerdrum (A-Mark) Dec.*, ¶ 8, 13, 14; *Maartens (Standard Bank) Dec.*, ¶¶ 13 - 15; *Johnson Dec.*, ¶ 49-50.

[22] *Shoemaker Trans.* pp. 65-69, Appx. pp 1316-17.

Hunter Wise manages its exposure to retail customer trading positions by trading derivatives in its own over-the-counter margin trading accounts.  Hunter Wise pools the funds it receives from Lloyds and other retail dealers (including the Dealer Defendants) in its own bank accounts.[23]  Hunter Wise then transfers a portion of those pooled funds to its own margin trading accounts at (1) A-Mark Precious Metals, Inc. ("A-Mark"); (2) Standard Bank Plc; ("Standard Bank"); (3) Natixis Commodity Markets Ltd. ("Natixis"); (4) R.J. O'Brien; and (5) OANDA.  The trades that Hunter Wise places in these accounts do not result in the transfer or delivery of any metals.[24]  Hunter Wise has never taken delivery of any metals as a result of the trades placed in these accounts.[25]

Representatives of both A-Mark and Standard Bank, where Hunter Wise maintained its two largest trading accounts since July 2011, testified that these companies do not maintain an inventory of physical metals for Hunter Wise or any customers of Hunter Wise,[26] that Hunter Wise has never taken delivery of physical metals as a result of trades in its account,[27] and that Hunter Wise does not receive title to any physical metals as a result of trades in these accounts.[28]  Natixis representatives confirmed that the Hunter Wise account at Natixis functions in a similar fashion.[29]  Hunter Wise's trades in its margin trading accounts do not involve the transfer or delivery of physical metals.  These firms only offer Hunter Wise over-the-counter margin trading facilities, not the purchase, sale or storage of physical metals for Hunter Wise or its customers.

---

[23] *Johnson Dec.* ¶ 44.

[24] *Gjerdrum (A-Mark) Dec.* ¶¶ 8, 13, 14; *Maartens (Standard Bank) Dec.* ¶¶ 13 – 15; *Johnson Dec.* ¶¶ 49-50.

[25] *Id.*

[26] *Gjerdrum (A-Mark) Dec.* ¶ 14 ("A-Mark does not store any metals for Hunter Wise or its customers in connection with Hunter Wise's margin trades."); *Maartens (Standard Bank) Dec.* ¶ 13 ("Standard Bank does not . . . store any physical metals for Hunter Wise or for the benefit of any Hunter Wise customer in connection with Hunter Wise's margin trades.")

[27] *Gjerdrum Dec.* ¶ 13 ("Margin trades are financially settled transactions, meaning that they do not involve the delivery of any metals."); *Maartens (Standard) Dec.* ¶ 13 ("Standard Bank has not delivered any physical metals to Hunter Wise.").

[28] *Gjerdrum Dec.* ¶ 14 ("A-Mark does not transfer title to any metals to Hunter Wise as a result of margin trades.  Hunter Wise does not own any metals as a result of its margin trades with A-Mark.); *Maartens (Standard) Dec.* ¶ 14 ("Standard Bank does not transfer title to any metals to Hunter Wise as a result of margin trades.")

[29] *Johnson Dec.* ¶ 50.

**D.     Defendants' Retail Commodity Transactions Are Within The CFTC's Jurisdiction Under Section 2(c)(2)(D) of the Commodity Exchange Act.**

Section 2(c)(2)(D) of the Commodity Exchange Act gave the CFTC new authority over Defendants' retail commodity transactions.  Congress added this authority to the Act to address confusion over potential regulatory gaps covering off-exchange commodity transactions that have for years been a fertile ground for fraud.  Effective July 16, 2011, financed commodity transactions with retail customers were prohibited unless conducted on a regulated exchange.  In addition, Congress gave the CFTC broad authority to pursue the fraud rampant in this type of investment offering.  The off-exchange margined, leveraged or financed trading in metals offered by Defendants to retail customers in this case is exactly the type of trading that is now illegal, and the CFTC has new authority to pursue fraud in connection with retail commodity transactions.

Section 2(c)(2)(D) broadly applies to any agreement, contract, or transaction in any commodity that is entered into with, or offered to, a non-eligible contract participant (ECP) or non-eligible commercial entity as defined by the Act (*i.e.*, retail customers) on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis.  Section 2(c)(2)(D) further provides that such an agreement, contract, or transaction shall be subject to sections 4(a), 4(b), and 4b of the Act "as if the agreement, contract, or transaction was a contract of sale of a commodity for future delivery."

The Dealer Defendants offered and entered into transactions in commodities with persons who do not come close to meeting the definitions of an ECP.  These customers have far less "invested on a discretionary basis" than the $10 million threshold set out in Section 1a of the Act, and they are not managing the risk associated with any asset or liability in entering into these transactions.  These individuals are often elderly, and are seeking a safe, secure investment.[30]

The transactions are also offered and entered into on a leveraged or margined basis.  Each of the Dealer Defendants' websites advertises (or has since July 2011) "financing" or "loans" in

---

[30] See, e.g., Declarations of Customers *McElroy, Toll, Vradenburg, Bauman, Lezak, Wimberly, Costa, Guichard, Mercaldo, Wilson, Brantley, Andrew Burk, Lee Ann Burk,* and *Dulac.*

connection with the purchase or sale of metals.[31]  For example CD Hopkins offered customers "high investment financing."[32]  Blackstone described its transactions as its "financed metals program."[33]  Newbridge told customers "If you wish to finance your purchase, you can receive a loan for up to 80 percent of the value of your precious metals."[34]  USCT offers a "Collateralized Financing Program" and claims that USCT "the potential return on [customer] investments can be amplified using collateralized financing."[35]  The vast majority of Defendants' transactions with retail customers were "financed" transactions rather than fully-paid, outright purchases of metals.[36]

## E.    The Actual Delivery Exception

Congress provided limited exceptions to the broad grant of jurisdiction to the CFTC over retail commodity transactions in Section 2(c)(2)(D).  In an effort to distinguish situations in which an individual might receive financing to purchase a physical commodity for use (for example, electricity, propane or natural gas supply agreements with residential customers) from the paper-based speculative trading transactions that Hunter Wise or similar firms offer, Congress excepted a contract of sale that "results in actual delivery within 28 days".  7 U.S.C. § 2(c)(2)(D)(ii)(III)(aa).  Thus, a transaction in which the retail customer receives the commodity within 28 days is not subject to being traded on a regulated commodity exchange.

On December 14, 2011, to provide guidance on how this exception applies in practice, the CFTC issued a statement explaining the meaning of "actual delivery" in Section 2(c)(2)(D) of the Act.[37]  The CFTC laid out various factors it would consider in determining whether actual delivery has occurred, including:

---

[31] *Christianson Dec*. Exs. A-D.

[32] *Id.*, Ex. A, Appx. p. 1129.

[33] *Id.*, Ex. B, Appx. p. 1165.

[34] *Id.*, Ex. C, Appx. p.1297.

[35] *Id.*, Ex. D, Appx. p. 1262.

[36] *Johnson Dec*. Ex. WW.

[37] Defendants are well aware of this CFTC interpretation.  In fact, despite being told of this impending enforcement action, Hunter Wise recently filed a declaratory judgment action against the CFTC relating to this interpretation.  See *Hunter Wise v. CFTC*, No. 12-cv-7656 (N.D.IL filed Sept. 25, 2012).  The CFTC is moving to dismiss the case filed by Hunter Wise in Illinois for various reasons including that it is a transparent attempt to impact this enforcement action.

ownership, possession, title, and physical location of the commodity purchased or sold, both before and after execution of the agreement, contract, or transaction; the nature of the relationship between the buyer, seller, and possessor of the commodity purchased or sold; and the manner in which the purchase or sale is recorded and completed.

*Retail Commodity Transactions Under Commodity Exchange Act*, 76 Fed. Reg. 77,670-72 (Dec. 14, 2011).

The advisory also included examples of what does or does not constitute actual delivery. One clear example of actual delivery is when a "seller has physically delivered the entire quantity of the commodity purchased by the buyer, including any portion of the purchase made using leverage, margin or financing, into the possession of the buyer and has transferred title to that quantity of the commodity to the buyer."  Id. at 7762.  On the other hand, the advisory makes clear that transactions such as those offered and executed by Defendants do not involve actual delivery:

Actual delivery will *not* have occurred if, within 28 days, a book entry is made by the seller purporting to show that delivery of the commodity has been made to the buyer and/or that a sale of a commodity has subsequently been covered or hedged by the seller through a third party contract or account, but the seller as not, in accordance with the methods described in Example 1 or 2, physically delivered the entire quantity of the commodity purchased by the buyer, including any portion of the purchase made using leverage, margin or financing, and transferred title to that quantity of the commodity to the buyer, regardless of whether the agreement, contract or transaction between the buyer and the seller purports to create an enforceable obligation on the part of the seller, or a parent company, partner, agent, or other affiliate of the seller, to deliver the commodity to the buyer.

*Id.*

## F.     Defendants Do Not Actually Deliver Any Metals In Connection With Their Retail Commodity Transactions.

In this case, actual delivery does not take place because there are no physical metals purchased or stored by Defendants in connection with their retail commodity transactions. Hunter Wise likely will claim that its "inventory" consists of its trading positions in its margin trading accounts with A-Mark, Standard Bank and Natixis.  But the fact of the matter is that none

of these firms ever store for or deliver to Hunter Wise any physical metals.[38]  Looking at Defendants' transactions in view of the factors identified in the CFTC's December 2011 advisory, whether before or after the transactions, neither Defendants nor retail customers own any metal, no one possesses any metal, no title to metal is passed, and there is no identifiable physical location of any purported metal.  The relationship between the buyer and seller of the metal is that of a casino to a gambler, both betting on the price of a commodity.  The purchase or sale is recorded and completed solely on paper.  Once Hunter Wise executes the transaction by recording the retail customers' trades into its database, the transaction is complete.  Therefore, there is no "actual delivery" consistent with the CFTC's interpretive statement.

Defendants may claim that they "transfer" metals to customers when they issue documents they describe as "Transfer of Commodity" notices.  Defendants may even argue that these documents transfer title to metals.  But these documents are part and parcel of the fraud, and serve only to deceive customers into believing that they have actually purchased a tangible, physical asset.

Hunter Wise provides off-exchange speculative metals transactions to retail customers.  Hunter Wise makes money by charging retail customers a significant price spread on each trade, "interest" on the loans it supposedly makes, and a "service" fee that accrues on the total market value of the account.  Hunter Wise compensates the retail dealers by allowing them to take a portion of the price spread, interest and service fee charges, as well as allowing the dealers to charge a commission on customer trades.  Separately, Hunter Wise manages its exposure to customer trading positions by maintaining trading positions in its own margin trading accounts.  None of this activity involves the actual delivery of commodities.

## III.    THE CFTC IS ENTITLED TO A PRELIMINARY INJUNCTION

The CFTC seeks an Order of Preliminary Injunction.  Section 6c(b) of the Commodity Exchange Act, 7 U.S.C. § 13a-1, specifically authorizes the CFTC to seek injunctive relief in federal district court whenever it appears that a person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the Act or CFTC regulations.[39]  The

---

[38] *Gjerdrum (A-Mark) Dec.* ¶¶ 8, 13, 14; *Maartens (Standard Bank) Dec.* ¶¶ 13 – 15; *Johnson Dec.* ¶¶ 49-50.

[39] Section 6c(b) also provides that upon a proper showing, a temporary or permanent injunction shall be granted without bond.

CFTC "need not prove irreparable injury or the inadequacy of other remedies as required in private injunctive suits.  A prima facie case of illegality is sufficient."  *CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978).  Factors to be considered by the court in assessing the propriety of an injunction include: "the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." *S.E.C. v. Ginsburg,* 362 F.3d 1292, 1304 (11th Cir. 2004); *CFTC v. Hunt*, 591 F.2d 1211, 1219 (7th Cir. 1979) ("When the violation has been founded on systematic wrongdoing, rather than an isolated occurrence, a court should be more willing to enjoin future misconduct.")  The "unqualified grant of statutory authority to issue an injunction under § 13a-1 [of the Act] carries with it the full range of equitable remedies."  *CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1344 (11th Cir. 2008).

Further, while there is substantial evidence of fraud in this case, the illegality of the transactions alone is sufficient to warrant a preliminary injunction.  *CFTC v. American Board of Trade, Inc.*, 803 F.2d 1242, 1251 (2d Cir. 1986) ("While fraudulent transactions are indeed unlawful, the Act and the regulations prohibited the options transactions at issue without regard to questions of fraud.  Defendants' manifest intent to continue their options business unless enjoined fully justified the entry of a permanent injunction against them."); *CFTC v. British American Commodity Options*, 560 F.2d 135, 142 (C.A. N.Y. 1977) ("The district court erred in concluding that the 'mere' continuation of the proscribed activities is not the necessary repetition of a wrong to warrant the injunction unless there is, in addition, proof of fraud or misconduct.")

In this case, the facts establish a prima facie case of illegality, including that Defendants offered and executed illegal retail commodity transactions, and defrauded customers on a systematic basis in violation of the Act and CFTC regulations.  In addition, Defendants' violations of the Act and CFTC regulations are ongoing and will continue unless the Court enters a preliminary injunction.  With the exception of CD Hopkins,[40] Defendants have shown no indication that they intend to cease offering and executing retail  commodity transactions despite being well aware of the investigation of their conduct for as long as a year.

---

[40] CD Hopkins ceased operations and transferred the vast majority of its customer accounts to Defendant Blackstone as of May 2012.  *See Johnson Dec.* ¶ 28 and Ex. V.

## IV.     DEFENDANTS HAVE VIOLATED AND CONTINUE TO VIOLATE THE COMMODITY EXCHANGE ACT

### A.     Each of the Defendants Violated Section 4(a) of the Commodity Exchange Act

Effective July 16, 2011, all of Defendants' retail commodity transactions became subject to Section 4(a) of the Act.  Section 4(a) provides that unless a transaction is conducted on a regulated exchange, it is unlawful for any person to offer to enter into, enter into, execute, confirm the execution of, or conduct any office or business anywhere in the United States for the purpose of soliciting, or accepting any order for, or otherwise dealing in retail commodity transactions.  The CFTC does not have to establish scienter to prove a violation of Section 4(a) of the Act – Defendants' conduct either violates this section or it does not.  *CFTC v. Noble Metals*, 67 F.3d 766, 773-775 (9th Cir. 1995).  Each of the Defendants has engaged in conduct that violates Section 4(a).

The Dealer Defendants violated Section 4(a) as their websites and promotional materials clearly offer retail commodity transactions[41] and they entered into account agreements with customers that expressly provide that retail customers enter into financed commodity transactions.[42]  The Dealer Defendants confirmed the execution of retail commodity transactions by sending customers trade confirmations and "Transfer of Commodity" notices.[43]  Lloyds violated Section 4(a) by facilitating the flow of orders and funds for retail commodity transactions, performing data entry to facilitate the execution of the transactions, and recruiting telemarketing firms like the Dealer Defendants to solicit retail customers to execute retail commodity transactions through Hunter Wise.[44]  Hunter Wise violated Section 4(a) by accepting orders for, executing, and confirming the execution of retail commodity transactions.  Hunter Wise accepts the orders by phone from Lloyds, executes the orders when it makes a book entry in a database reflecting the retail customer's transaction, and confirms the execution of the orders

---

[41] See, e.g., *Christianson Dec.* Exs. A-D.  Blackstone's website offers a "financed metals program."  Newbridge's website offered a "Financing Program" to purchase metals.  CD Hopkins promotional materials pitch its "high financing strategy" for the purchase of metals. USCT similarly offered "financed" metals trading.

[42] *Johnson Dec.* ¶¶ 73, 77 and Exs. BBB, EEE; *Mercaldo Dec.* Ex. C; *Wimberly Dec.* Ex. C; *McElroy Dec.* Ex. A.

[43] See, e.g., *Johnson Dec.*¶ 58 and Ex. RR; *Guichard Dec.* ¶ 8 and Exs. B and C.

[44] *Johnson Dec.* ¶ 37 and Ex. DD.

when it generates and sends trade confirmation and Transfer of Commodity documents.[45] Hunter Wise actually executes the retail customer's transaction because the order is not filled or complete until Hunter Wise has entered the transactional information into its database and associated the transaction with the retail customer.[46] In addition, all defendants conduct offices and business in the United States for purposes of engaging in these activities.

**B.**     **Defendants' Fraud Violates Sections 4b and 6(c)(1) of the Commodity Exchange Act, and CFTC Regulation 180.1.**

Sections 4b and 6(c)(1) of the Act, and CFTC Regulation 180.1, are broad anti-fraud provisions.  Defendants[47] violated these provisions by misrepresenting and failing to disclose material facts in connection with their retail commodity transactions.  To establish liability under Section 4b(a) of the Act, the CFTC must show: (1) that a misrepresentation, misleading statement, or omission was made; (2) with scienter; and (3) that the misrepresentation, statement or omission was material.  *CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1328 (11th Cir. 2002), *cert. denied*, 125 S.Ct. 808 (2004) (citations omitted).

The CFTC must make the same showing for a claim under Section 6(c)(1) of the Act and Regulation 180.1.  Section 6(c)(1) of the Act (as amended by the Dodd-Frank Act and to be codified at 7 U.S.C. §§ 9, 15), provides that it is unlawful for any person "to employ . . . in connection with any contract of sale of any commodity in interstate commerce . . . any manipulative or deceptive device or contrivance, in contravention of [CFTC rules and regulations]."  Regulation 180.1(a) implements this prohibition.  It follows the structure of SEC Rule 10b-5 and, in relevant part, makes it unlawful for any person:

> in connection with any . . . contract of sale of any commodity in interstate commerce . . . to intentionally or recklessly:  (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue

---

[45] *Morales Trans.* pp. 59-69; *Shoemaker Trans.* pp. 47-54; s*ee also Johnson Dec.* Ex. PP, Appx. p. 570.

[46] *Shoemaker Trans.* pp. 47-54; *Johnson Dec* Ex. PP, Appx. pp. 575-77.

[47] Due to its role as an intermediary and its limited direct contact with retail customers, Lloyds is not charged in the Complaint with fraud under Sections 4b or 6(c)1 of the Act, or Regulation 180.1.  Lloyds is charged with violating Section 4(a) of the Act and with liability for aiding and abetting the violations of Section 4(a) by the other Defendants.

or misleading; (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

See *Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation*, 76 Fed. Reg. 41398, 41401 (July 14, 2011).

### 1. Defendants Made Misrepresentations And Omissions

Hunter Wise and the Dealer Defendants misrepresented the nature of the product they sold by telling customers that they (1) sell and transfer ownership of physical metals to customers; (2) make loans to customers to purchase the physical metals; and (3) store customers' physical metals in independent depositories. The Dealer Defendants made these representations on their websites and in written marketing materials sent to existing and prospective customers. Hunter Wise makes these same misrepresentations to retail customers when it generates all customer account statements, trade confirmations, and the Transfer of Commodity notices. Although Hunter Wise places the logos of its dealers on these documents, they are all generated by Hunter Wise and in many cases sent directly by Hunter Wise to retail customers. These documents explicitly state that customers are buying and selling physical metals,[48] that customers own and have title to these metals,[49] metals are stored at independent depositories,[50] and that customers received loans for the purchase of these metals.[51] Hunter Wise also provides customers with web-based access to its "portal" system where they are told that they own physical metals, that they have an outstanding loan on which they are paying interest, and that they are paying a service fee that includes the cost of storing the physical metals they purchased.[52]

Despite rosy predictions of likely profit and assurances of safety,[53] Defendants also failed to disclose the significant losses being suffered by customers engaging in retail commodity

---

[48] *Johnson* ¶ 58 and Ex. QQ.

[49] *Bauman* Ex. D.

[50] *Johnson* Exs. QQ, RR, SS.

[51] *Id.*

[52] *Johnson* Ex. PP, Appx. 559.

[53] See, e.g., *Toll Dec.* ¶ 2 ("Weiner told me that silver would be rising in price to at least $50 per ounce from its price at the time of $30 per ounce."); *Vradenburg Dec.* ¶ 2 ("[Henry] told me that if I invested in metals through USCT that I could earn at least 10-15& a year on my investment.

transactions.[54]  Defendants had access on a daily basis to reports that detailed customer performance.[55]  These reports reflect that all or nearly all of their customers suffer substantial losses.  Based on profit-loss reports generated by Hunter Wise, between July 2011 and March 31, 2012:

- Over 98% of customers who engaged in retail commodity transactions with CD Hopkins lost money, and the net loss suffered by CD Hopkins customers was $2,406,731.

- Over 77 % of Blackstone customers lost money, and the net loss suffered by Blackstone customers was $605,839.

- Over 94% of Newbridge customers lost money, and the net loss suffered by Newbridge customers was $452,925.

- 100% of USCT customers lost money, and the net loss suffered by USCT customers was $460,411.[56]

Despite this clear negative track record, neither Hunter Wise nor any Dealer Defendant disclosed this information to customers or prospective customers.

### 2.  Defendants Acted With Scienter

Hunter Wise and the Dealer Defendants were either severely reckless, or acted intentionally, when telling customers that Defendants purchased and sold physical metals, made loans to do so, and when they failed to disclose customer losses.[57]  Scienter is defined as "a

---

Henry made it sound like all his clients made money from their investments in metals with USCT."); *Guichard Dec.* ¶ 7 ("At one point, Muller told me 'we're predicting silver will go up to $70 or $80 an ounce.'  He told me that he expected the market was 'going to skyrocket.'"); *Bauman Dec.* ¶ 7 ("Cheek said he was sure prices were going up.  Cheek also told me that Newbridge's customers were making good returns.")

[54] *Costa Dec.* ¶¶ 4, 5; *Guichard Dec.* ¶¶ 7, 9; *Mercaldo Dec.* ¶ 9; *Wilson Dec.* ¶¶ 5, 7; *Brantley Dec.* ¶ 9; *Andrew Burk Dec.* ¶ 4; *Bauman Dec.* ¶¶ 4, 8, 9, 10, 12; *Lezak Dec.* ¶¶ 4, 5, 8, 9; *Wimberly Dec.* ¶¶ 4, 5, 10, 11; *McElroy Dec.* ¶¶ 2, 3, 8, 21; *Toll Dec.* ¶¶ 2, 3, 7, 10; *Vradenburg Dec.* ¶¶ 2, 3.

[55] *Johnson Dec.* ¶ 57 and Ex. PP, Appx. 562-63.

[56] *Johnson Dec.* ¶¶ 75, 79, 84, 89 and Exs. CCC, FFF, JJJ, NNN.

[57] The acts and omissions of the employees and agents acting for Defendants occurred within the scope of their employment or agency with these entities, and are deemed to be the acts and omissions of these entity defendants under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (2011) and CFTC Regulation 1.2, 17 C.F.R. § 1.2 (2012).

mental state embracing intent to deceive, manipulate, or defraud." *SEC v. Adler*, 137 F.3d 1325, 1340 (11th Cir. 1998), *citing Aaron v. SEC*, 446 U.S. 680, 686 n.5 (1980).  In the Eleventh Circuit, recklessness, meaning an extreme deviation from the standards of ordinary care, also suffices to establish scienter.  *R.J. Fitzgerald & Co.*, 310 F.3d at 1330; *see also Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1010 (11th Cir. 1985) ("The rule in this circuit is that 'severe recklessness' satisfies the scienter requirement."); *White v. Sanders*, 689 F.2d 1366, 1367 n.4 (11th Cir. 1982).

Hunter Wise acted with scienter because it is fully in control of the representations it makes to customers in Transfer of Commodity forms, account statements and trade confirmations, and also fully aware of the true nature of its margin trading accounts.  Martin and Jager, the two principal owners of Hunter Wise, signed account agreements for Hunter Wise's margin trading accounts.  They know that Hunter Wise only maintains trading positions in metals as opposed to an inventory of physical metals.

The Dealer Defendants acted with scienter by making blatant misrepresentations to customers that they made loans to customers to purchase physical metals, and by failing to disclose massive customer losses while at the same time advertising fantastic profit potential. For example, the CD Hopkins website claimed that customers "will receive the title to your precious metals delivered to the depository, giving you ownership . . . The metal held for you is not an asset of C.D. Hopkins Metals Division, the bank or depository, and as such, the security of your metal does not depend on their individual or collective financial condition."[58]  CD Hopkins also told customers they received loans from Hard Asset Lending,[59] even though this company never loaned anyone any funds.  Hard Asset Lending existed only to collect in a bank account for Chad Hopkins the portion of price spread, service fee and interest charges assessed to CD Hopkins customers.  Similarly, Blackstone told customers that their physical metals would be delivered to a depository within 72 hours.[60]  Newbridge claimed that customers' financed or stored metal is delivered to an independent bank or depository vault at which time the customer

---

[58] *Christianson Dec.* Ex. A., Appx. p. 1130.

[59] *Christianson Dec.* Ex. A., Appx. p. 1137.

[60] *Christianson Dec.* Ex. B., Appx. p. 1175.  The Blackstone website stated: "Am I buying a [*sic*] real gold or a certificate?  When you purchase your gold with Blackstone Metals, you will receive a commodity transfer notice and a receipt.  We will deliver the gold to your depository within 72 hours after the purchase is made."

owns and receives title to the metals.[61]  And USCT told customers they would "Receive the legal title to your metal, giving you actual ownership."[62]  These explicit misrepresentations concern clearly discernible facts, yet the Dealer Defendants did not undertake any reasonable efforts to ensure their accuracy.

### 3. Defendants' Misrepresentations Were Material

A statement or omitted fact is material if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest.  *R&W Technical Serv. Ltd. v. CFTC*, 205 F.3d 165 (5th Cir. 2000); *see also R.J. Fitzgerald & Co.*, 310 F.3d at 1328-29.  The most fundamental misrepresentations at issue in this case relate to the nature of the product being sold.  Customers are told that they are purchasing physical metals from metals dealers.  In fact, retail customers are entering into off-exchange, speculative bets, unassociated with any actual physical metals.  Retail customer accounts are managed and backed by an undisclosed third party that has no inventory of physical metals.  These misrepresentations and omissions are all material as any reasonable investor would want to know this information.  *See, e.g., Saxe v. E.F. Hutton & Co., Inc.*, 789 F.2d 105, 110 (2d Cir. 1986) ("'[m]aterial misrepresentations about the nature of the organization handling [an] account, the people [dealt] with, and the type of trading [the] funds were used for' would be sufficient to state a cause of action pursuant to the [Act].") (quoting *Psimenos v. E.F. Hutton & Co. Inc.*, 722 F.2d 1041, 1043-44, n.5 (2d Cir. 1983)).

Defendants' failure to disclose to customers the massive losses of existing and past customers is also material.  Past success and experience are material factors which a reasonable investor would consider when deciding to invest through that firm or broker.  *CFTC v. Commonwealth Fin. Group, Inc.*, 874 F. Supp. 1345, 1353-54 (S.D. Fla.1994) ("Plaintiffs suggest that it amounts to a misrepresentation when salespeople emphasize the profits enjoyed by Commonwealth customers without mentioning any of the losses. The Court agrees."); *CFTC v. Risk Capital Trading Group, Inc.*, 452 F. Supp. 2d 1229, 1245-46 (N.D. Ga. 2006) (nondisclosure of track record showing that the vast majority of customers had lost their investments was a material omission of fact); *CFTC v. White Pine Trust Corp.,* No. 04CV2093

---

[61] *Christianson Dec.* Ex. D, Appx. p. 1297.

[62] *Christianson Dec.* Ex. C, Appx. p. 1268.

J(NLS), 2007 WL 1121249, at *9 (S.D. Cal. Apr. 11, 2007) ("Misrepresentations regarding the experience or profitability of a firm or account manager are material because historical success and experience would be considered extremely important factors to a reasonable investor when deciding to invest").

**C.    The Court Should Issue A Preliminary Injunction Against the Individual Defendants**

The individual defendants directly violated Section 4(a) of the Act by conducting an office or business in the United States for the purpose of engaging in activity in connection with illegal off-exchange retail commodity transactions.  In addition, these individual defendants are liable for the violations of the Act and regulations of the entities that they controlled pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).  "A controlling person is liable under 13c(b) if he had "'actual or constructive knowledge of the core activities that constitute the violations at issue and allowed them to continue.'" *Commodity Futures Trading Comm'n v. Commonwealth Fin. Group*, 874 F.Supp. 1345, 1357 (S.D.Fla.1994) (quoting *In re Matter of Spiegel*, [1987–1990 Transfer Binder] Comm. Fut. L. Rep (CCH) ¶ 24,103 at 34,767 (CFTC Jan. 12, 1988)); *see also CFTC v. Sterling Trading Group, Inc.*, 605 F.Supp. 2d 1245, 1258 (S.D. Fla. 2009) (the ability to control the activities of a company with respect to the decision to engage in particular business activities supports a finding of control person liability).  A "fundamental purpose" of the statute is "to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as on the corporation itself."  *R.J. Fitzgerald*, 310 F.3d at 1334, *quoting JCC, Inc. v. CFTC*, 63 F.3d 1557, 1567 (11th Cir. 1995).

**1.    Each Individual Defendant Controlled at Least One Corporate Defendant**

Each of the individual defendants controlled the operations of their respective entities. Jager as the Chief Executive Officer of Hunter Wise and Martin as the President and Chief Operating Officer of Hunter Wise controlled the operations of Hunter Wise, including executing contracts on behalf of Hunter Wise, controlling its bank accounts, and making hiring and firing decisions.[63]  James Burbage and Frank Gaudino own Lloyds, and direct and control its operations.  Gaudino and Burbage sign contracts on behalf of Lloyds, are authorized signatories

---

[63] *Johnson Dec.* ¶¶ 5-11 and Ex. A-H.

on its bank accounts, and make hiring and firing decisions for the company.[64]  Chad Hopkins was the sole member of CD Hopkins and its affiliate Hard Asset Lending.  Chad Hopkins was the authorized signatory on the CD Hopkins bank accounts, and he made hiring and firing decisions for the company.[65]   Baris Keser is the sole managing member of Blackstone.  Keser is the authorized signatory on the bank accounts of Blackstone.  Keser is responsible for paying Blackstone's employees and contractors, and he makes hiring and firing decisions for Blackstone.[66]  King is the CEO of Newbridge.  King had sole control over Newbridge's bank accounts.[67]  King made hiring and firing decisions for Newbridge.  Moore is the managing member and sole owner of USCT.  Moore controlled the bank accounts of USCT.  Moore made hiring and firing decisions for USCT.[68]

### 2.    Each Individual Defendant Knowingly Induced the Unlawful Conduct

Beyond owning and controlling the entity defendants, the individual defendants did not act in good faith or knowingly induced the violations of the firms they ran.  A controlling person does not act in good faith if he fails to maintain a "reasonably adequate system of internal supervision and control" or fails to enforce that system "with any reasonable diligence." *Monieson v. CFTC*, 996 F.2d 852, 860 (7th Cir. 1993), quoting *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992).

Each of the principals of each corporate Defendant was directly involved in the illegal transactions, and the fraudulent actions identified in this filing.  Martin and Jager both know the true nature of Hunter Wise trading accounts, yet they market Hunter Wise to dealers as a supplier of physical metals,[69] and issue account documents to retail customers falsely stating that the customers own metals.  Burbage and Gaudino know the nature of Lloyd's operation as an intermediary between dealers and Hunter Wise, but also market themselves as suppliers of

---

[64] *Johnson Dec.* ¶¶ 18-20 and Exs. N-P.

[65] *Johnson Dec.* ¶¶ 24-27 and Exs. T, U.

[66] *Johnson Dec.* ¶ 29-30 and Exs. W, X.

[67] *King Trans.*, p. 20, Appx. p. 1346.

[68] *Moore Trans*. pp. 33-36, Appx. p. 1363.

[69] *Johnson Dec.* ¶ 36, Ex. CC.

physical metals.[70]  Chad Hopkins had control over the content of the CD Hopkins website.[71]  On a daily basis, he personally performed market research, reviewed customer account activity, discussed customer performance with CD Hopkins staff, and monitored his staff's phone communications with customers.[72]  Keser either personally approved or authored the content of Blackstone's website, and he approved all of Blackstone's promotional materials.[73]  Keser also runs the Compliance Department for Blackstone.  King administers and is responsible for the content of the Newbridge website.  King is also responsible for compliance functions at Newbridge, including creating compliance policies.[74]  Moore runs the day to day operations of USCT, including general supervision of the firm's operations and sales solicitations.  He personally sends out information to customers.  Moore is the compliance department at USCT. Moore created and had control over the content on USCT's website.[75]

## V.    CONCLUSION

Defendants do not make "actual delivery" of metals in connection with the transactions, which means their conduct is subject to the CFTC's jurisdiction over financed retail commodity transactions; they do not conduct the transactions on an exchange, which makes the transactions illegal; and they do not possess physical metals, which makes their solicitation and purported financing of the transactions fraudulent.  In light of the strong likelihood of ongoing fraud and illegal transactions, and a need to protect Defendants' customers, the CFTC respectfully requests that the Court enter an Order of Preliminary Injunction and against Defendants pursuant to Section 6c(a) of the Commodity Exchange Act, 7 U.S.C. § 13a-1(a), enjoining them from committing further violations of the Act and the CFTC Regulations, and freezing assets, requiring an accounting, appointing a Receiver, preserving and allowing CFTC inspection of books and records, and granting other equitable relief.

---

[70] *Johnson Dec.* ¶ 37 and Ex. DD.

[71] *Hopkins Trans,* pp 113 – 114, Appx. pp. 1337-38.

[72] *Id*., pp 90-91, Appx. pp. 1335-36.

[73] *Keser Testimony* pp. 168-70, Appx. pp. 1358-70,

[74] *King Testimony* pp. 13-15, Appx. pp. 1343-45.

[75] *Moore Testimony* pp. 57-60, Appx. pp. 1367.

Date: December 6, 2012

Respectfully submitted,

Attorneys for Plaintiff
Commodity Futures Trading Commission

/s/ *Carlin Metzger*
Carlin Metzger (cmetzger@cftc.gov)
Special Bar ID # A5501599
Joseph Konizeski (jkonizeski@cftc.gov)
Special Bar ID # A5501602
Brigitte Weyls (bweyls@cftc.gov)
Bar ID # A5501826
Thaddeus Glotfelty (tglotfelty@cftc.gov)
Bar ID # A5501827
Rosemary Hollinger (rhollinger@cftc.gov)
Associate Director
Special Bar ID # A5500849
525 West Monroe Street, Suite 1100
Chicago, IL 60661
Telephone: (312) 596-0700
Fax: (312) 596-0714


Peter Riggs (priggs@cftc.gov)
Bar ID # A5501828
Jeff Le Riche (jleriche@cftc.gov)
Bar ID # A5501829
4900 Main Street, Suite 500
Kansas City, Missouri 64112
Telephone (816) 960-7700
Fax: (816) 960-7754

CERTIFICATE OF SERVICE

I certify that a copy of the foregoing Motion for an Order of Preliminary Injunction and

Memorandum in Support Thereof is being sent to process servers to be served on the Defendants

at the following addresses, along with the Plaintiff's Complaint:

Hunter Wise Commodities, LLC
c/o Registered Agent Ed Martin
4966 South Rainbow Blvd., Suite 110
Las Vegas, NV 89118

Hunter Wise Services, LLC
c/o Registered Agent Ed Martin
2361 Campus Drive, Suite 180
Irvine, CA 92612

Hunter Wise Credit, LLC
c/o Registered Agent Ed Martin
4966 South Rainbow Blvd., Suite 110
Las Vegas, NV 89118

Hunter Wise Trading, LLC
c/o Registered Agent Ed Martin
4966 South Rainbow Blvd., Suite 110
Las Vegas, NV 89118

Lloyds Commodities, LLC
c/o Registered Agent J.B. Grossman, P.A.
200 E. Las Olas Blvd., Suite 1660
Fort Lauderdale, FL 33301

Lloyds Commodities Credit Company, LLC
c/o NVRA Services, Inc.
120 Hwy 50, Suite 3
Dayton, NV 89403

Lloyds Services, LLC
c/o Registered Agent J.B. Grossman, P.A.
200 E. Las Olas Blvd., Suite 1660
Fort Lauderdale, FL 33301

C.D. Hopkins Financial, LLC
c/o Corporate Creations Network
8275 South Eastern Avenue, #200
Las Vegas, NV 89123

Hard Asset Lending Group, LLC
c/o Corporate Creations Network, Inc.
11380 Prosperity Farms Road, #221E
Palm Beach Gardens, FL 33410

Blackstone Metals Group LLC
c/o Registered Agent Baris Keser
801 Northpoint Pkwy, Suite 75
West Palm Beach, FL 33407

Newbridge Alliance, Inc.
c/o Law Offices of Paul J. Burkhart, PL
800 Village Square Crossing
Palm Beach Gardens, FL 33410

United States Capital Trust, LLC
c/o Registered Agent David Moore
660 Federal Hwy, #300
Pompano Beach, FL 33062

Harold Edward Martin, Jr.
5952 Vizzi Court
Las Vegas, NV 89131-2858

Fred Jager
53 S. Peak
Laguna Niguel, CA 92677-2903

James Burbage
1915 Washington Avenue
Santa Monica, CA 90403-3305

Frank Gaudino
1312 Sonoma Court
Palm Beach Gardens, FL 33410-1517

Baris Keser
4008 40th Way
West Palm Beach, FL 33407-6828

Chadewick Hopkins
646 Flower Ave., Apt. 3
Venice, CA 90291-6711

John King
319 Clematis Street
West Palm Beach, FL 33401-4608

David A. Moore
144 Silver Lake Road 1
Staten Island, NY 10301-2734


/s/  *Carlin Metzger*_____
Carlin Metzger (cmetzger@cftc.gov)
Special Bar ID # A5501599
525 West Monroe Street, Suite 1100
Chicago, IL 60661
Telephone: (312) 596-0536