# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

## Case Number:  12-CV-81311-Middlebrooks/Brannon

U.S. COMMODITY FUTURES TRADING COMMISSION                  )
)
       Plaintiff,                  )
)
v.                  )
)
HUNTER WISE COMMODITIES, LLC et al.                  )
)
       Defendants,                  )
                                          /

## DEFENDANTS', NEWBRIDGE ALLIANCE, INC. AND JOHN KING, MOTION TO DISMISS COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

COMES NOW, the Defendants, NEWBRIDGE ALLIANCE, INC. ("Newbridge") and JOHN KING ("King"), by and through their undersigned counsel, and pursuant to the applicable Federal Rules of Civil Procedure and the Southern District of Florida Local Rules, hereby file their Motion to Dismiss Plaintiff's, Commodity Futures Trading Commission ("CFTC"), Complaint for Injunctive and Equitable Relief and Penalties Under the Commodity Exchange Act ("Complaint"), and in support thereof states as follows:

### Introduction

1.      On or about December 5, 2012, Plaintiff filed its original Complaint in the United States District Court for the Southern District of Florida, alleging multiple causes of action against multiple Defendants.

2.     Specifically, the Complaint alleges claims against Newbridge and King for violation of Section 4(a) of the Act (Count I), violation of Section 4(b) of the Act (Count VIII), and violations of Section 6(c)(1) of the Act and Regulation 180.1 (Count IX).

3.     On January 22, 2013, Defendant, Hunter Wise, filed its Motion to Dismiss and incorporated memorandum of law ("Hunter Wise Motion"), which sets forth a comprehensive analysis of the Federal statutes and facts involved in this matter, and will be used as a reference point by Defendants throughout this Motion.

4.     The CFTC states that it can exercise jurisdiction over Newbridge (including its principal, King) and its business operations pursuant to Section 742 of the Dodd-Frank Act., and the Commodity Exchange Act ("CEA") at 7 U.S.C. §2(c)(2)(D).   See Complaint, [DE 1 at paragraph 8].  However, as discussed below, CFTC's Complaint against the Defendants must be dismissed.

5.     CFTC sets forth that the Act provides it jurisdiction over "financed commodity transactions with retail customers…which…require[s all such retail commodity transactions] to be…executed…on an exchange [through the services of a futures commission merchant]. Complaint, [DE 1, pages 1-2).

6.     However, the Act must be read and enforced in light of the Uniform Commercial Code's ("U.C.C.") standard commercial practices on how inventories of commodities may be stored and sold.  If the U.C.C. applies, as Defendants contend, then they are doing business in accordance with the law.

### Parties

7.     Newbridge Alliance, Inc., is a retail dealer in precious and industrial metals. Newbridge deals in purchases and sales of physical precious, or industrial, metals (i.e. gold,

silver, platinum, etc.). It does not deal in futures transactions. Newbridge often purchases inventory from wholesale dealers, such as Hunter Wise, and then resells that inventory to the investing public.

8.      The CFTC is an independent agency of the United States of America and has exclusive jurisdiction to enforce the CEA and its regulation of transactions involving contracts of sale of a commodity for future delivery and specifically mentioned leverage transactions (unless otherwise provided by the Dodd-Frank Act).

## Statement of Facts

9.      With respect to the facts and history of this matter, Defendants would hereby incorporate and restate the facts set forth in the Hunter Wise Motion.

10.     Of particular note is the fact that, at no time, has any public investor or contract purchaser of inventory from the Defendants, failed to receive the value of the purchaser's account upon offset of a metal position, or failed to receive the metal delivered as per a client's delivery instruction.

11.     Newbridge maintains that it can and will, when required, immediately deliver or transfer either physical possession or economic control on all outstanding liabilities for any inventory sold.

12.     Further, Defendants would stress that the process utilized by Hunter Wise, Defendants, and the other retail dealers, is a system that is almost uniformly employed by the entire precious and industrial metals industry. In fact, this same system is designated by the U.C.C. for the sale and financing of fungible goods.

## Argument

**A.      The Defendants' transactions are not off-exchange transactions falling under Section 4(a) of the Commodity Exchange Act.**

13.     Defendants are not subject to the registration requirement of Section 4(a) of the CEA, 7 U.S.C. §6(a) (2011), because they do not deal in futures contracts.   Newbridge's contracts with its customers are not "contracts for the purchase and sale of a commodity for future deliver" and are not otherwise within the CFTC's Section 4(a) regulatory jurisdiction.

**B.     The Defendants' transactions are not contracts for sale of a commodity for future delivery and, therefore, are not within the regulatory jurisdiction of the CFTC under Section 2(a)(1)(A), or 4(a), 7 U.S.C. §§ 2(a)(1)(A) and 6(a).**

14.     Pursuant to the CEA, the CFTC has jurisdiction to regulate transactions involving contracts of sale of a commodity for future delivery, commonly referred to as "futures contracts." Section 2(a)(1)(A), 7 U.S.C. § 2(a)(1)(A).   The language of the CEA, though, provides little guidance to the CFTC in terms of defining what a Section 4(a) contract for future delivery is. However, Section 1a(27) of the CEA, 7 U.S.C. §1a(27), does state that a futures transaction does not include any sale of any cash commodity for deferred shipment or delivery. These "cash forward" or "spot" contracts are not subject to regulation by the CFTC because the underlying commodity holds an "inherent value" to the contracting parties, <u>Andersons, Inc. v. Horton Farms, Inc.</u>, 166 F.3d 308, 318 (6th Cir. 1998), and actually involve the sale of the underlying commodity. <u>CFTC v. Zelener</u>, 373 F.3d 861 (7th Cir. 2004).

15.     Conversely, a futures contract is a promise to buy or sell a particular commodity at a fixed date in the future. <u>CME v. SEC</u>, 883 F.2d 537, 542 (7th Cir. 1989). Futures contracts are fungible and readily transferrable because they have standard terms, which allow the trading to occur in the contract as opposed to the underlying commodity. <u>Zelener</u>, 373 F.3d at 864–66. Conversely, cash forward contracts are not subject to regulation because the terms of the contracts are not standardized. <u>See</u> generally Section 19 of the CEA, 7 U.S.C. 23 and <u>Zelener</u>, 373 F.3d at 865–66. Accordingly, the relevant inquiry is the standardization a contract, which is

what truly differentiates a regulated futures contract from an excluded cash forward contract. CFTC v. Erskine, 512 F.3d 309, 323 (6th Cir. 2008) (noting that the definitions of the respective contracts make mention of anticipation of delivery, therefore, delivery is not a practical distinction between the two).

16.     The court in CFTC v. Zelener provided guidelines for differentiating between a futures contract and a forward contract that is exempted from regulation by Section 1a(27).  See Hunter Wise Motion, paragraphs 74-80.    In Zelener, the CFTC attempted to rely on a delivery test for determining the singular focus of whether a transaction was a contract of sale for future delivery, *i.e.* whether delivery actually occurred no matter what other factors may be relevant to the party's purpose for entering into of the transaction (a test the CFTC states was developed by the Ninth Circuit in CFTC v. Co Petro Marketing, Inc., 680 F.2d 573 (9th Cir. 1981).

17.     However, the Zelener court rejected the test and recognized that treating absence of delivery (actual or intended) as a defining characteristic of a futures contract yields indeterminacy, because *every commodity futures contract* traded on the Chicago Board of Trade calls for delivery in some manner – and few ever result in delivery. Id., at 865 (emphasis added). See also Hunter Wise Motion, paragraphs 74-80.

18.     The Zelener court also provided its "trade in the contract" test to determine if a transaction is a futures contract, or an exempted trade transaction (focusing on whether the transaction is a sale of the contract or the commodities in determining whether the contract is a future contract). Id., at 865–66. See Hunter Wise Motion, paragraph 75. This test also leads to a determination that the contracts entered into by the Defendants are not "futures" contracts that are subject to regulation by the CFTC.

19.     The transactions executed by Defendants and its customers are not "standardized contracts" under the CEA. The transactions in metal by Defendants necessarily involve the sale of the metal itself, not a transaction in a contract. When a client of Newbridge enters into a transaction, the retail client receives actual delivery of the metal through a transfer of economic control of the metal upon the closing of the metal transaction, while also maintaining the right to demand physical delivery of the metal, if the customer so desires. See U.C.C. § 2-401(3)(a).[1]

**C.      Defendants are not subject to CFTC regulation under Section 19 of the Commodity Exchange Act because Defendants do not deal in "standardized" or "leveraged" transactions.**

**a.      "Standardized Transactions"**

20.     Pursuant to the Commodity Exchange Act, the CFTC has exclusive jurisdiction over transactions subject to regulation by the Commission under Section 19(a) of the Act, *i.e.,* leveraged transactions.[2]  7 U.S.C. § 23(a) (2011).

21.     The plain language of Section 19(a) restricts the Commission's jurisdiction under this section to specifically:

> A standardized contract commonly known to the trade as a margin account, margin contract, leverage account, or leverage contract, or under any contract, account, arrangement, scheme, or device that the Commission determines serves the same function or function as such a standardized contract, or is marketed or managed in substantially the same manner as such a standardized contract.

7 U.S.C. § 23(a). As noted previously, Defendants do not deal in standardized transactions.

**b.      "Leveraged Transactions"**

---

1.    U.C.C. Section 2-401(3)(b) provides that when delivery is to be accomplished without physically moving the goods, and the goods are already identified and no documents of title are to be delivered, title to the goods passes at the time and place of contracting.

2.    See First National Monetary Corp. v. CFTC, 860 F.2d 654, 657–58 (6th Cir. 1988) (defining transactions governed by section 19 as "leverage contracts").

22.    While Congress declined to define "margin account," "margin contract," "leverage account," or "leverage contract," the CFTC has set forth it own narrow definition of a leverage contract in CFTC Regulation 31.4(w).  First Nat'l Monetary Corp. v. CFTC, 860 F.2d 654, 658 (6th Cir. 1988) (citing 17 C.F.R. §§ 31.1–31.26).  A "leverage contract", according to the CFTC, is one which is standardized as to terms and conditions, for the long term (10 years or longer) purchase or sale of a leverage commodity.  See Hunter Wise Motion, paragraph 31.

23.    The CFTC has stated that, by defining a "leverage contract" in Regulation 31.4(w), the CFTC exercised its authority to specify the standardized contracts that Congress expected to be regulated under Section 19 of the CEA.    Regulation of Certain Leverage Transactions, 49 Fed. Reg. 5498-01, at 5498 (CFTC Feb. 13, 1984).

24.    As such, if Defendants' precious and industrial metals transactions lack standardized terms and conditions, are less than ten (10) years in duration, or fail to provide for all of the listed elements of the CFTC's definition, the transactions are *not* within Section 19 (a) of the CEA's regulatory jurisdiction.  See CFTC v. P.I.E., Inc., 853 F.2d 721, 724 (9th Cir. 1988) (holding that contracts that had a duration of less than ten years could not be leverage contracts); First Nat'l Monetary Corp., 860 F.2d at 658.  See also Hunter Wise Motion, paragraph 31.

25.    The transactions executed by Defendants are not "leverage contracts" within the CEA, because the transactions do not have durations of ten (10) years or longer, and are not standardized as to their terms and conditions.  Newbridge and its clients negotiate the terms and conditions of each transaction.

26.    Thus, from the plain language of Section 19 of the CEA, 7 U.S.C. § 23, it is clear that "leverage contracts" constitute the exclusive type of transactions governed by Section 19 of

the CEA.  See CFTC v. 20/20 Trading Comp., Inc., 2011 WL 2221177, at **5–6 (C.D. Cal. 2011)(Tucker). See Hunter Wise Motion, paragraph 33.

**D.     The Defendants' transactions are not "futures contracts", nor contracts traded through a "designated contract market", and are not governed by Section 4b.**

27.     Liability based on misrepresentation, deceit, or fraud, is found within 7 U.S.C. § 6b (i.e., Section 4b of the CEA, the anti-fraud provisions).[3]  Section 4b of the CEA ("Section 4b") only applies anti-fraud provisions to those transactions which involve a "contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, *on or subject to the rules of a designated contract market*" or "any contract of sale of any commodity for *future delivery.*"  See 7 U.S.C. §§ 6b(a)(1)–(2) (emphasis added).  See Hunter Wise Motion, paragraph 81.

28.     Fraud under Section 4b clearly requires that the acts be completed with knowledge of their nature and character.  Liability under Section 4b of the CEA is substantially similar to the common-law claim for fraud.  Greenwood v. Dittmer, 776 F.2d 785, 789, n.4 (8th Cir. 1985) (holding that the language of the anti-fraud provisions of Section 4b of the CEA were fashioned according to the common-law fraud elements).  Proof of "scienter" of the alleged fraudulent act is required for a claim under Section 4b of the CEA.  Hammond v. Smith Barney, Harris Upham & Co., [1987–1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,617 (CFTC 1990).[4]

---

3.     Under Section 4b of the CEA, there are two major rules as promulgated by the Commission:  CFTC Regulation 32.9 (i.e., 17 C.F.R. § 32.9) which is entitled "Fraud in Connection with Commodity Option Transactions;" and CFTC Regulation 33.10 (i.e., 17 C.F.R. § 33.10) which is also entitled "Fraud in Connection with Commodity Option Transactions."

4 Scienter has been defined as "a mental state embracing intent to deceive, manipulate, or defraud."  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, n.12 (1976).  Furthermore, this scienter requirement can be satisfied by a showing of reckless conduct by the defendant.[4]  See e.g., Mayoza v. Heinold Commodities, 871 F.2d 672, 679 (7th Cir. 1989).

29.     The CFTC has adopted a specific intent standard (or a standard of scienter which is very close to a specific intent standard) as explained in the <u>Hammond</u> case in construing Section 4b of the CEA.  See Hunter Wise Motion, paragraph 87.

30.     As previously discussed, Defendants do not deal in "futures contracts," but rather is in the business of buying and selling precious and industrial metals.  <u>See</u> 7 U.S.C. § 1a(19).  Further, designated contract markets (with most acting like traditional futures exchanges) are boards of trade (or exchanges) that operate under the regulatory oversight of the CFTC, pursuant to Section 5 of the CEA.  Defendants' business operations are not conducted pursuant to Section 5 of the CEA ( on a board of trade) and are not a "designated contract market."  Lastly, there are absolutely no allegations in the Complaint to suggest that Defendants have acted or will act (or has instructed a third party to act) in such a manner that would be deemed to meet the scienter element discussed above.

**E.     The CFTC does not have regulatory jurisdiction over the Defendants pursuant to Section 2(c)(2)(D) of the Commodity Exchange Act.**

31.     Section 2 of the CEA designates the parameters of the CFTC's regulatory jurisdiction.  The Dodd-Frank Act added a new subsection into Section 2(c)(2) of the CEA.  <u>See</u> Dodd-Frank Wall Street Reform and Consumer Protection Act, H.R. 4173, 111th Cong., § 742(a) (2010); 7 U.S.C. § 2(c)(2)(D) (2011).

32.     Section 2(c)(2)(D) authorizes the Commission to possess jurisdiction over any agreement, contract, or transaction in any commodity that is:

(I)   entered into with, or offered to (even if not entered into with), a person that is not an eligible contract participant or eligible commercial entity; and

(II) entered into, or offered (even if not entered into), on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis.

7 U.S.C. § 2(c)(2)(D)(i)(I)–(II). See also Hunter Wise Motion, paragraphs 28-29.

33.    Section 2(c)(2)(D) applies only to "any agreement, contract, or transaction in any commodity" that is "entered into . . . on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty *on a similar basis*." 7 U.S.C. § 2(c)(2)(D)(i)(II). However, as noted above and discussed more fully in the Hunter Wise Motion, a transaction cannot be "leveraged" or "margined" unless this transaction is standardized as to its terms and conditions, and holds at least a (10) year duration. See Hunter Wise Motion, paragraph 31.

34.    It is evident from the use of these terms by Congress, when creating and implementing Section 742 of the Dodd-Frank Act, that this section, if applicable to precious and industrial metals transactions at all, applies in a manner like Section 19 of the CEA.

35.    Additionally, the phrase "financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis" has not been defined under the CEA. The method of payment in a transaction will often determine whether a it is considered "leveraged" or "margined" and "financed".

36.    "Leveraged" or "margined" accounts involve a security deposit paid by the customer, designed to protect against adverse price movements in the commodity. Leist v. Simplot, 638 F.2d 283, 287 (2d Cir. 1980). The payment is generally only a small percentage of the full amount or value of the total transaction. Id. It is not a payment on the purchase price but, rather, an assurance on the performance of the contract.

37.     A financed account is more like a loan, whereby a third party (i.e. a bank or financial institution) acts to finance the transaction. The customer is required to make payments to the third-party financial institution in order to repay the loan. In finance transactions, the metals dealer is paid in full for the metal, and the customer takes full ownership of the metal, subject to a lien held by the lender.

38.     The Section 742 language inserted into the CEA at Section 2(c)(2)(D) also contains the language, "financed. . . *on a similar basis*,", which the CFTC is inappropriately using to claim regulatory jurisdiction under this section.

39.     The words "financed . . . on a similar basis" refer directly back to the "leveraged" or "margined" transactions at the beginning of the sentence, and accordingly, this language leads to the unambiguous conclusion that Sections 742 of Dodd-Frank and 2(c)(2)(D) of the CEA apply only to transactions that operate in a similar fashion as "leveraged" or "margined" transactions, and not to the transactions conducted by the Defendants and its customers. See Hunter Wise Motion, paragraphs 34-40.

**F.     The CFTC does not hold regulatory jurisdiction under CEA Section 2(c)(2)(D)(ii)(III)(aa) because Newbridge makes actual delivery within twenty-eight (28) days of the sale.**

40.     Defendants' transactions are not governed by Section 2(c)(2)(D) of the CEA because subparagraph 2(c)(2)(D) does not apply to a contract of sale that results in "actual delivery" within twenty-eight (28) days. 7 U.S.C. § 2(c)(2)(D)(ii)(III)(aa). However, the definition of the term "actual delivery" is cause for debate and has gone undefined by legislation or the courts.

41.     The U.C.C., however, does provide guidance on what is meant by the delivery of commodities. "'Delivery,' with respect to an electronic document of title means voluntary

transfer of *control*. . . ."   U.C.C. § 1-201(b)(15) (2011) (emphasis added).   See Hunter Wise Motion, paragraph 42.

42.     U.C.C. Article 2 provides that when "delivery" is to be made without moving the goods, if the goods are at the time of contracting already identified and no documents of title are to be delivered, title to the goods passes at the time and place of contracting.   See U.C.C. § 2-401(3)(b); see also Hunter Wise Motion, paragraphs 45-48.

43.     As such, the U.C.C. provides that "delivery" can be accomplished in ways other than physically picking up the item that was bought and transferring it to the possession of the buyer.   See Circuit City Stores, Inc. v. Commissioner of Revenue, 439 Mass. 629, 642, 790 N.E.2d 636, 638 – 39 (Mass.2003) (holding that the defendant had performed its delivery obligations when the sale was entered as an alternative location sale into Circuit City's DPS system and the purchased merchandise was "reserved" for the customer at the designated location); American Petrofina, Inc. v. PPG Industries, Inc., 679 S.W. 2d 740, (Tex.App. 2 Dist.,1984) (when oil was purchased, but for convenience was retained at the facility of the oil producer, ownership of the oil transferred at the time of contracting).   See also Hunter Wise Motion, paragraphs 45-48.

44.     The Defendants' transactions with their customers operate in a very similar fashion to that in the Circuit City case, at least with respect to delivery of the precious or industrial metals.   After a customer places an order with Newbridge, an entry is recorded on the books of Newbridge and the amount of metal that was purchased by the customer is recorded. Among other accounting documentation, a trade confirmation and a transfer of commodity document is issued for every transaction that occurs, which details the amount and value of the metal that was moved into or out of the customer account.

45.     Both Newbridge and its customers are aware that the precious and industrial metal that is being purchased is securely located in one of the depositories from which Newbridge purchases its metal.  There is no definite agreement between the parties as to a specific place for delivery, only that if the customer chooses to have the metal delivered to a specified location, the customer has that right.

46.     The CFTC has recently issued an interpretation and request for comments that without stating so, attempts to negate the U.C.C.'s typical commercial practice, and define "actual delivery" as the functional equivalent of "physical delivery."  However, this proposed interpretation is in conflict with the U.C.C., and thus does not meet other standards imposed on the CFTC that any rule it promulgates concerning delivery must be based upon the typical commercial practice in cash or spot markets for the commodity involved.  See Hunter Wise Motion, paragraphs 52-53.

## Conclusion

For the above reasons, Defendants, NEWBRIDGE ALLIANCE, INC. and JOHN KING, respectfully request the Court to enter an Order dismissing Plaintiff's, U.S. COMMODITY FUTURES TRADING COMMISSION, Complaint as it relates to Defendants (Counts I, VIII, and IX).

LAW OFFICES OF PAUL J. BURKHART, PL
800 Village Square Crossing
Palm Beach Gardens, Florida 33410
Telephone: (561) 880-0155
Facsimile: (561) 656-2070


By:  /s/ Jeffrey C. Pepin
        Jeffrey C. Pepin
        Florida Bar No.: 416304
        jpepin@paulburkhart.net

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on January 22, 2013, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF and is also being served on all counsel of record listed in the attached service list in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

/s/____ Jeffrey C. Pepin_____
Jeffrey C. Pepin
Fla. Bar # 416304

## SERVICE LIST

**U.S. Commodity Futures Trading Commission v. Hunter Wise Commodities, LLC et al.**
**CASE NO.:  12-CV-81311-Middlebrooks/Brannon**

*Via Email and CM/ECF*

Attorneys for Plaintiff
U.S. Commodity Futures Trading Commission

**Carlin Metzger** (cmetzger@cftc.gov)
Bar ID # A5501599
525 West Monroe Street, Ste 1100
Chicago, IL 60661
Telephone: (312) 596-0536
Fax: (312) 596-0714

**Brigitte Weyls** (bweyls@cftc.gov)
Bar ID # A5501826
**Thaddeus Glotfelty** (tglotfelty@cftc.gov)
Bar ID # A5501827
**Joseph Konizeski** (jkonizeski@cftc.gov)
Bar ID # A5501602
**Rosemary Hollinger** (rhollinger@cftc.gov)
Regional Counsel
Bar ID # A5500849
U.S. Commodity Futures Trading Commission
525 West Monroe Street, Ste 1100
Chicago, IL 60661
(312) 596-0700

**Peter Riggs** (prigs@cftc.gov)
Bar ID # A5501828
A5501828
**Jeff Le Riche** (jleriche@cftc.gov)
Bar ID # A5501829
U.S. Commodity Futures Trading Commission
4900 Main Street, Ste 500
Kansas City, Missouri 64112
Telephone: (816) 960-7700
Fax: (816) 960-7754

<u>Attorney for Defendants</u>

**Jay Bruce Grossman**
J.B Grossman, P.A.
200 East Las Olas Boulevard, Ste 1660
Fort Lauderdale, FL 33301
Telephone: (954) 452-1118
Fax: (954) 916-4448

**Timothy J Carey**
Winston & Strawn, LLP
35 W. Wacker Drive
Chicago, IL
Telephone: (312) 558-6232

**Gary M. Sinclair**
2043 N Mohawk St
Chicago, OL 60614
Telephone: (773) 871-4389