**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No.: 12-CV-81311-Middlebrooks/Brannon

UNITED STATES COMMODITY FUTURES
TRADING COMMISSION,

      Plaintiff,

  v.

HUNTER WISE COMMODITIES, LLC,
HUNTER WISE SERVICES, LLC, HUNTER
WISE CREDIT, LLC, HUNTER WISE
TRADING, LLC, LLOYDS COMMODITIES,
LLC, LLOYDS COMMODITIES CREDIT
COMPANY, LLC, LLOYDS SERVICES,
LLC, C.D. HOPKINS FINANCIAL, LLC,
HARD ASSET LENDING GROUP, LLC,
BLACKSTONE METALS GROUP, LLC,
NEWBRIDGE ALLIANCE, INC., UNITED
STATES CAPITAL TRUST, LLC, HAROLD
EDWARD MARTIN, JR., FRED JAGER,
JAMES BURBAGE, FRANK GAUDINO,
BARIS KESER, CHADEWICK HOPKINS,
JOHN KING, and DAVID A. MOORE,

      Defendants.

**PLAINTIFF CFTC'S RESPONSE TO THE COURT'S APRIL 19, 2013 ORDER AND
THE MONITOR'S INITIAL REPORT**

      The CFTC supports the Special Monitor's recommendations that (1) the Corporate Monitor should be appointed as a Receiver; (2) this Court stay all legal proceedings involving the Lloyds Entities and Dealer Entities in which they are defendants pending further evaluation by the Monitor and direction from the Court; and (3) that the Monitor be permitted to stay the action filed by Hunter Wise pending the resolution of this action or seek its transfer to this Court.  All three actions should

result in a more efficient and effective means of preserving assets pending a final judgment in this action.

**I.      The Monitor should be granted full receivership authority.**

The Monitor's Initial Report (DE 102) shows that:

1) There is a vast shortfall of funds available to compensate customer losses.

2) The vast majority of the Entity Defendants' businesses involved the illegal, financed retail commodity transactions that are the focus of the CFTC's Complaint.

3) There is no viable ongoing business model for the Entity Defendants that would involve them continuing to buy or sell physical metals on a fully-paid basis.

4) The Entity Defendants are incurring continued expenses that will deplete the funds ultimately available for recovery.

Under these circumstances, a receiver would be better positioned than a monitor to marshal assets of the Defendants and prevent the dissipation of assets pending a final judgment in this case.

First and foremost, there is a dramatic shortfall in frozen assets available to provide restitution to individuals who suffered losses in Defendants' illegal financed commodities transactions. This summary of some key figures in the Monitor's Initial Report shows that there is good reason to focus the Monitor's attention on recovering and preserving assets as opposed to monitoring or managing business operations:

| | |
|---|---|
| Retail Customer Losses 1/1/2008 to 2/25/2013 | $83,334,325.50 |
| Retail Customer Losses 7/16/2011 to 2/25/13 | $57,239,211.35 |
| Retail Customer Equity as of 2/25/2013 | $7,574,597.62 |
| Hunter Wise Cash and Equity as of 2/25/2013 | $6,975,142.01 |

These figures are shocking not only because of the massive losses, but also because they show that as of February 25, 2013, the Hunter Wise entities did not even have sufficient assets to repay existing retail customers their equity. In other words, if all customers with existing equity in trading positions on February 25, 2013 demanded the return of their funds on that date, Hunter Wise could not have satisfied the request.[1] Fortunately, the Monitor was able to prevent further charges to existing retail customers going forward (in terms of interest and service charges on the illegal financed transactions) by converting retail customer trading positions on the books of Hunter Wise to cash positions.[2] In addition, this measure insulated existing retail customers from significant price drops in metals in recent weeks.[3] The Monitor has also been able to preserve assets by converting Hunter Wise's own trading positions to cash so that Hunter Wise was not incurring additional trading expenses associated with its margin trading accounts.[4] But given the relatively limited assets the Monitor currently has control over (approximately **$7.6 million** from the Hunter

---

[1] Based on reports produced by Hunter Wise through the Monitor, it appears that Hunter Wise had 3,881 retail customers between July 16, 2011 and February 25, 2013. Of those customers, 852 had remaining equity as of February 25, 2013.

[2] See Initial Report, Exhibit B (DE 108-2, page 9 of 10), the final page of the Hunter Wise report entitled, Consolidated Client Statistics by Dealer, which includes a summary table entitled "Totals Across all Dealers" and column labeled "Current Equity". As of February 25, 2013, retail customer cash equity on account at Hunter Wise was $7,573,979.92. This Current Equity figure is the sum of current cash equity for all retail customers holding a trading account at any of Hunter Wise's active dealers as of February 25, 2013. This report was generated from Hunter Wise's own records and databases.

[3] See e.g., "Gold Plunges as Fears Over Inflation Fade, Metals 9.4% Drop on Comex Is Largest in 30 Years," Wall Street Journal, (http://online.wsj.com/article/SB10001424127887324030704578424123590556556.html) (Berthelsen, Wessel, Zuckerman) (last visited April 26, 2013).

[4] See Initial Report, Exhibit K (DE 102-11). As of February 25, 2013, the value of Hunter Wise's trading accounts, physical metals, and cash on hand totaled $6,975,142.01. The Monitor has also obtained some additional funds from affiliates of the Hunter Wise entities such as the Hunter Wise Cayman operation, which bring the total Hunter Wise funds collected thus far per the Report to $7,678,368.96.

Wise Defendants, and about **$8.1 million** total from _all_ of the Defendants combined) and the magnitude of retail customer losses, a court-appointed receiver would be better positioned to attempt to recover and preserve assets for a potential recovery in this matter.  In particular, a receiver should have the authority to completely cease the operations of the Entity Defendants to avoid expenses going forward, to pursue claims on behalf of the Defendants (such as against the Hunter Wise Cayman company, which may owe the Hunter Wise Defendants millions of dollars[5]), and to convert any other tangible assets (such as office furniture and equipment) to cash.  The CFTC believes a receivership would focus resources on preserving Defendants' assets rather than managing or monitoring their business operations.

The Monitor should also be given full receivership authority because the vast majority of the Entity Defendants' business operations involved illegal financed transactions, and the limited fully-paid metals business of the Entity Defendants is not viable going forward.  At the conclusion of the evidentiary hearing on February 22, there was a discussion of whether the Entity Defendants could continue as going concerns after the cessation of their illegal financed transactions.  The Monitor's assessment in the Initial Report is that they cannot, and that assessment is well-supported by the underlying numbers.  The Monitor states that "the fully paid sale and delivery of precious metals represented 0.85% of the HW Entities' business in 2011, and less than 3% in 2012 and 2013."[6]

---

[5] The Hunter Wise Cayman entity (www.hwic.com) appears to be substantially in debt to the Hunter Wise entity defendants in this case.  The Initial Report indicates that the Cayman entity set up in 2012 owes Hunter Wise at least $572,172.31, and that the Cayman entity "also received approximately $1,571,792.85 from HW Credit with little or no consideration provided."  In addition, the predecessor to this Cayman entity was until 2012 a U.K. entity that was a wholly-owned subsidiary of a Defendant in this case, Hunter Wise Commodities LLC, and which according to the Monitor is "also indebted to HW Credit in the approximate amount of $1,330,910.58."  [D.E. 102, p. 18.]

[6] See Initial Report, DE 102, p. 44 of 47.

Further, in terms of the percentage or number of customers engaging in financed versus fully paid transactions, Hunter Wise records show that between July 16, 2011 and February 25, 2013, at least 85% of retail customers executing transactions through Hunter Wise engaged in illegal financed transactions.[7]  The volume of fully paid metals transactions, as well as sales and revenue associated with this type of transaction, is simply insufficient to continue as a going concern.

The Monitor's Initial Report also reflects that the Entity Defendants are incurring ongoing expenses that may deplete assets ultimately available for recovery in this case.  For example, since the Monitor currently does not have the authority to liquidate assets, she must arrange for storage of items such as office furniture and equipment.  The CFTC concurs with the Monitor's assessment that the authority to liquidate such assets and to avoid expenses associated with maintaining or storing such assets would be a more effective way to preserve assets in this case.

II.     **The CFTC supports the Monitor's request for authorization to stay legal proceedings involving the Lloyds Entities or the Dealer Entities pending further evaluation by the Monitor.**

The Monitor has identified several actions in which the Lloyds Entities or Dealer Entities (in particular U.S. Capital Trust) are defendants.  At this point, the Monitor is simply asking for additional time to further evaluate these cases and provide a more detailed recommendation.  Staying these cases pending a more detailed evaluation and recommendation should help preserve assets for a potential recovery in this case.  It is not likely to be efficient to have the Monitor expend

---

[7] In fact, this figure is much higher if customers' trading activity prior to July 16, 2011 is considered.  Many of these trading accounts span the time period before and after the effective date of Section 742 of the Dodd Frank Act.  For example, these figures include customers who engaged in financed transactions prior to July 16, 2011, but who closed the trading positions prior to July 16, 2011 and had cash positions on the books of Hunter Wise as of that date.  The reports show that 3,290 out of 3,881 customers from July 16, 2011 to February 25, 2013 engaged in financed transactions and that 4,221 out of 4,801 (88%) retail customers between January 1, 2008 and February 25, 2013 engaged in financed transactions.  These figures are based on up to date client statistics reports produced by Hunter Wise through the Monitor.

5

resources representing the Entity Defendants in these state-court actions. This is particularly the case to the extent these Defendants have little or no assets for recovery in this action let alone others.[8]

### III. The CFTC supports the Monitor's recommendation to stay the Hunter Wise action filed in the Northern District of Illinois or transfer the action to this Court.

The Monitor is facing expenses associated with the litigation in the case filed by Hunter Wise against the CFTC in the Northern District of Illinois. Most recently, Defendants Ed Martin and Fred Jager filed a motion to intervene in the case Hunter Wise filed in the Northern District of Illinois. The Monitor has retained counsel to represent the Monitor and Hunter Wise in that action.

As it stands, in the N.D. of Illinois case, Hunter Wise is asserting (and Martin and Jager if permitted to intervene would be asserting) the same legal argument that they have already raised as a defense in this action. The CFTC believes it would be more efficient and cost-effective to either stay that litigation pending the outcome of this case or have the case transferred to this Court rather than to have the parties and another Court address the same issue. Further, the legal issue raised in the N.D. of Illinois case is also the subject of Martin and Jager's interlocutory appeal of this Court's February 25, 2013 Preliminary Injunction Order.

Dated: April 26, 2013

Respectfully submitted,

Attorney for Plaintiff
Commodity Futures Trading Commission
 /s/  *Carlin Metzger*
Carlin Metzger (cmetzger@cftc.gov)
Special Bar ID # A5501599
525 West Monroe Street, Suite 1100
Chicago, IL 60661
Telephone: (312) 596-0536

---

[8] The CFTC objects to the recent filings in this case of attorney Russell Forkey relating to state-court actions filed against Lloyds Commodities given that Mr. Forkey does not represent any party in this case.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 26th day of April 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will simultaneously transmit an electronic copy of the foregoing to counsel for the Defendants:

*Attorney for Fred Jager and Ed Martin*
J.B. Grossman
J.B. Grossman, P.A.
200 E. Las Olas Blvd., Suite 1660
Fort Lauderdale, FL 33301
jbg@jbgpa.com


*Attorney for John King*
Jeffrey C. Pepin
Law offices of Paul J. Burkhart, PL
800 Village Square Crossing
Palm Beach Gardens, Florida 33410
jpepin@paulburkhart.net
Telephone 561-880-0155
Fax: 561-656-2070


*Attorney for Baris Keser*

Richard B. Carey, Esq.
1711 Worthington Rd, Ste. 107
West Palm Beach, FL 33409
richard@rcareylaw.com


*Attorney for James Burbage and Frank Gaudino*
James D. Sallah
Sallah & Cox, LLC
2101 NW Corporate Boulevard, Suite 218
Boca Raton, FL 33453
jds@sallahcox.com
Telephone: 561-989-9080
Fax: 561-989-9020


*Attorneys for David A. Moore*
Gary Sinclair
2043 N. Mohawk Street
Chicago, IL 60614
gary@garyslaw.com
Telephone: 773-871-4389

Bradford M. Cohen
1123 SE 3rd Ave,
Fort Lauderdale, FL 33316
lawronin@aol.com
Telephone: 954-523-7774
Fax: 954-253-2656

*Attorney for the Corporate Monitor on behalf of all Entity Defendants*

**DAMIAN & VALORI, LLP**
KENNETH DANTE MURENA, P.A.
FLORIDA BAR NO. 147486
Counsel for Special Monitor / Corporate Manager
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965

/s/   *Carlin Metzger*
Carlin Metzger (cmetzger@cftc.gov)
Special Bar ID # A5501599
525 West Monroe Street, Suite 1100
Chicago, IL 60661
Telephone: (312) 596-0536