## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.: 12-81311-CIV-MIDDLEBROOKS/BRANNON

UNITED STATES COMMODITY FUTURES
TRADING COMMISSION,

     Plaintiff,

v.

HUNTER WISE COMMODITIES, LLC, *et al.*,

     Defendants.

_____/

### ORDER ON THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT

THIS CAUSE comes before the Court upon Motion by Plaintiff United States Commodity

Futures Trading Commission ("CFTC") for Summary Judgment (DE 149) and Counter-Motion by

Defendants Harold Edward Martin, Jr. ("Martin") and Fred Jager ("Jager") (collectively,

"Defendants Jager and Martin") for Summary Judgment (DE 176).[1]  The CFTC filed its

Consolidated Reply in Support of its Motion for Summary Judgment and Response to Martin and

Jager's Counter-Motion for Summary Judgment. (DE 185; DE 195).[2]  Defendants Jager and Martin

filed the Reply to their Counter-Motion for Summary Judgment. (DE 196).  I have reviewed the

---

[1]  Defendants Jager and Martin included its Response to the CFTC's Motion for Summary Judgment in their Counter-Motion for Summary Judgment. (DE 175).  Further, Defendants Jager and Martin sought clarification whether its Counter-Motion for Summary Judgment was filed timely.  I deem Defendants Jager and Martin timely filed.

[2]  Defendants James Burbage and Frank Gaudino filed a Response in Opposition to the CFTC's Motion for Summary Judgment. (DE 172).  The CFTC and Defendants Burbage and Gaudino resolved their claims and, on February 5, 2014, the Court entered a Consent Order.  (DE 254).  Therefore, the Court shall not address the claims raised by Defendants Burbage and Gaudino in their Response.

Parties' respective Statements of Material Fact (DE 153; DE 175-1), corresponding exhibits, depositions, and affidavits, (DE 150, DE 184, DE 187-94), and the record and I am otherwise advised in the premises.

## I.   STATUTORY BACKGROUND

On December 5, 2012, the CFTC filed the Complaint (DE 1) in the instant action, alleging thirteen Counts against Defendants[3] for violations of several sections of the Commodity Exchange Act, Pub. L. No. 74-765, 49 Stat. 1491 (1936), as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act. Pub. L. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank").[4] Section 742 of the Dodd-Frank Act expanded the scope of the CFTC's jurisdiction to include financed commodity transactions with consumers, granting the CFTC the power and authority to ensure that transactions involving commodities were to be executed on an exchange, subjecting such

---

[3] For purposes of this Order, "Defendants" consist of the Entity Defendants (Hunter Wise Commodities, LLC, Hunter Wise Services, LLC, Hunter Wise Credit, LLC, Hunter Wise Trading, LLC, C.D. Hopkins Financial, LLC, Hard Asset Lending Group, LLC, Blackstone Metals Group, LLC, Newbridge Alliance, Inc., and United States Capital Trust, LLC) as well as individual Defendants David A. Moore, Chadewick Hopkins, Baris Keser, John King, Harold Edward Martin Jr, and Fred Jager. As noted previously, *see supra* note 2, the Lloyds Defendants, which consist of Lloyds Commodities, LLC, Lloyds Commodities Credit Company, LLC, Lloyds Services, LLC, and Defendants Burbage and Gaudino, settled the claims against them and their conduct will not be reviewed in this Order. For purposes of this order, the "Hunter Wise Defendants" include Hunter Wise Commodities, LLC, Hunter Wise Services, LLC, Hunter Wise Credit, LLC, Hunter Wise Trading, LLC, and Defendants Jager and Martin. The "C.D. Hopkins Defendants" consist of C.D. Hopkins Financial, LLC, Hard Asset Lending Group, LLC, and Defendant Hopkins. The "Blackstone Defendants" include Blackstone and Defendant Keser. The "Newbridge Defendants" consist of Newbridge and Defendant King. The "USCT Defendants" include USCT and Defendant Moore. "Dealer Defendants" refers to C.D. Hopkins, Defendant Hopkins, Hard Asset Lending, Blackstone, Defendant Keser, Newbridge, Defendant King, USCT, and Defendant Moore.

[4] Dodd-Frank became effective on July 16, 2011 and granted the CFTC new authority over certain leveraged, margined, or financed commodity transactions with retail customers, including authority to prohibit fraud in connection with such transactions in interstate commerce.

transactions to the anti-fraud provisions of Sections 4(a) and 4b of the Commodity Exchange Act ("Act" or "CEA").[5]  Specifically, the Dodd-Frank Act added Section 2(c)(2)(D).  *See* 7 U.S.C. § 2(c)(2)(D)).

Section 2(c)(2)(D) provides, in relevant part:

**(D) Retail commodity transactions**

**(I) Applicability**

Except as provided in clause (ii), this subparagraph shall apply to any agreement, contract, or transaction in any commodity that is –

**(I)**    entered into with, or offered (even if not entered into with), a person that is not an eligible contract participant[6] or eligible commercial entity; and

**(II)**    entered into, or offered (even if not entered into), on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis.

**(ii) Exceptions**

This subparagraph shall not apply to –

---

[5]  The Commodity Exchange Act "is a remedial statute that serves the crucial purpose of protecting the innocent individual investor – who may know little about the intricacies and complexities of the commodities market – from being misled or deceived." *CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F. 3d 1321, 1329 (11th Cir. 2002).  Initially, the only commodities regulated by Congress were certain grain futures transactions pursuant to the Grain Futures Act.  In 1936, Congress renamed the Act to be the Commodity Exchange Act, and expanded its coverage to include additional agricultural commodities.  Since then, the Act has been amended several times. In 1974, the CFTC was established by the Commodity Futures Trading Commission Act, Pub. L. No. 93–463, 88 Stat. 1389.  The CFTC is charged by Congress with administering and enforcing the Commodity Exchange Act and the Commission Regulations promulgated thereunder. *See* 17 C.F.R. §§ 1 *et seq.*

[6]  The Act defines an eligible contract participant ("ECP"), in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual enters into the transaction in order to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual. 7 U.S.C. § 1a(18)(xi).

(I)     an agreement, contract or transaction described in paragraph (1) or subparagraphs (A), (B), or (C), including any agreement, contract, or transaction specifically excluded from subparagraph (A), (B), or (C).

(II)    any security;

(III)   a contract of sale that –

(aa)    results in actual delivery within 28 days or such other longer period as the Commission may determine by rule or regulation based upon the typical commercial practice in cash or spot markets for the commodity involved; or

(bb)    creates an enforceable obligation to deliver between a seller and a buyer that have the ability to deliver and accept delivery, respectively, in connection with the line of business of the seller and buyer[.]

7 U.S.C. § 2(c)(2)(D).[7] This section further states that, apart from the exceptions listed above, these types of transactions are subject to Sections 4(a),[8] , 4(b), and 4b[9] of the Act "as if the agreement,

---

[7]  It follows that a "retail customer" is a person that is not an ECP, i.e., an individual who does not meet the standards as set forth in 7 U.S.C. § 1a(18)(A)(xi). In the instant matter, the CFTC claim that Defendants' retail customers did not have the $5 million or more invested on a discretionary basis that is required to be an ECP. (*See* DE 149 at 5 n.2).

[8]  7 U.S.C. § 6(a), provides, in relevant part:

**(a) Restriction on futures trading**

. . . [I]t shall be unlawful for any person to offer to enter into, to enter into, to execute, to confirm the execution of, or to conduct any office or business anywhere in the United States, its territories or possessions, for the purpose of soliciting or accepting any order for, or otherwise dealing in, any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery (other than a contract which is made on or subject to the rules of a board of trade, exchange, or market located outside the United States, its territories or possessions) unless--

(1) such transaction is conducted on or subject to the rules of a board of trade which has been designated or  registered by the Commission as a contract market or derivatives transaction execution facility for such commodity; [and]

(2) such contract is executed or consummated by or through a contract market[.]

[9]  7 U.S.C. § 6b(a)(2), provides, in relevant part:

4

contract, or transaction was a contract of sale of a commodity for future delivery." 7 U.S.C. § 2(c)(2)(D)(iii).

Further, Section 753 of the Dodd-Frank Act amended Section 6(c) of the Act (7 U.S.C. §§ 9, 15)[10] to broaden the CFTC's anti-fraud jurisdiction as set out in Commission Regulation 180.1, which prohibits the "intentional or reckless" use of deceptive or manipulative practices in

---

**(a) Unlawful actions**

It shall be unlawful–

. . .

(2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market–

    (A)    to cheat or defraud or attempt to cheat or defraud the other person;

    (B)    willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]

    (C)    willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person[.]

[10]  Section 6(c) of the CEA is codified in both 7 U.S.C. § 9 and 7 U.S.C. § 15. 7 U.S.C. § 9(1), became effective on August 15, 2011 and provides, in relevant part:

It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010[.]

"connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity." *See* 17 C.F.R. § 180.1.

## II.   FACTUAL BACKGROUND

On December 5, 2012, the CFTC filed a Motion for Preliminary Injunction (DE 4) seeking to enjoin the Defendants from offering and executing illegal retail commodity transactions. On February 22, 2013, after the Court held a hearing on the Motion for Preliminary Injunction, the Court issued an Order Temporarily Appointing Special Corporate Monitor. (DE 77). The Court issued an Order on Plaintiff's Motion for Preliminary Injunction (DE 78) on February 25, 2013 finding that the CFTC is entitled to a preliminary injunction and other equitable relief as well as reaffirming the Special Monitor's authority as it relates to the Entity Defendants. *See id.* at 33-37.

The CFTC alleges that Defendants engaged in a fraudulent scheme where they claim to sell physical metals to retail customers, make loans to customers to purchase the commodities, and enter agreements with suppliers to store the metals in independent depositories. (DE 153, ¶¶ 1-5). In actuality, however, Defendants did not possess the metals, did not operate on a regulated exchange, and only provided their retail customers with a means of speculating on the price of metals. *Id.* ¶¶ 8, 17-22.[11]

The Dealer Defendants contacted prospective buyers by telephone or through their website. *Id.* at ¶ 1. If a retail consumer decided to purchase or sell precious metals, which included gold, silver, platinum, palladium, or copper, they would enter into agreements with the Dealer Defendants that allowed for financing of the transaction and promised to store the metals for the retail

---

[11] Defendants Jager and Martin contend that the facts in the instant matter have changed since the Court's Omnibus Order Denying Defendants' Motion to Dismiss (DE 155), issued on June 21, 2013. (*See* DE 175 at 10-11). As discussed below, I disagree with Defendants Jager and Martin. The evidence on the record continues to support the facts the CFTC claims.

consumers. *Id.* at 2. The Dealer Defendants would contact the Hunter Wise Defendants through the Lloyds Defendants to effectuate a trade with the retail consumer. *Id.* at 153, ¶ 9. After completing a purchase, retail customers received a "Transfer of Commodity" notice from Defendants, which purported to allow the retail customers to take possession of the "purchased commodities" at their election.[12]

---

[12]  The Transfer of Commodity notices, sent to consumers, make the following representations:

    (a)   Product Received into your account

    (b)   Product Shipped out of your Account

    (c)   [Dealer Defendant] hereby confirms that a depository ("Custodian") authorized by agreements referred to below has received custody of the goods and/or warehouse receipts therefore ("commodities") identified above.

    (d)   Your are hereby notified of deliver of commodities to the Custodian for your benefit.

    (e)   The Custodian has notified [Dealer Defendant] that it will hold such commodities in accordance with the terms and conditions of the [Dealer Defendant] Purchase and Sale Agreement

    (f)   The warehouse receipts held by the Custodian represent [Dealer Defendant] customer commodities stored by facilities authorized in the Loan and Security Agreement. Each warehouse receipt is subject to the specific terms and conditions of storage set forth therein.

    (g)   The goods held by the custodian represent [Dealer Defendant] customer commodities stored by facilities authorized in the Loan and Security Agreement. All such goods are subject to the specific terms and conditions of storage set forth therein.

    (h)   The customer acknowledges that upon receipt of commodities for customer's account, Custodian will maintain collectively with the commodities held on behalf of all [Dealer Defendant] customers' physical inventories which are held at one or more of several depositories. The Custodian also may at its own direction order [Dealer Defendant] to transfer custody of your commodities to another Custodian provided such Custodian is authorized by the aforementioned Agreements and [Dealer Defendant] is notified of such transfer.

    (I)   Delivery of Commodities: You are hereby notified that the Custodian has released the commodities identified above which it has held for you to [Dealer Defendant] pursuant to your order for delivery or transfer of these commodities.

Despite the representations made in the transaction agreements and confirmations, the CFTC alleges that Defendants never had actual possession of or title to the metals. (DE 153, ¶ 17). Therefore, the retail customers could not take possession of the precious metals at their election. Instead, Defendants used their retail consumers' funds to make trades on the open market while charging the consumers inflated commissions, a price spread, interest on the purported loan, and other fees. *Id.* at ¶¶ 4-6, 18-20.

The Hunter Wise Defendants offered and managed a database, "portal," that allowed dealers and retail customers to access their account and transaction information and provided the Dealer Defendants to generate reports on the retail customers. *Id.* at ¶¶ 10-12. Hunter Wise generated the account documents that were given to retail consumers, even though they were on the Dealer Defendants' letterhead and appeared to be from the Dealer Defendants. *Id.* at ¶¶ 15-16.

In its Motion for Summary Judgment, the CFTC seeks summary judgment as to Count One of its Complaint (DE 1), illegal, off-exchange transactions in violation of Section 4(a) of the Act, against all remaining Defendants, and as to Count Twelve of its Complaint (DE 1), failure to register as a Futures Commission Merchant in violation of Section 4(d) of the Act, against the Hunter Wise Defendants. In addition, the CFTC requests partial summary judgment against the Hunter Wise and CD Hopkins entity defendants that the entity defendants operated as "common enterprises" for purposes of their liability on all counts of the Complaint.

---

(For examples, *see* DE 150-1 at 219; DE 150-2 at 339, 373). In addition to the aforementioned representations, the Transfer of Commodity notices sent by the Newbridge Defendants contains the following representation, "Newbridge Alliance hereby confirms that a depository ('Custodian') authorized by agreements referred to below has received custody of the goods and/or warehouse receipts therefore ('commodities') identified above and to which you hold title." (DE 150-1 at 262, 276; DE 150-2 at 303).

In their Motion for Summary Judgment, Defendants Jager and Martin claim: (1) the Hunter Wise Defendants did possess the precious metals that they were contractually obligated to provide retail consumers; (2) the Hunter Wise Defendants were not required to execute these transactions through a regulated exchange because the "actual delivery" exception applied; and (3) Section 2(c)(2)(D)(iii) is vague, facially and as-applied to Defendants.

## III.   LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56(c)(1)(A)). Where the non-moving party bears the burden of proof on an issue at trial, the movant may simply "[point] out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

After the movant has met its burden under Rule 56(c), the burden shifts to the non-moving party to establish that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). Although all reasonable inferences are to be drawn in favor of the non-moving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), he "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The non-moving party may not rest upon the mere allegations or denials of the adverse party's pleadings, but instead must come forward with "specific facts showing

that there is a *genuine issue for trial*." *Id.* at 587 (emphasis in original) (citing FED. R. CIV. P. 56(e)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If the non-moving party fails to make a sufficient showing on an essential element of his case on which he has the burden of proof, the moving party is entitled to a judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

Essentially, so long as the non-moving party has had a full opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. *Anderson*, 477 U.S. at 257. If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." *Id.* at 249-50. The Court does not weigh conflicting evidence, *Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007), *reh'g and reh'g en banc denied*, 254 F. App'x 803 (11th Cir. 2007), and the Court does not determine the credibility of witnesses. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (citation omitted). Upon discovering a genuine material dispute of fact, the Court must deny summary judgment and proceed to trial. *Id.* at 1292.

With these standards in mind, I turn to the issues raised in the Parties' Motions.

## IV.   DISCUSSION

### A.   *Count One - Section 4(a) as to All Defendants*

Dodd-Frank authorized the CFTC's jurisdiction over leveraged, margined, or financed retail commodities transactions. If the transactions involve a retail customer, a person who is not an

Eligible Contract Participant, *see* 7 U.S.C. § 1a(18)(A)(xi), then the transactions must occur in a regulated exchange or board of trade. *See* 7 U.S.C. § 2(c)(2)(D). Unregulated commodities transactions violate the CEA and, therefore, are illegal.

In the instant matter, the CFTC provided evidence on the record demonstrating that Defendants engaged in and/or offered financed commodity transactions, including gold, silver, and platinum, between July 16, 2011 and February 25, 2013, and that they did not conduct these transactions on a regulated exchange as required by Section 4(a) of the CEA. *See* 7 U.S.C. § 2(c)(2)(D); (DE 153 at ¶¶ 1-8 (citing to witness depositions and affidavits describing the commodities transactions at issue in the instant matter)).

Each Defendant engaged in conduct that resulted in the violation of Section 4(a) of the Act. The Dealer Defendants solicited and offered financed precious metal transactions to retail consumers. They sent "Transfer of Commodity" notices to retail consumers who entered into these transactions that purported to allow them to obtain the metals upon their election. Hunter Wise took orders from the Lloyds Defendants regarding new retail commodity transactions, managed the database that executed the transactions, and generated the documents confirming the transactions.

Reviewing the transactions, not just the particular parties in the transaction, I find that the commodities transactions involved non-Eligible Contract Participants, i.e., retail consumers, and the transactions were financed through loans. The financed precious metal transactions at issue here were supposed to have been conducted on a regulated exchange. Therefore, the CFTC had jurisdiction to enforce the CEA as it relates to these transactions.

       1.    *The Actual Delivery Exception*

Congress excepted from the CFTC's enforcement jurisdiction transactions that resulted in "actual delivery within 28 days." 7 U.S.C. § 2(c)(2)(D)(ii)(III)(aa). Under the CFTC's interpretation of "actual delivery," the CFTC recognizes that Congress' use of the term "actual" requires it to look beyond the contract documents and review relevant factors of the transaction, including:

> Ownership, possession, title, and physical location of the commodity purchased or sold, both before and after execution of the agreement, contract, or transaction; the nature of the relationship between the buyer, seller, and possessor of the commodity purchased or sold; and the manner in which the purchase or sale is recorded and completed.

*Retail Commodity Transactions Under Commodity Exchange Act*, 76 Fed. Reg. 77,670, 77,672 (Dec. 14, 2011) (hereinafter, "Interim Interpretation"); *see also Retail Commodity Transactions Under Commodity Exchange Act*, 78 Fed. Red. 52,426 (Aug. 23, 2013) (hereinafter, "Final Interpretation").[13]

Defendants Jager and Martin point only to the contracts that were entered into with the suppliers and retail customers to support their claims that actual delivery occurred. (*See* DE 175-1 at 6-10, ¶ 20-38).[14] Defendants Jager and Martin contend that the "Transfer of Commodity" notices

---

[13] The Act provides language that allows that the CFTC has enforcement jurisdiction retail commodity transactions "as if the agreement, contract, or transaction was a contract of sale of a commodity for future delivery." 7 U.S.C. § 2(c)(2)(D)(iii). The CFTC's Interim Interpretation cites to several Congressmembers' statement regarding the reason and importance for authorizing the CFTC's jurisdiction over transactions that are futures contracts, yet appear to be spot contracts because of the wording of agreements and contracts. Senator Lincoln noted that retail customer commodity transaction will be subject to the "on-exchange trading requirement of CEA Section 4(a), 'as if' the transaction was a futures contract. *See* Interim Regulation, 76 Fed. Reg. at 77,672. Further, Congressman Jim Marshall stated, "If in substance it is a futures contract, it is going to be regulated. It doesn't matter how clever your draftmanship is." *Id.* at 77,672 n.12.

[14] The Court notes that in Defendants Jager and Martin's Statement of Material Facts in Opposition to Plaintiff's Motion for Summary Judgment begins its paragraph numbering at the number four, instead of one, there are several unnumbered paragraphs that they label as paragraphs twenty through twenty-two, and there are no paragraphs seven, fourteen, twenty-three, and twenty-five through thirty-five. (*See* DE 175-1).

it issued to retail customers transferred title to the metals, which would comply with the actual delivery exception.[15] As the record makes clear, A-Mark Precious Metals, Inc., Standard Bank Plc, and Natixis Commodity Markets Ltd. owned the commodities Defendants Jager and Martin claim were part of their inventory. Hunter Wise's margin trading accounts held with their suppliers never resulted in the transfer or delivery of any commodities. (For examples of the Agreements with suppliers, *see* DE 150-4 at 643-51; DE 150-5 at 671-96). Defendants Jager and Martin fail to show how they could transfer title to the metals to the retail customers when the Hunter Wise Defendants neither had possession nor title of the metals. Furthermore, the agreements with the suppliers do not specify the segregation or allocation status of the medals; the identity of the commodities were unascertainable. Defendants never possessed, owned, or held title to the commodities detailed in the Transfer of Commodity document. (DE 153, ¶¶ 21-22). Therefore, title could not have passed from them to the retail customers, even though documents stated otherwise.

Defendants Jager and Martin argue that they received confirmation that they purchased enough medals to match their liabilities to their customers from Delaware Depository Services Company and Haskell & White, LLP. That Defendants used third-party entities to confirm their assets and liabilities on "paper" does not mean that the Hunter Wise Defendants actually held the title to or possession of the metals they claimed. An agreement or promise to pay a supplier at a

---

[15] Defendants Jager and Martin's use of the Uniform Commercial Code and Florida laws in support of this argument is misplaced. Both sources are inapplicable to the instant matter as the federal law preempts uniform law and state law. *See* U.S. Const. art. VI, cl. 2; *United States v. Alabama*, 691 F.3d 1269, 1281 (11th Cir. 2012) (explaining that federal preemption occurs "when the state law stands as an obstacle to the objective of the federal law") (quotations omitted). For the purposes of Section 4(a), Congress required "actual delivery" of the commodities by the seller to the buyer in order to avoid the CFTC's jurisdiction. To the extent that Florida state laws contradict how delivery of commodities is defined, they are preempted by the CEA and are inapplicable here.

future date for title and identification of the commodities is not the same as holding title to those commodities. As the Interim Interpretation and Final Interpretation noted, a book entry implying that delivery has been made or that the buyer has entered into a third party contract to ensure delivery does not constitute delivery, "regardless of whether the agreement . . . between the buyer and seller purports to create an enforceable obligation on the part of the seller . . . to deliver the commodity to the buyer." Interim Interpretation, 76 Fed. Reg. at 77,672; Final Interpretation, 78 Fed. Reg. at 52428. The Parties agree that the agreements Defendants entered into for the commodities transactions purported to confirm actual deliver. Defendants Jager and Martin, however, fail to rebut the CFTC's supported arguments that Defendants' precious metal transactions with retail consumers did not result in actual delivery as required by Section 4(a). once these retail commodities transactions are reviewed closely.

I find Defendants Jager and Martin's attempt to create an issue of fact as to the actual delivery exception unconvincing. The record evidence, even when viewed in the light most favorable to Defendants, shows that the commodity transactions Defendants entered into, and oversaw, did not result in actual delivery of the commodities. The actual delivery exception does not apply to Defendants' commodities transactions with retail customers in the instant matter. Since Defendants did not comply with Section 4(a) of the Act and no exception is applicable here, no dispute of material facts exist. Therefore, the CFTC's request for summary judgment is warranted and granted as to Count One.

**B.    *Individual Defendants' Control of the Entity Defendants for the Violation of Section 4(a)***

Citing to evidence on the record, including admissions from Defendants and depositions and affidavits from relevant individuals, the CFTC asserts that the Individual Defendants are liable under Section 4(a) of the CEA because they controlled all aspects of the Entity Defendants' business operations. Section 13c(b) explains:

> Any person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations, or orders issued pursuant to this chapter may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the acts or acts constituting the violation.

7 U.S.C. § 13c(b). The Eleventh Circuit has noted that Section 13(b) of the Act is "about power and imposing liability for those who fail to exercise it to prevent illegal conduct." *R.J. Fitzgerald & Co.*, 310 F.3d at 1334. The "fundamental purpose" of the statute is "to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as on the corporation itself." *Id.* (quoting *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1567 (11th Cir. 1995). Under Section 13(b), to demonstrate that the Individual Defendants had control over the Entity Defendants requires the CFTC to show the controlling individual: (1) had control and (2) lacked good faith or knowingly induced the acts constituting the violation. *See* 7 U.S.C. § 13c(b); *In re First Nat'l Trading Corp.*, [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) 26,142, at 41,787 (CFTC July 20, 1994), *aff'd without opinion sub nom.*, *Pick v. CFTC*, 99 F.3d 1139 (6th Cir. 1996).

As to the first prong, to establish control, the CFTC must show the individual possessed general control over the operation of the entity principally liable. *See R.J. Fitzgerald & Co.*, 310 F.3d at 1334. The Court may find control exists where evidence demonstrates that the individual is

an officer, founder, principal, or the authorized signatory on the company's bank accounts. *See In re Spiegel*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep (CCH) 24,103, at 34767 (CFTC Jan. 12, 1988).

As to the second prong, the CFTC must show either the individual lacked good faith or knowingly induced the acts. To establish good faith, the CFTC must show that the individual failed to maintain a "reasonably adequate system of internal supervision and control" or did not oversee the system "with any reasonable diligence." *Monieson v. CFTC*, 996 F.2d 852, 860 (7th Cir. 1993) (quoting *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992)). To establish the "knowing inducement" element, the CFTC has the burden of showing that "the controlling person had actual or constructive knowledge of the core activities that constitute the violations at issue and allowed them to continue ." *JCC, Inc.*, 63 F.3d at 1568 (quoting *In re Spiegel*, 24,103, at 34,767. Controlling persons cannot avoid liability by deliberately or recklessly avoiding knowledge about potential wrongdoing. *In re Spiegel*, 24,103, at 34,767. Courts have found that constructive knowledge of wrongdoing is sufficient for a finding of knowing inducement. *See JCC, Inc.*, 63 F.3d at 1568. To support a finding of constructive knowledge, the Commission must show that a defendant "lacked actual knowledge only because he consciously avoided it." *Id.* at 1569 (citations omitted).

1.    *Hunter Wise Control*

The CFTC contends that Defendants Jager and Martin controlled and knowingly induced the conduct of the Hunter Wise entity defendants. Defendants Jager and Martin argue that since there is no liability under 7 U.S.C. § 2(c)(2)(D) and § 6(a), "there can then be no control person liability.

Further, the evidence shows Defendant Jager did not exercise operational control over the day[-]to[-] business affairs of" Hunter Wise Commodities. (DE 175 at 11 n.11).

The CFTC explained that Defendant Jager was the Chairman and Chief Executive Officer of Hunter Wise and Defendant Martin was the President and Chief Operating Officer. (DE 153, ¶ 23). Although Defendant Martin ran the business day-to-day, *id.*, Defendant Jager's position within Hunter Wise demonstrates he had knowledge of and "direct[ed] the economic aspects" of the entity. *Apache Trading Corp.* [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) 25,251, at 38,795 (CFTC Mar. 11, 1992). Both individuals were authorized to and did enter into agreements with A-Mark, Standard Bank, and Natixis for Hunter Wise's margin trading transactions. *Id.* In signing the agreements and trading with the suppliers, Defendants Jager and Martin were aware that Hunter Wise did not own or acquire the commodities. *Id.* Even with that knowledge, Defendants Jager and Martin entered into the agreements at issue in this matter. As such, I find that the CFTC has met its burden in showing that Defendants Jager and Martin controlled the Hunter Wise entities defendants and knowingly induced Hunter Wise to violate Section 4(a) of the Act.

### 2.   *Blackstone Control*

The CFTC claims that Defendant Keser controlled and knowingly induced the Blackstone entity defendant's conduct. Defendant Keser owned Blackstone, controlled its operations, and was a managing member of Blackstone. *Id* at ¶ 27. He had control over Blackstone's bank accounts and could enter into contractual agreements that bound Blackstone. *Id.* In addition, he controlled or supervised individuals who controlled the day-to-day operations. *Id.* Knowing that Blackstone was soliciting retail consumers to enter into retail precious metal transactions, he allowed them to continue, in violation of Section 4(a) of the Act. Therefore, I find that CFTC met its burden under

17

Section 13(b) of the Act by showing that Defendant Keser was in control of the Blackstone entity defendant and induced it to violate Section 4(a) of the Act.

### 3.   *Newbridge Control*

The CFTC alleges that Defendant King, the sole incorporator, owner, and operator of Newbridge, *id*. at ¶ 28, controlled and knowingly induced the entity's conduct.  He was authorized to hire and fire Newbridge employees, managed Newbridge's bank accounts and funds, and prepared the content for Newbridge's website. *Id*. Newbridge's website contained language soliciting retail customers to engage in financed retail commodity transactions. *Id*.  As Chief Executive Offer of Newbridge, Defendant King supervised the Newbridge sales staff on a day-to-day-basis. *Id*. Defendant King understood and oversaw the daily operations of Newbridge and knowingly enabled the conduct that led to Newbridge violating Section 4(a) of the Act by soliciting consumers for the precious metal transactions.

### 4.   *CD Hopkins Control*

The CFTC seeks to apply Section 13(b) of the Act to Defendant Hopkins' control and knowing inducement of CD Hopkins' conduct. Defendant Hopkins was responsible for day-to-day operations and he managed the CD Hopkins's website, including the content that advertised the commodity transactions. *Id*. at ¶ 34.  He used Hard Asset's bank account as a personal account, which is the same account that received the funds from charges applied against the trading accounts of CD Hopkins' retail customers. *Id*. at ¶ 35. CD Hopkins' documents claimed that Hard Asset was a lender, yet it did not make any disbursement of funds to CD Hopkins' retail consumers. *Id*. Defendant Hopkins' conduct demonstrates that he knew the core activities of CD Hopkins, and its affiliate, and enabled them to continue in violation of Section 4(a) of the Act.  I find that the CFTC

has shown that Defendant Hopkins is liable through Section 13(b) because he controlled CD Hopkins and knowingly induced it to violate Section 4(a) of the Act.

### 5.  USCT Control

The CFTC contends that Defendant Moore controlled and knowingly induced USCT to violate Section 4(a) of the Act. Here, Defendant Moore had direct or indirect control over USCT's bank accounts and supervised, or controlled those who controlled, the day-to-day operations of USCT. *Id* at ¶ 29. Further, he was aware of USCT's involvement in the retail consumer commodities transactions and allowed them to continue. Therefore, I find that Defendant Moore was in control of USCT and knowingly induced it to violate Section 4(a) of the Act.

### C.  *Common Enterprise as to the Hunter Wise Entity Defendants and the CD Hopkins Entity Defendants*

#### 1.  *Hunter Wise Entity Defendants Common Enterprise Analysis*

Defendants Jager and Martin do not dispute the CFTC's contention that the Hunter Wise Entity Defendants operated as a common enterprise. (DE 196 at 8). They, however, dispute the CFTC's implications that the "Hunter Wise entities operated as a common enterprise with the Dealer Defendants." *Id*. Since the CFTC requested in its Motion for Summary Judgment that the Court find that the entity defendants "operated as separate common enterprises," (DE 149 at 15), there is no dispute as to this issue.[16] Therefore, I find that the Hunter Wise entity defendants operated as a common enterprise.

---

[16] Even if Defendants Jager and Martin sought to oppose the CFTC's claim that the Hunter Wise entity defendants acted as a common enterprise, they would fail. The CFTC provided detailed facts regarding how the Hunter Wise entity defendants held themselves out as a single operation, did not have separate office space, shared revenue, and Defendants Martin and Jager were officers in all of the Hunter Wise entity defendants. (DE 153, ¶¶ 30-32). The Hunter Wise entity defendants did operate as a common enterprise.

2. *CD Hopkins Entity Defendants Common Enterprise Analysis*

In its Motion for Partial Summary Judgment as to whether the CD Hopkins Entity operated as a common enterprise, the CFTC's facts describe how CD Hopkins, Hard Asset, and Defendant Hopkins acted as one unit. As discussed previously, Defendant Hopkins controlled the conduct of both CD Hopkins and Hard Asset. Hard Asset did not receive any income besides what it received from the price spread, interest, and service fees charged to CD Hopkins' retail consumers. (DE 153, ¶ 35). Defendant Hopkins would use money in Hard Asset's accounts to support CD Hopkins' operations. *Id.* Additionally, Hard Asset was named as a lender in CD Hopkins' documents, but it did not disburse any funds to CD Hopkins' retail consumers to finance the precious metal transactions. *Id.* As such, I find that the CD Hopkins entity defendants operated as a common enterprise.

**D. *Count Twelve - Section 4(d) as to the Hunter Wise Defendants***

Under Section 1a(28), a "futures commission merchant" is an individual, association, partnership, corporation, or trust that is engaged in soliciting or in accepting orders for . . . any agreement, contract, or transaction described in section 2(c)(2)(C)(I)." 7 U.S.C. § 1a(28). Section 4(d) of the Act requires any individual or entity engaged in commodities transactions described in 7 U.S.C. 2(c)(2(D)(I), and, therefore, a futures commission merchant, to register with the CFTC. *See* 7 U.S.C. § 6(d)(a). Because I previously found that the Hunter Wise Defendants engaged in transactions described in Section 4(a) of the Act, the Hunter Wise Defendants were required to have registered with the CFTC as futures commission merchants to engage in the transactions. They did not do so, in violation of Section 4(d). *See id.* Therefore, I find that no dispute of material fact existed and summary judgment is warranted as to Count Twelve of the CFTC's Complaint.

### E.    *Vagueness Analysis*

Defendants Martin and Jager contend that Section 2(c)(2)(D)(iii) of Title 7 and the CFTC's interpretation of "actual delivery" should be voided because they are vague.[17] They believe that the Act is "unclear and ambiguous as to how Hunter Wise is required to trade non-standardized contracts involving cash/spot market metals transactions upon a regulated board of trade, exchange, or contract market," (DE 196 at 9), and they assert a facial challenge to Section 2(c)(2)(D)(iii).

Mathematical certainty is not to be expected when interpreting a law for vagueness. *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). A law should only be found vague if its terms are so indefinite that "men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). When determining whether a law is vague, the Court will look to "what the [statute] as a whole prohibits." *Grayned*, 408 U.S. at 110 (citing *Estaban v. Cent. Mo. State Coll.*, 415 F.2d 1077, 1088 (8th Cir. 1969).

As previously discussed, Section 2(c)(2)(D) requires those engaged in commodities transactions to purchase and sell those commodities on a regulated board of trade, exchange, or contract, unless certain exceptions exist, including actual delivery of the commodities within twenty-eight days of the transaction. The statute defines to whom and to what types of transactions this section applies and, therefore, over whom and over what the CFTC has jurisdiction. Furthermore, the Act provides the CFTC with the conditions that must be present before it can enforce Section 2(c)(2)(D). Men of common intelligence would understand the statute's meaning and would not differ as to its application. Therefore, I find that Section 2(c)(2)(D)(iii) is not facially vague.

---

[17] After the CFTC noted that Defendants Jager and Martin did not clarify the type of challenge they were making in their Counter-Motion, (DE 195 at 12), Defendants Jager and Martin explained that they were asserting both a facial challenge and an as-applied challenge. (DE 196 at 8 n.13).

In addition, Defendants Martin and Jager make an as-applied challenge to Section 2(c)(2)(D)(iii), as interpreted by the CFTC in its Interim Interpretation and Final Interpretation. (DE 196 at 9-10). They argue that the CFTC has not provided fair notice because the CFTC fails to provide a clear definition of "actual delivery." Defendants Jager and Martin contend that "market participants cannot know or understand the application of the three factors which the CFTC will utilize to determine if 'actual delivery' has been satisfied." *Id.* at 9.

When enacting a statue, Congress must ensure it not only "provide[s] the kind of notice that will enable ordinary people to understand what conduct it prohibits" but also that it does not authorize or "even encourage arbitrary and discriminatory enforcement." *United States v. Di Pietro*, 615 F.3d 1369, 1371 (11th Cir. 2010) (citing *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (discussing an as-applied challenge in the criminal law context)).

Section 2(c)(2)(D) clearly proscribes the conduct in which the Hunter Wise Defendants engaged and thus the statute is not unconstitutional as applied to them. The relevant section prohibits financed retail commodity transactions that are not traded on a regulated exchange, unless actual delivery occurred. Defendants entered into and/or offered commodities as described in Section 2(c)(2)(D) and they did so even though the transactions were not on a regulated exchange. As I found previously, Defendants did not deliver any metals to retail consumers; they could not do so because they did not have possession, title, or ownership of the commodities. Defendants Jager and Martin cannot logically assert that they did not receive fair "notice that [would] enable ordinary people to understand what conduct" the applicable section prohibits. *Horton v. City of St. Augustine, Fla.*, 272 F.3d 1318, 1331 (11th Cir. 2001).

Furthermore, the statute does not "encourage arbitrary and discriminatory enforcement" of futures commission merchants. It authorizes the CFTC to regulate individuals and entities that engage in commodities transactions on a regulated exchange as proscribed in Section 2(c)(2)(D), even when those individuals and entities attempt to circumvention the CFTC's jurisdiction. Defendants sought to avoid regulation and the CFTC enforced the laws of the CEA against them. Market participants who do not engage in prohibited transactions, those who actually deliver metals to their retail consumers, are protected from enforcement.

Lastly, the Supreme Court has stated that one "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Di Pietro*, 615 F.3d at 1372 (quotations omitted). Therefore, Defendants Jager and Martin's proposed example of how the applicable section may be unconstitutional in another context is inapplicable here.

## V.     CONCLUSION

Accordingly, it is hereby

**ORDERED AND ADJUDGED** that

1.    The CFTC's Motion for Summary Judgment (DE 149) is **GRANTED**;

2.    Defendant's Counter Motion for Summary Judgment (DE 176) is **DENIED**;

3.    Defendant's Counter Motion for Summary Judgment (DE 176) is **DEEMED** timely filed;

23

4.  Judgment shall be entered separately in favor of the CFTC and against Hunter Wise Defendants, the CD Hopkins Defendants, and the Blackstone Defendants as to Count One of the Complaint (DE 1);[18]

5.  The CFTC's Motion for Partial Summary Judgment (DE 149) is granted.  The Court finds that the Hunter Wise entity defendants and CD Hopkins entity defendants operated as "common enterprises" for purposes of their liability on all counts of the Complaint; and

6.  Judgment shall be entered separately in favor of the CFTC and against the Hunter Wise Defendants as to Count Twelve of the Complaint (DE 1).

**DONE AND ORDERED** in Chambers in West Palm Beach, Florida, this 19 day of February, 2014.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to:    Counsel of Record
              Melanie E. Damian, Special Monitor and Corporate Manager
              John A. King, II, *pro se* Defendant
              Chadewick Hopkins, *pro se* Defendant

---

[18]  As of today, the remaining Defendants consist of: the Hunter Wise Defendants, the CD Hopkins Defendants, the Blackstone Defendants, the USCT Defendants and the Newbridge Defendants.  Settlement approval is pending before the CFTC as to the USCT Defendants and the Newbridge Defendants.  Should the CFTC approve the settlement, the Parties may move the Court to vacated its findings in this Order as to the particular Defendants.  Should a final settlement not be approved, the Court shall enter judgement against the USCT Defendants and the Newbridge Defendants as to Count One, pursuant to this Order's findings.

24