**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 12-81311-CV-MIDDLEBROOKS/BRANNON**

UNITED STATES COMMODITY FUTURES
TRADING COMMISSION,

       Plaintiff,

vs.

HUNTER WISE COMMODITIES, LLC, *et al.*,

       Defendants.

_____/

## OPINION AND ORDER

THIS CAUSE comes before the Court for final disposition of the issues presented during a bench trial held from February 26, 2014 through February 28, 2014 and March 3, 2014. Plaintiff United States Commodity Futures Trading Commission ("CFTC") alleges that Defendants[1] violated several sections of the Commodity Exchange Act (the "Act"), 7 U.S.C. § 1, *et seq.*, as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank")[2] and CFTC Regulations. The trial in this matter focused primarily on Hunter Wise, Mr. Jager, and Mr. Martin, whom the CFTC asserts led a commodities scheme that

---

[1] For purposes of this Order, "Defendants" consist of the Entity Defendants, which are Hunter Wise Commodities, LLC, Hunter Wise Services, LLC, Hunter Wise Credit, LLC, and Hunter Wise Trading, LLC, (collectively, "Hunter Wise"), C.D. Hopkins Financial, LLC and Hard Asset Lending Group, LLC, (collectively, "CD Hopkins"), Blackstone Metals Group, LLC, ("Blackstone"), Newbridge Alliance, Inc., ("Newbridge"), United States Capital Trust, LLC ("USCT") and Lloyds Commodities, LLC, Lloyds Commodities Credit Company, LLC, Lloyds Services, LLC, (collectively, "Lloyds") as well as individual Defendants David A. Moore, Chadewick Hopkins, Baris Keser, John King, Harold Edward Martin Jr, and Fred Jager. "Dealer Defendants" refers to CD Hopkins, Blackstone, Newbridge, and USCT.

[2] As discussed in more detail below, Dodd-Frank became effective on July 16, 2011 and granted the CFTC new authority over certain leveraged, margined, or financed commodity transactions with retail customers, including authority to prohibit fraud in connection with such transactions in interstate commerce.

involved misrepresenting the nature of precious metals transactions with retail customers[3] and that resulted in losses totaling millions of dollars.[4]

This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). All proposed findings of fact and conclusions of law inconsistent with those set forth herein are rejected.

## I. FACTUAL BACKGROUND

Hunter Wise "investors are not players in the casino, instead they own the casino. . . . Put another way, our investors are not betting on the horses; we own the race track [sic]. The point is

---

[3] A "retail customer" is a non-eligible contract participant. An "eligible contract participant" means, in pertinent part:

**(A)** acting for its own account –

> **(xi)** an individual who has amounts invested on a discretionary basis, the aggregate of which is in excess of –
>
> > **(I)** $10,000,000; or
> >
> > **(II)** $5,000,000 and who enters into the agreement, contract, or transaction in order to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual

7 U.S.C. § 1a(18)(A)(xi). Therefore, a retail customer is an individual who does not have amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual enters into the transaction in order to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual. *Id.*

[4] Lloyds Commodities, LLC, Lloyds Commodities Credit Company, LLC, Lloyds Services, LLC, Mr. Burbage, and Mr. Gaudino settled the claims against them and, on February 5, 2014, the Court entered a Consent Order. (DE 254). The Court also entered a Consent Order as to: (1) Newbridge and Mr. King (DE 289) and (2) USCT and Mr. Moore (DE 288). The Court shall enter default judgment against CD Hopkins and Mr. Hopkins and Blackstone and Mr. Keser under separate Order.

that we control the process, and stand to make money no matter where the markets shift."[5] E-mail from Jager to Pandora Pang (June 1, 2008) (CFTC Ex. 180 at 1). This statement embodies Mr. Jager and Mr. Martin's intentions, their understanding of what Hunter Wise stood for, and how they, and Hunter Wise investors, profited on the backs of approximately 3,200 retail customers who lost over $52 million from July 16, 2011 through February 25, 2013. In their minds, they unreasonably believed that the house always wins.

### A. The Casino - Its Owners and Its Dealers

Mr. Jager and Mr. Martin's "casino" was a well-planned and executed scheme dealing with financed, off-exchange commodities transactions that they orchestrated using retail customers, the Dealer Defendants, non-party dealers, and metals Suppliers.[6] Hunter Wise's business model revolved around the supposed buying and selling of precious metals, including gold, silver, platinum, palladium, and copper. Hunter Wise claimed to purchase and sell these precious metals from several Suppliers.

Hunter Wise was originally a California limited liability company started in July 2007, but it has been a registered Nevada limited liability company since October 2010. It maintains business addresses in Las Vegas, Nevada and Irvine, California. Mr. Martin is the registered agent. He and Mr. Jager are managers and members of Hunter Wise Commodities. Hunter Wise Commodities is the sole member of both Hunter Wise Credit, LLC and Hunter Wise Trading, LLC. Hunter Wise Commodities, Hunter Wise Credit, and Hunter Wise Trading all share the same business address in Las Vegas and the same mailing address in Irvine. Hunter Wise

---

[5] The Hunter Wise "investors" Mr. Jager mentions do not include the retail customers, who entered into Hunter Wise's precious metals transactions, but those who invested in Hunter Wise.

[6] For purposes of this Order, "Suppliers" includes A-Mark Precious Metals, Inc. ("A-Mark"), Standard Bank, PLC ("Standard Bank"), and Natixis Commodity Markets Ltd. ("Natixis").

Services also shares the Irvine mailing address.[7] Mr. Martin and Mr. Jager are the sole members and managers of Hunter Wise Services, LLC and are the Chief Operating Officer and Chief Executive Officer of Hunter Wise Services, respectively. Both Mr. Martin and Mr. Jager testified at trial.

Mr. Martin has thirty-five years of experience in the precious metals industry. His precious metals experience includes working at Monex Precious Metals, formerly Pacific Coast Coin Exchange, Unimet Credit Corporation, where he was in charge of business development for the buying, selling, and financing of precious metals.[8] Mr. Martin founded and was president of Capital Asset, which was in the business of buying, selling, and financing commodities transactions through a network of dealers. The dealers would find customers and send them to Capital Asset. An outside investor eventually terminated him from that company. Capital Asset was his last venture in commodities until 2006, when he and Mr. Jager decided to develop the business plan for Hunter Wise.

Mr. Jager has experience in the securities market as well. Prior to working for Hunter Wise Commodities, Mr. Jager ran, and continues to run, Hunter Wise Securities, a securities firm that is registered by the Financial Industry Regulatory Authority. Mr. Jager put in the seed capital for Hunter Wise and he was responsible for raising the equity capital for Hunter Wise.

---

[7] In my February 19, 2014 Order on the Parties' Motions for Summary Judgment ("February 19, 2014 Order") (DE 281), I found that Hunter Wise operated as a common enterprise. (DE 281 at 19). Although Mr. Martin ran the business's day-to-day operations, Mr. Jager's position within Hunter Wise demonstrated that he had knowledge of and directed the economic aspects of the entity. Therefore, I found that Mr. Martin and Mr. Jager controlled Hunter Wise. *Id.*

[8] As discussed in further detail below, due to a Consent Order Mr. Martin entered into because of his conduct at Unimet, Mr. Martin was permanently enjoined from making misrepresentations and omitting disclosures related to material facts regarding information relevant to a customer's decision to enter into an investment in commodities. *See* Consent Order as to Defendants E. Keith Owens, Ed Martin, and Ed Myers, CFTC Ex. 159, *Federal Trade Commission v. Unimet Credit Corp.*, No. 92-5759 (C.D. Cal., Dec. 20, 1994).

Although he had no prior experience in the precious metals industry, Mr. Jager was crucial to Hunter Wise's success because he provided important contacts and determined the strategic direction of the corporation, all in partnership with Mr. Martin.

In addition, two other key employees testified during the trial: Sylvia Williams and Steve Fitch. Ms. Williams was Hunter Wise's Director of Operations. She reported directly to Mr. Martin. Mr. Fitch was responsible for interfacing with the dealers. He offered dealer training and knew what services Hunter Wise offered to the dealers. According to Hunter Wise's records, Hunter Wise received retail customers from over 110 dealers. Summary Exhibit – Hunter Wise Dealer Loss Reports (with Customer Names) by Dealer (July 2011-present), CFTC Ex. 67. Both employees testified to Hunter Wise's operations in the commodities industry.

On December 5, 2012, the CFTC filed the Complaint (DE 1) in the instant action, alleging thirteen Counts[9] against Defendants for Dodd-Frank violations.[10] The CFTC seeks injunctive and equitable relief and penalties under the Act.

---

[9] The Counts against Hunter Wise, Mr. Jager, and Mr. Martin consisted of:

1. Count One, violations of Section 4(a) of the Act, 7 U.S.C. § 6(a), through illegal, off-exchange transactions against all Defendants;
2. Count Two, violations of Section 4b of the Act, 7 U.S.C § 6b(a), against Hunter Wise, Mr. Martin, and Mr. Jager;
3. Count Three, violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Rule 180.1, 17 C.F.R. § 180.1, against Hunter Wise, Mr. Martin, and Mr. Jager;
4. Count Twelve, violations of Section 4d of the Act, 7 U.S.C. § 6d(a), for failure to register against Hunter Wise, Mr. Martin, and Mr. Jager; and
5. Count Thirteen, aiding and abetting under Section 13(a) of the Act, 7 U.S.C. § 13c, against Hunter Wise, Mr. Martin, and Mr. Jager.

(Compl., DE 1). For each of the individual, non-entity Defendants and for each of the Counts, the Complaint alleges control person liability pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).
[10] Dodd-Frank expanded the CFTC's jurisdiction by including Section 2(c)(2)(D) to the Act, 7 U.S.C. § 2(c)(2)(D), which provides, in pertinent part:

On December 6, 2012, the CFTC filed a Motion for Preliminary Injunction (DE 4) seeking to enjoin the Defendants from offering and executing illegal retail commodity transactions. On February 22, 2013, after the Court held a hearing on the Motion for Preliminary

---

**(D) Retail commodity transactions**

**(i) Applicability**

Except as provided in clause (ii), this subparagraph shall apply to any agreement, contract, or transaction in any commodity that is –

**(I)** entered into with, or offered to (even if not entered into with), a person that is not an eligible contract participant or eligible commercial entity; and

**(II)** entered into, or offered (even if not entered into), on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis.

**(ii) Exceptions**

This subparagraph shall not apply to –

**(I)** an agreement, contract, or transaction described in paragraph (1) or subparagraphs (A), (B), or (C), including any agreement, contract, or transaction specifically excluded from subparagraph (A), (B), or (C);

**(II)** any security;

**(III)** a contract of sale that -

**(aa)** results in actual delivery within 28 days or such other longer period as the Commission may determine by rule or regulation based upon the typical commercial practice in cash or spot markets for the commodity involved; or

**(bb)** creates an enforceable obligation to deliver between a seller and a buyer that have the ability to deliver and accept delivery, respectively, in connection with the line of business of the seller and buyer[.]

7 U.S.C. § 2(c)(2)(D). For a more detailed discussion regarding Dodd-Frank's changes to the Act and the requirement that retail commodity transactions occur on a regulated exchange, see the Court's February 19, 2014 Order. (DE 281).

Injunction, the Court issued an Order Temporarily Appointing Special Corporate Monitor. (DE 77).[11] The Court issued an Order on Plaintiff's Motion for Preliminary Injunction (DE 78) on February 26, 2013, finding that the CFTC has jurisdiction over the commodities transactions at issue in the instant matter and was entitled to a preliminary injunction and other equitable relief. The Court also reaffirmed the Special Monitor's authority as it relates to the corporate Defendants.[12] (*See* DE 78. at 33-37).

The Court entered an Order on the Parties' Motions for Summary Judgment on February 19, 2014. (DE 281). In the February 19, 2014 Order, the Court granted summary judgment in favor of the CFTC and against the Hunter Wise Defendants as to Count One of the Complaint, violations of Section 4(a) of the Act: illegal, off-exchange transactions; and Count Twelve of the Complaint, violations of Section 4d of the Act for failure to register. Therefore, the Court need only address Count Two, violations of Section 4b of the Act[13] by cheating, defrauding, or

---

[11] Melanie Damian, the Court-appointed Special Monitor, testified during the trial regarding Hunter Wise's margin trading accounts, the losses to retail customers due to Hunter Wise's scheme, and Hunter Wise's profits.

[12] On April 15, 2014, the Eleventh Circuit affirmed the Court's Order on Plaintiff's Motion for Preliminary Injunction. *CFTC v. Hunter Wise Commodities, LLC*, -- F.3d --, 2014 WL 1424435, *12 (11th Cir. 2014) (hereinafter, "*Hunter Wise*"). In its opinion, the Eleventh Circuit: (1) found no error with the Court's factual findings and agreed with its legal conclusions; (2) held that the CFTC had enforcement authority over the disputed precious metal transactions and that no exceptions applied; and (3) affirmed the Court's grant of preliminary injunction because the CFTC had pleaded a prima facie case of a violation of the Act. *Id.* at *12.

[13] Section 4b of the Act states, in pertinent part:

**(a) Unlawful actions**

It shall be unlawful–

. . .

(2)   for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that

attempting to cheat or defraud retail customers in connection with retail commodities

transactions; Count Three, violations of Section 6(c)(1) of the Act[14] and Regulation 180.1[15] by

---

is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market–

(A) to cheat or defraud or attempt to cheat or defraud the other person;

(B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]

(C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person[.]

7 U.S.C. § 6b(a)(2).
[14] Section 6(c)(1) of the Act provides, in relevant part:

It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with ... a contract of sale of any commodity in interstate commerce ... any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate.

7 U.S.C. § 9(1).
[15] Rule 180.1 reads, in pertinent part:

(a) It shall be unlawful for any person, directly or indirectly, in connection with any ... contract of sale of any commodity in interstate commerce ... to intentionally or recklessly:

(1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

employing a scheme or artifice to defraud in connection with contracts of sale of commodities; and Count Thirteen, aiding and abetting under Section 13(a) of the Act, 7 U.S.C. § 13c(a).[16] The CFTC alleges that Mr. Martin and Mr. Jager developed a scheme using Hunter Wise's corporate web to defraud over 3,200 retail customers and resulted in the retail customers losing over $52 million from July 16, 2011 through February 25, 2013.

### B. The Casino's Operations

Hunter Wise's scheme was a multi-level model. First, the Dealer Defendants would contact and solicit novice and amateur investors to enter into financed commodities transactions using Hunter Wise's documents and training material to guide them. Next, the dealers would send the retail customers' funds to Hunter Wise, who would in turn distribute the dealers' applicable share of the fees and interest. Lastly, Hunter Wise would use the remaining funds to enter into margin trading transactions with the metals Suppliers. Hunter Wise steered and controlled every aspect of this process.

(1)   *The Retail Customers' Interactions with the Dealer Defendants and Hunter Wise*

Because of the Dealer Defendants' misrepresentations, these investors, i.e., the retail customers, thought they were purchasing precious metals from the Dealer Defendants on a

---

17 C.F.R. § 180.1.

[16] Section 13(a) of the Act provides, in relevant part:

> Any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this chapter, or any of the rules, regulations, or orders issued pursuant to this chapter, or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this chapter or any of such rules, regulations, or orders may be held responsible for such violation as a principal.

7 U.S.C. § 13c(a).

financed basis. For example, the Dealer Defendants' websites claimed that retail customers would be buying metals, but that the metals would be stored in a depository, which would require a storage fee. *See, e.g.*, Blackstone Website, CFTC Ex. 52 at 4. The Dealer Defendants claimed that once the retail customers submitted a down payment, the retail customers would receive a loan to cover the rest of the cost of buying the metals. The retail customers were charged exorbitant interest on these purposed loans.[17]

Retail customers expected to reap the benefits of their investment in these metals commodity transactions. Hunter Wise's own training materials, which it offered to Dealer Defendants to use on retail customers, claimed that trading in precious metals was a "medium risk investment" and that retail customers saw "over 300% return." CFTC Ex. 112 at 7, 12. Further, the Hunter Wise-created training materials promised "physical ownership" of the metals that were liquid and would "always have value." *Id.* at 31.

The retail customers entered into several agreements with the Dealer Defendants—agreements that were prepared by Hunter Wise. A Customer Loan, Security & Storage Agreement provided that its purpose was to:

> set forth the terms under which [the dealer] will lend to Borrower, from time to time, physical commodities (the "Commodity Loans"), and sums of money to purchase physical commodities (the "Cash Advances"), including, but not limited to, delivery to a depository, costs, fees, storage, collateral, security interest, certain risks and costs associated with each loan transaction.

Customer Account Agreement Template, CFTC Ex. 150 at 4 (hereinafter, "Loan Agreement"). From this Loan Agreement, the retail customers were led to believe that the interest they were paying was for the loans their dealers financed for these transactions and that metals stored on behalf of the retail customers actually existed.

---

[17] As described below, the retail customers did not actually own any metals and Hunter Wise never executed any loans.

As part of the scheme, Hunter Wise created templates and issued documents on the Dealer Defendants' behalf through its online database called the "portal." Hunter Wise maintained and controlled this "portal," which allowed dealers and retail customers to access their account and transaction information and allowed the Dealer Defendants to prepare reports on their retail customers. Hunter Wise generated the account documents that were given to retail consumers, even though they were on the Dealer Defendants' letterhead and appeared to be from the Dealer Defendants. The documents included Trade Confirmation notices, tax forms, Notices of Transfers, and account statements. Further, Hunter Wise provided training materials and other services that the Dealer Defendants used to solicit retail customers and maintain their accounts in order to continue the scheme. *See* Fitch Testimony, Feb 27-28, 2014, Mar. 3, 2014. All of these documents contained misleading statements or deceptive omissions regarding whether the retail customers actually owned precious metals.

Through the portal or discussion with their dealers, the retail customers thought they were able to buy and sell metals. If their trading equity fell below a certain percentage, they would get a margin call and they would have to deposit more money into their account. If their position fell to an even lower equity percentage, part of the retail customers' account would be liquidated until there were enough funds in the account so that the equity percentage would be over the margin call amount. Hunter Wise had the ability to impose margin calls and liquidate retail customers' positions.

(2) *Hunter Wise's Management of the Dealer Defendants*

It is apparent that the whole scheme would fall apart without Hunter Wise's ever-present oversight. For example, Frank Gaudino, the owner of Lloyds Commodities, testified regarding how much he and the Dealer Defendants depended on Hunter Wise to operate the scheme.

Lloyds was responsible for recruiting the dealers who solicited the retail customers for Hunter Wise. All of Lloyds' dealers used Hunter Wise's services. *See* Gaudino Testimony, Mar. 3, 2014.

Lloyds served as an intermediary between Hunter Wise and the Dealer Defendants; it provided no other services to the dealers. *Id.* Although Lloyds would find dealers to do business with Hunter Wise, it was Hunter Wise that ran the background checks on those dealers to ensure their credibility. It was Hunter Wise that would develop the ticket number with a price for all transactions for Lloyds to relay to the dealers, and the dealers to the retail customers. It was Hunter Wise that provided the services Lloyds claimed it provided in its promotional brochures, which were identical to those claimed in Hunter Wises' own promotional brochures. *Compare* Lloyds Promotional Brochure, CFTC Ex. 105 *with* Hunter Wise Promotional Brochure, CFTC Ex. 151. In addition, it was Hunter Wise that Lloyds depended on to purchase the metals and to provide confirmation to retail customers that the metals existed. Similar to the identical promotional brochures, Lloyds simply rebranded the contents of a Hunter Wise Newsletter that confirmed the metals inventory and sent it to its customers under Lloyds' logo. *Compare Transfer Notices*, Hunter Wise Newsletter, July 20, 2011, CFTC Ex. 118 with E-mail *with* Lloyds Newsletter (Aug. 23, 2011) (CFTC Ex. 119).

Sylvia Williams, a former employee and owner of Lloyds Asset Management and a former broker-dealer for Hunter Wise through Universal Clearing Firm S.A. and Barclay Metals, Inc., also testified about how much control Hunter Wise had over its dealers. *See* Williams Testimony, Feb. 27, 2014. Retail customers' account statements were sent directly from Hunter Wise to the customers. Her Florida-based corporation, Barclay Metals, did not execute the loans it purported to offer its clients; she admitted, "We didn't have that kind of money." *Id.* at 18:6-12. Instead, Barclays looked to Hunter Wise to control the lending and deal with the metals.

Hunter Wise representatives, Jay Bruce Grossman, its legal counsel,[18] and Joe De Dios, its Director of U.S. Development, confirmed that Hunter Wise "absolutely" had the metals. *Id.* at 13:12-14:2. Ms. Williams recalled Mr. Grossman insisting that she provide his phone number to her brokers and then to the retail customers so that he could confirm Hunter Wise's ownership of the metals to them. *Id.*

The Dealer Defendants sent the deposits and other funds provided by the retail customers, as well as their account information, directly to Hunter Wise or to Lloyds, who would then send it to Hunter Wise. No matter the intermediary, however, the retail customers' funds would end up in Hunter Wise's accounts.

### (3) *Hunter Wise's Transactions with the Metals Suppliers*

While Hunter Wise was directing its brokers and dealers to cheat the retail customers, it was also using the retail customers' funds to execute another level of its scheme. Instead of buying precious metals on a financed basis in the retail customers' name, as they were told and as they agreed to, Hunter Wise took the customers' money, provided the Dealer Defendants with their share,[19] and bought their own precious metals on a financed basis from the Suppliers. These margined trading transactions allowed Hunter Wise to offset its risk and use its downstream

---

[18] Mr. Grossman and his law firm, J.B. Grossman, P.A., were also legal counsel and the registered agent for Lloyds. During the early stages of this suit, Mr. Grossman appeared as counsel for Hunter Wise. However, in the Court's September 6, 2013 Order Granting Plaintiff's Motion to Disqualify J.B. Grossman and J.B. Grossman, P.A. as Counsel (DE 210), the Court found that, pursuant to Florida Bar Rule 4-1.9, a conflict of interest existed, and Mr. Grossman and his law firm were disqualified from representing Mr. Martin and Mr. Jager in this matter. (DE 210 at 10). I will discuss Mr. Grossman's involvement in more detail below.

[19] The Dealer Defendants would receive half of the price spread, interest on loans that they never disbursed, and service fees. Hunter Wise would receive the full commission charged, a percentage of the retail customers' first deposit, as well as the remaining price spread, interest, and service fees.

clients'[20] money to do so. The agreements Hunter Wise entered into with the Suppliers and their representatives made it clear that Hunter Wise did not in fact own the metals in these margin trading accounts. Delivery of the metals on the retail customers' behalf, whether deferred or not, did not occur. *See* Fitch Testimony, Feb. 28, 2014.

Hunter Wise claims that it owned the metals in the Suppliers' possession, but, in actuality, the evidence shows that Hunter Wise owned an interest in metals and was subject to a margin call, just like its retail customers. Mr. Martin and Mr. Jager tried to compare its margin trading activity to a mortgage. However, with a mortgage an individual receives ownership and actual delivery occurs. A bank may foreclose on a home only if the individual stops paying. Here, transfer of ownership and actual delivery of the metals never occurred. If Hunter Wise's accounts fell below a certain equity level, Hunter Wise would have to invest more money or risk losing it all. There was no transfer of ownership to the downstream clients. Paper confirmations without true ownership, and the risk of losing their investments if margin calls occurred, made the transactions Hunter Wise offered entirely different from mortgages.

### C. The Deceived Patrons - The Retail Customers

It seems that patrons of Las Vegas casinos would fare better than the retail customers who were caught up in Hunter Wise's scheme. While Hunter Wise was celebrating its gains, over 90% of the retail customers in the scheme lost money between July 16, 2011 and February 25, 2013.[21]

Hunter Wise, Lloyds, and the Dealer Defendants neither purchased precious metals on the retail customers' behalf, disbursed loan funds to finance the portion of the purchase price

---

[20] Mr. Steve Fitch, Director of Dealer Training at Hunter Wise, agreed that he would consider the retail customers to be "downstream clients" of Hunter Wise. *See* Fitch Testimony, Feb. 27, 2014.
[21] According to its records, Hunter Wise made over $18 million from July 16, 2011 and February 25, 2013 through spread charges, interest, and service fees.

remaining, nor delivered metals to the retail customers. Yet, the retail customers paid fees and interest on the mistaken belief that the Defendants had done all these things for the retail customers' benefit.

Victims of the scheme, Hunter Wise's downstream clients, testified to losing thousands of dollars of their life savings. For example, Dagmar McElroy testified during her deposition that her USCT dealer, "Mr. Lepore," informed her that she would not be charged any fees, aside from an initial 10% charge, and that the silver she was purchasing would be stored in a facility in her name. McElroy Depo. at 9:10–10:1. Ms. McElroy invested $28,000.00 in silver, gold, and palladium. Although she had access to her online account, Ms. McElroy explained that the statements were confusing and that it was easier to speak with her broker about the status of her metals. Never did her broker inform her about her losses. Ms. McElroy checked her account in February 2012, and she testified to being "absolutely floored" that she was charged over $15,000.00 in commission fees and over $900 in interest. *Id.* at 27:22-25. After demanding that her account be closed, Ms. McElroy received a check for only $3,457.87, which amounted to $24,542.13 in losses.

Another victim, John Wimberly, stated his dismay at the magnitude of his losses and his frustration with Newbridge. In a certified letter addressed to the "Newbridge Alliance Bookkeeping Dept." and dated February 23, 2012, Mr. Wimberly wrote:

> Apparently, the principals [sic] of leverage were never made clear to me. I invested twenty[-]eight thousand dollars. At the end, I should have been in control of eleven hundred fifty ounces of silver valued at $33.40 per ounce. That equals thirty[-]eight thousand four hundred ten dollars.
>
> Now when I close out my account, you are sending me a hand written [sic] check for eight thousand four hundred eleven dollars and sixty[-]five cents. I am returning this check. I have no intention of cashing this (or any other check) without a written, detailed explanation of where nineteen thousand five hundred eighty[-]eight dollars and thirty[-]five cents of my money went.

Letter from Wimberly to Newbridge (Feb. 23, 2012) (CFTC Ex. 36). Mr. Wimberly, an unsophisticated investor who receives Social Security checks and a VA pension, depended on Newbridge dealer Clifford Cheek to direct him toward successful investments. *See* Wimberly Testimony, Feb. 26, 2014. While there were risks in investing in silver, Mr. Cheek convinced him that silver was undervalued and would only go up. Mr. Wimberly believed he would be making money by buying metals through Newbridge, as Mr. Cheek promised. Unfortunately, that was not the case.

Mr. Fitch testified that it would be "odd" for a dealer to disappear, *see* Fitch Testimony, Feb. 28, 2014, yet that is exactly what happened when some of the victims sought explanations about their losses and the return of their money from dealers. William Metzger, a retiree of the real estate business, testified to receiving a "Position Reconciliation" statement from the Delaware Depository Service Company ("DDSC") dated September 14, 2011 that stated, "Hunter Wise Services, LLC'S [sic] records reflect that as of 9/14/2011 your current position(s) with C.D. Hopkins Metals Division are" a purchase of thirty ounces of gold. CFTC Ex. 44. Based on information Hunter Wise provided, Mr. Metzger was the "beneficial owner of" gold. *Id.*

Yet Mr. Metzger never received the gold or silver he supposedly owned. In December of 2012, when Mr. Metzger asked Blackstone dealer Mukarram Mawjood to deliver his metals, Mr. Mawjood talked him out of that request, even though Mr. Metzger had already lost approximately $7,000 of the $20,000 he had invested. Mr. Metzger was convinced by Mr. Mawjood that there was money to be made in these transactions, and gave Mr. Mawjood sixty more days to turn the investment around.

At the end of the sixty days, Mr. Mawjood was nowhere to be found. Mr. Metzger called and left him messages, but he did not return Mr. Metzger's calls. After a few weeks, Mr. Metzger learned Mr. Mawjood's voice mailbox was full and he never spoke to Mr. Mawjood again. With no metals in his name, the last statement he received listed his balance at $7.975.66, considerably less than the $20,000 he had invested. Metzger Blackstone Account Statement (Jan. 2013) (CFTC Ex. 41 at 9).[22]

Hunter Wise provided the tools for the Dealer Defendants to misrepresent the type of transaction into which the retail customers were entering. From training manuals, scripts, and videos[23] to documents confirming the existence of metals on their behalf, Hunter Wise controlled every aspect of the downstream client deception, yet it did not disclose its involvement to the customers. Furthermore, it used the retail customers' funds to purchase margin trading accounts that did not guarantee the existence of the commodities. Hunter Wise knew there were no metals in its possession, knew no loans existed though it charged interest, and knew there was no actual delivery of the metals within the twenty-eight day period. In order to make a bigger profit, Hunter Wise willingly defrauded its customers.

### D. Dodd-Frank Warnings from Hunter Wise's Counsel

As Dodd-Frank neared implementation, Hunter Wise sought ways of continuing to defraud retail customers even though Hunter Wise's illegal operations would soon be under the CFTC's jurisdiction. Hunter Wise hired several attorneys to advise it on its scheme and on the

---

[22] Three additional retail customers, Patricia Mercaldo, Andrew Burk, and Robert Bauman testified during the trial. The Court reviewed the deposition testimonies of the retail customers that were designated by the Parties as well.

[23] Mr. Mawjood testified, "When I first came into this business at Lloyds Asset Management, they introduced me to a series of videos that Hunter Wise had, and it broke down exactly how the financed product work[s], where a client has to put a certain down payment." Mawjood Depo., (DE 191-1 at 49:18-24).

implications of Dodd-Frank. During the relevant period, Hunter Wise's former counsel included John Giovannone ("Giovannone") formerly of Greenberg Traurig; Timothy Carey ("Carey") of Winston and Strawn, and formerly of Dewey & LeBoeuf; and Jay Bruce Grossman ("Grossman") of J.B. Grossman PA or the former firm Grossman Greenberg. Prior to and after Dodd-Frank became effective, Hunter Wise's counsel explained to Mr. Jager and Mr. Martin the serious legal issues associated with Hunter Wise's operations. While Mr. Giovannone was more adamant about Hunter Wise, Mr. Jager, and Mr. Martin's civil and criminal liability, Mr. Carey, and even Mr. Grossman, indicated that Hunter Wise documents and actions would violate Dodd-Frank.

### (1) *Mr. Giovannone's Dodd-Frank Warnings*

As the July 16, 2011 date for Dodd-Frank to become effective approached, Mr. Martin and Mr. Jager received strong warnings from Mr. Giovannone regarding Dodd-Frank's impact on Hunter Wise. For example, on June 24, 2011, Mr. John Giovannone sent an e-mail to Mr. Martin and Mr. Jager with clear and concise recommendations regarding their scheme:

1. Hunter Wise should stop accepting new purchase orders on or before close of business on [Friday,] July 15, 2011. I think the odds are against Hunter Wise being able to successfully defend a CFTC enforcement action attacking its current method of doing business under Sections 4(a) and 4(b) of the CE Act.

2. You should consider stopping acceptance of new purchase orders now and giving your customers notice that they will have to to [sic] liquidate their existing positions before July 15 or you will liquidate their positions on that date. This is the safe and most conservative approach.

3. In the alternative, you may wish to permit your customers to maintain their current positions until they choose to liquidate them. However, I cannot at this time predict whether the CFTC will consider that a breach of the CE Act or not.

4. If Ed was in fact successful in getting Standard Bank to agree to provide you with the financing you require to effect substituted delivery within 28 days of sale, we should rush to get that put into place before July 18. Even then, there

is still the question of whether the CFTC would permit you to maintain your current customer positions after July 15 because they will not have featured delivery within the required 28 days.

E-mail from Giovannone to Jager and Martin (June 24, 2011) (CFTC Ex. 187 at 3). Mr. Giovannone's analysis included his belief that:

[T]he CFTC plans to bring a series of enforcement actions as early as [Monday,] July 18 against every company in the precious metals industry which continues to offer precious metals for sale on a margined or financed basis on that date unless delivery is made, at least on a substituted basis to a depository which issues the equivalent of an non-negotiable warehouse receipt to the ultimate customer, within 28 days of the sale.

Id. at 2. Thus, Mr. Giovannone raised the red flag regarding the impact Dodd-Frank would have on Hunter Wise. Under the Dodd-Frank amendments to the Act, Hunter Wise would be brought under the CFTC's jurisdiction and would risk a suit brought by the CFTC. Hunter Wise was not actually delivering metals to retail customers and it was not providing non-negotiable warehouse receipts to retail customers within twenty-eight days, as Dodd-Frank required. Mr. Giovannone's recommendations were unequivocal: Hunter Wise had to shut down or change its operations by July 15, 2011, if not before, in order to avoid liability.

Although Mr. Giovannone's recommendations were unambiguous, Mr. Martin sent an e-mail that same day asking, "Am I correct that John is essentially suggesting that we close the company?" Id. at 1. Mr. Jager's response confirmed he and Mr. Martin understood Hunter Wise counsel's legal advice by stating, "That, in my opinion, as the purveyor of the worst case scenario, was essentially his opinion." Id. Mr. Martin and Mr. Jager understood Mr. Giovannone's statements that the Dodd-Frank enforcement authority jeopardized Hunter Wise's business activities. In fact, they recognized they could no longer continue their scheme.

Yet, when Mr. Giovannone sent an e-mail to Mr. Martin and Mr. Jager about three weeks later seeking to determine whether they had implemented any of his recommendations, he learned that very little had changed. *See* E-mail from Giovannone to Martin (July 12, 2011) (CFTC Ex. 169 at 5). On July 12, 2011, as opposed to heeding Mr. Giovannone's warnings, Mr. Martin stated that he and Mr. Jager would refuse to close down the company if they were unable to reach a deal with a United States depository to receive actual delivery of metals within the twenty-eight day period pursuant to Dodd-Frank. In response to Mr. Martin's statement that they were willing to violate the law instead of shutting Hunter Wise down, Mr. Giovannone was even more adamant about his analysis: "If you cannot be sure that you can get delivery in place within the 28 day period, i.e., by August 15, you should shut down until you are. You could personally be guilty of a felony!" *Id.*

That same day, after reviewing Mr. Giovannone's warnings about the potential for criminal charges being brought against them for their actions, Mr. Jager sent an e-mail to Mr. Martin stating that on Friday, July, 15, 2011, "we decide if we shut down the entire company, or as John [Giovannone] says[,] 'we risk it[.]'" E-mail from Jager to Martin (July 12, 2011) (CFTC Ex. 189 at 1). Mr. Jager was keenly aware of the choices available to them and the consequences of continuing to operate. Perhaps even more aware of the consequences was Mr. Martin, who wrote in an e-mail to Mr. Jager, "With any luck we will have adjoining cells." *Id.*

(2) *Mr. Carey and Mr. Grossman's Advice*

Mr. Giovannone was not alone in advising Mr. Jager and Mr. Martin about Hunter Wise's legal issues. Mr. Carey and Mr. Grossman's discussions with Mr. Jager and Mr. Martin also provided ample reasons why Hunter Wise's operations and business plan would be illegal once Dodd-Frank came into effect.

For example, Mr. Carey testified that towards the beginning of his representation, which began in May 2011, he informed Mr. Martin and Mr. Jager that Hunter Wise's agreements with the dealers were troublesome and inconsistent with Hunter Wise's actual practices. *See* Carey Depo. at 170: 14-17. The agreements, which included the trading agreements, the loan agreements, and administrative service agreements, did not describe accurately the way Hunter Wise transacted its business, but Hunter Wise nevertheless continued to use them and share them with the dealers, who, in turn, provided them to the retail customers. *Id*. at 18-24.

Mr. Carey advised Mr. Martin that he did not understand why Mr. Martin believed Hunter Wise had stored metals with each of the Suppliers "given what seemed to be the book entry obligations as opposed to something [he] could hold in [his] hand." *Id*. at 142:11-17. In an e-mail to Mr. Jager, on August 3, 2011, Mr. Carey advised him about a discussion Mr. Carey had had with Mr. Martin and noted that "getting the notes from the [Suppliers] from whom [Mr. Jager] purchase[d] that there [was] metal behind their sales" would confirm that they actually had metal stored for Hunter Wise's retail customers.

Instead of obtaining "notes" as Mr. Carey advised, Mr. Martin and Mr. Jager had DDSC issue Position Reconciliation forms to retail customers that only "confirm[ed] . . . that the products exist[ed] and that on the books of your Collateral Manager, Hunter Wise Services, LLC, your client, [sic] is identified as the beneficial owner of that collateral." *Transfer Notices*, Hunter Wise Newsletter, July 20, 2011, CFTC Ex. 118. The DDSC's Position Reconciliation forms troubled Mr. Carey. He advised, "it would be a good idea that if you're going to confirm that some amount of physical metal occurs that someone is doing more than writing that on a piece of paper and has some basis on which to make the statement." Carey Depo. at 152:12-21. Mr. Carey questioned the Position Reconciliation notice's language and Mr. Jager and Mr.

Martin's decision to have DDSC issue them in light of the fact that neither DDSC, nor anyone else for that matter, had verified the existence of the metals.

Hunter Wise's other counsel, Mr. Grossman, understood that Hunter Wise's scheme did not result in Hunter Wise actually having physical inventory and he advised Mr. Martin and Mr. Jager as such; it was his belief that there was "no metal at the end of the rainbow." Taped call between Grossman and Gaudino (July 21, 2011 at 3:24 p.m.) (CFTC Ex. 225). In July 2011, Mr. Grossman stated that he had explained to Mr. Martin that the metals did not exist; Hunter Wise merely had offset hedging. *Id.*[24]

In regards to the Transfer of Commodity form Hunter Wise sent out to the retail customers, Mr. Grossman explained that the form "lays out exactly what is being held, how and for whom. It nowhere says that HW and any of HW's customer dealers is (though they may be) holding any physical product that is required to meet obligations to HW's dealer customers or ultimately the retail customer." E-mail from Grossman to Martin (July 24, 2011) (CFTC Ex. 238). Mr. Grossman goes on to advise his clients,

> [T]here is a marked difference between explaining how Hunter Wise trades the derivative and physical markets to provide an assured ability to meet any and all

---

[24] Mr. Grossman's actions suggest his role was more akin to an active participant in the fraud rather than disinterested counsel. For example, as noted previously, Sylvia Williams testified that Mr. Grossman told her Hunter Wise "absolutely" had metals and that he would confirm that fact to her customers. However, in a recorded telephone conversation, he told Frank Gaudino there were no metals. Then, he told me during the preliminary injunction hearing that Hunter Wise possessed metals. Furthermore, throughout the Eleventh Circuit oral arguments, when the panel asked Mr. Grossman to explain where it could find evidence on the record that Hunter Wise possessed metals, he continually shifted positions and refrained from answering direct questions. In one such instance, Judge Stanley Marcus asked Mr. Grossman, "Did they ever have in their hot little hands, possession of a single piece of metal?" Oral Argument at 8:09, Hunter Wise, 2014 WL 1424435 (11th Cir. 2014). Mr. Grossman answered yes, but went on to claim only that Hunter Wise would provide metals to all retail customers who requested them. In other exchanges, he told the Eleventh Circuit that the agreements between Hunter Wise and the Suppliers purportedly gave Hunter Wise possession, even when he had previously stated otherwise. His conduct in this matter merits scrutiny by the Florida Bar and regulatory authority.

customer trade claims no matter where a particular precious and industrial market may trend and, on the other hand providing assurances to your customer dealer's retail clients that you are holding 'physical inventory' which may be taken to mean specific inventory.

*Id.* at 2. Months later, Mr. Grossman acknowledged that stating Hunter Wise had metals stored on its behalf would "almost [be] an untruth," even though Mr. Martin sought to make such a declaration. Taped Call Between Grossman and Gaudino (Nov. 21, 2011 at 11:45 a.m.) (CFTC Ex. 227).

Ultimately, Mr. Martin and Mr. Jager chose to ignore Mr. Giovannone's warnings, as well as Mr. Carey and Mr. Grossmans' advice regarding Dodd-Frank's requirements and Hunter Wise's misleading statements and deceptive omissions. Hunter Wise continued operating after July 16, 2011.

### E. Prior Knowledge of the Scheme's Regulatory Implications

#### (1) Not His First Rodeo - Mr. Martin's Consent Order

As Mr. Giovannone was providing legal advice to Mr. Martin and Mr. Jager regarding the Dodd-Frank issues that existed at Hunter Wise, Mr. Martin seemed to believe that his thirty-five year history in the precious metals industry made him better suited to analyze Dodd-Frank's implications. In response to Mr. Giovannone's e-mail asking Mr. Jager and Mr. Martin whether they had implemented the recommendations he had made regarding Hunter Wise's operations, Mr. Martin stated, "Been doing this since 1977. This is not my first rodeo." E-mail from Martin to Giovannone (July 13, 2011) (CFTC Ex. 169 at 1).

Indeed, it was not. Mr. Martin was an executive at Unimet when, due to the actions of Mr. Martin and other representatives, the Federal Trade Commission ("FTC") commenced an action in the United States District Court, Central District of California, against Unimet Credit Corporation, Unimet Trading Corporation, and four individual defendants, including Mr. Martin.

*See* Compl., CFTC Ex. 158, *FTC v. Unimet Credit Corp.*, No. 92-5759 (CD Cal., Sept. 23, 1992). In *Unimet*, Mr. Martin and two other defendants stipulated to the entry of a Consent Order. *See* Consent Order as to Defendants E. Keith Owens, Ed Martin, and Ed Myers, CFTC Ex. 159, *Unimet*, No. 92-5759 (CD Cal., Dec. 20, 1994). The Consent Order enjoined Mr. Martin from "providing substantial assistance to any commodities retailer whom [he knows] is failing to disclose any material fact, including[,] but not limited to[,] the true amount of commissions and fees." *Id.* at 6. The Consent Order permanently restrained Mr. Martin from misrepresenting the "degree of risk associated with an investment in commodities; the likelihood that a consumer would earn a profit on an investment"; and the amount of fees or any other material fact objectively material to a consumer's decision to invest in a commodity or other investment offering. *Id.* at 5. Mr. Martin received and agreed to abide by the Consent Order, which detailed what would constitute fraud and explained what he was permanently enjoined from doing.

Here, Mr. Martin and Mr. Jager developed the Hunter Wise scheme to insulate them from retail customers' claims. Mr. Martin and Mr. Jager seemed to believe that if they were not directly soliciting clients, even as they were committing fraud, they could not be liable for their losses. They intended to hide behind a cloak of anonymity as they were pulling the strings.

(2) *Regulatory Problems that Implicated Hunter Wise*

Aside from Mr. Martin's personal experience with regulatory agencies regarding fraud in precious metals transactions, Mr. Martin and Mr. Jager were made aware of the issues with the Hunter Wise scheme through lawsuits that directly, or by implication, related to Hunter Wise's actions in dealer fraud.

(a)    Article Regarding Commodities Fraud Cases in Florida

Mr. Martin and Mr. Jager were made aware of the CFTC's expanded jurisdiction as early as March 2011. On March 23, 2011, Chris Jain, an attorney, forwarded to Mr. Martin and Mr. Jager an article that discussed the many victims who were taken advantage of by unscrupulous brokers and dealers. Jon Burstein, *Little Regulation, Lots of Risk Can Leave Gold Investors on Shaky Ground*, Sun Sentinel, March 19, 2011, CFTC Ex. 168 (hereinafter, "*Little Regulation*"). Although much of the article focused on the fact that precious metal businesses and transactions conducted in Florida have gone unregulated, the author advised readers of the pending federal regulatory changes associated with Dodd-Frank. Immediately following the discussion of the criminal history of two individuals who solicited retail customers in Hunter Wise's scheme, *see* Martin Depo. Feb. 26, 2014, the article explained:

> More federal oversight of the gold firms appears to be on the horizon when a new law takes effect in July. Companies that sell precious metals in leveraged deals will have to deliver the gold within 28 days to the customer or a location where the metals are easily accessible so the buyer can verify that they actually exist. If the gold isn't physically delivered, the transaction will fall under CFTC jurisdiction, and companies and their brokers will need to be federally licensed to work in commodities.

*Little Regulation*, at 5. Mr. Martin and Mr. Jager received this explanation of Dodd-Frank's implications more than four months before its implementation.

(b)    Federal Trade Commission's Action Against 20/20

In April 2011, the CFTC filed an action against 20/20 Trading Company, Inc., 20/20 Precious Metals, Inc., and its officers (collectively, "20/20") in the United States District Court for the Central District of California. *See 20/20* Compl. CFTC Ex. 182, *CFTC v. 20/20*, No. 11-000643 (CD Cal. Apr. 26, 2011). The Complaint alleged that from January 2006 through the filing of the action, in April of 2011, 20/20 "had cheated and defrauded customers and

prospective customers by lying about the likelihood of profiting, and concealing the near certainty of substantial losses, when investing with" 20/20. *Id.* at 2 ¶ 1. The *20/20* Complaint sought to hold 20/20 liable for defrauding retail customers out of at least $4 million in losses.

Mr. Giovannone mentioned the *20/20* Complaint in an e-mail to Mr. Martin and Mr. Jager on May 3, 2011, claiming that it was "imperative" that they speak with him. *See* E-mail from Giovannone to Martin and Jager (May 3, 2011) (CFTC 182 at 1). On May 13, 2011, he forwarded the *20/20* Complaint to Mr. Martin and Mr. Jager and directed that they read paragraphs 56 and 60 of the Complaint in particular. Paragraph 56 reads, in pertinent part, "When a customer sends 20/20 Metals funds to purchase physical metals, 20/20 Metals wires those funds to a third party, [Hunter Wise,] and uses them to enter into leveraged transactions in the name of 20/20 Metals." *20/20* Compl., CFTC Ex. 182 at 21 ¶ 56. Paragraph 60 states,

> Additionally, 20/20 Metals misrepresents how customer funds are being used. Specifically, 20/20 Metals misrepresents that it purchases physical metals, that title has passed to the customer, and that the metal is stored in a secure depository. Since 20/20 Metals only has an account with [Hunter Wise] in which it enters into leveraged transactions in its own name, not the name of the customer, the customer has no right to any metals and title to any metals that might be purchased does not pass to the customer."

*Id.* at 22 ¶ 60.

Mr. Carey testified that Hunter Wise initially retained him and his former law firm, Dewey & LeBoeuf, in May of 2011 because of the *20/20* action. *See* Carey Depo., at 19:7-12. Hunter Wise's concerns regarding the implications of the *20/20* action seemed to increase even further after the court-appointed Receiver in the *20/20* matter filed a Report with the trial court. The Report stated that after investigating and interviewing relevant individuals, he was not "able to obtain and examine the evidence to verify the existence, ownership[,] and safekeeping of the precious metals purchased and held in the customer's accounts." *Id.* at 27:18-22; *see also* E-mail

from Martin to Carey (May 23, 2011) (CFTC Ex. 183 at 1) ("[T]he Receiver, after three weeks of trying, has been unable to find evidence that product exists.").

Upon learning of the Receiver's findings, Mr. Jager sent an e-mail to Mr. Martin, Mr. Carey, and Mr. Grossman relaying his concern for Hunter Wise's future. Mr. Jager wrote, "This is really crushing news[,] which is angering on many levels. That would seem to indicate that the next shoe to drop is with [Hunter Wise, if] they indeed do believe there is no product." *Id.*

     (c)    <u>Florida Office of Financial Regulation's Action against Midas</u>

A month after the FTC filed the *20/20* Complaint, in late June 2011, the Florida Office of Financial Regulation ("FOFR") requested documents from Hunter Wise in relation to its criminal investigation of Midas Asset Management, another Hunter Wise dealer. Mr. Grossman explained that a FOFR representative, "Ms. Gromnicki," asked, "Where is the depository facility where the precious metal is stored." E-mail from Grossman to Martin (July 5, 2011) (CFTC Ex. 234 at 1). According to Mr. Grossman, Ms. Gromnicki had posed that important question to him on numerous occasions. Mr. Martin responded to Mr. Grossman's e-mail that same day, writing, "I believe our response to the question of where the metal is stored needs to be carefully thought out." *Id.*

### F. Betting the House

Mr. Martin and Mr. Jager bragged about owning the casino, controlling the process, and the ability to "make money no matter where the markets shift." E-mail from Jager to Pandora Pang (June 1, 2008) (CFTC Ex. 180 at 1). They received legal advice and warnings regarding Hunter Wise's Dodd-Frank violations and fraudulent conduct. Yet, they purposefully decided to risk criminal and civil liability by continuing Hunter Wise's fraudulent and illegal operations.

Approximately 3,200 retail customers lost over $52 million because of Hunter Wise's scheme. The house cannot win when, in violation of the law, the game is rigged.

## II.   STATUTORY BACKGROUND

Section 742 of the Dodd-Frank Act expanded the scope of the CFTC's jurisdiction to include financed commodity transactions with consumers, thereby granting the CFTC the power and authority to ensure that transactions involving commodities were to be executed on an exchange and subjecting such transactions to the anti-fraud provisions of the Act and Commission Regulations.

Count Two of the Complaint alleges that Hunter Wise, Mr. Martin, and Mr. Jager committed fraud in violation of Section 4b of the Commodity Exchange Act. Section 4b(a)(2) of the Act states, in relevant part:

**(a) Unlawful actions**

It shall be unlawful–

. . .

(2)    for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market–

    (A)    to cheat or defraud or attempt to cheat or defraud the other person;

    (B)    willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]

    (C)    willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person[.]

7 U.S.C. § 6b(a)(2).

Count Three alleges that Hunter Wise, Mr. Martin, and Mr. Jager committed fraud under Section 6(c)(1) of the Act and Commission Regulation 180.1. Section 6(c)(1) and Commission Regulation 180.1 were meant to "augment the [CFTC's] existing authority to prohibit fraud and manipulation." Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41398, 41401 (July 14, 2011). Section 6(c) of the Act is codified in 7 U.S.C. § 9(1), and provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with . . . a contract of sale of any commodity in interstate commerce . . . any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate.

7 U.S.C. § 9(1).

> Commission Regulation 180.1, states, in pertinent part:

> (a) It shall be unlawful for any person, directly or indirectly, in connection with any . . . contract of sale of any commodity in interstate commerce . . . to intentionally or recklessly:

>> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

>> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]

>> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 180.1.

Count Thirteen of the Complaint claims that Hunter Wise, Mr. Martin, and Mr. Jager aided and abetted the violations of the Act that were committed by other defendants in the instant matter. Section 13(a) of the Act states, in pertinent part:

Any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this chapter, or any of the rules, regulations, or orders issued pursuant to this chapter, or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this chapter or any of such rules, regulations, or orders may be held responsible for such violation as a principal.

7 U.S.C. § 13c(a).

## III.   LEGAL ANALYSIS

"The [Act] is a remedial statute that serves the crucial purpose of protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived." *CFTC v. RJ Fitzgerald & Co.*, 310 F.3d 1321, 1329 (11th Cir. 2002), *cert. denied*, 124 S.Ct. 808 (2004).

### A.   *Section 4b of the Act - Fraud*

Count Two of the Complaint alleges that Hunter Wise, Mr. Martin, and Mr. Jager committed fraud in violation of Section 4b of the Commodity Exchange Act. A defendant is liable under Section 4b(a) of the Act if the CFTC demonstrates: (1) that a misrepresentation, misleading statement, or omission was made; (2) with scienter; and (3) that the misrepresentation, statement, or omission was material. *Id.* at 1328. Failure to establish any one of these elements is dispositive and would preclude the CFTC's fraud claims. *Id.*

#### (1) *Misrepresentations, Misleading Statements, or Omissions*

In the face of strong evidence showing otherwise, Mr. Martin and Mr. Jager argue that Hunter Wise did not make misrepresentations or deceptive omissions. "Whether a misrepresentation has been made depends on the overall message and the common understanding of the information conveyed." *Id.* (internal quotations omitted). Courts may find that when an individual drafts and distributes promotional and training material that is relayed to retail

customers that claims little to no risk in commodities transactions, the individual has acted fraudulently. *See Clayton Brokerage Co. v. CFTC*, 794 F.2d 573, 580-81 (11th Cir. 1986). In addition, claiming that a retail customer will profit from certain market trends, without advising the customer of the likelihood of that not occurring is material and deceptive. *In re JCC*, [1992–1994 Transfer Binder] (CCH) Comm. Fut. L. Rep. ¶ 26,080 at 41,576 (CFTC 1984), *aff'd sub num. JCC Inc. v. CFTC*, 63 F.3d 1557 (11th Cir. 1995).

Here, Hunter Wise misrepresented facts about the precious metals transactions it oversaw. In particular, it directly and indirectly led the retail customers to believe metals were stored on their behalf. Hunter Wise prepared and distributed documents, including account statements, Transfer of Commodities forms, and trade confirmation notices, to the retail customers confirming the existence of the metals, the loans, and the purchases. Hunter Wise failed to inform the parties that the metals it purchased were on a financed basis, it did not own the metals, and the metals, if there were any at all, were not in the retail customers' names.

Evidence demonstrating Hunter Wise's conduct comes specifically from the Position Reconciliation statement William Metzger received from DDSC, which stated, "Hunter Wise Services, LLC'S [sic] records reflect that as of 9/14/2011 your current position(s) with C.D. Hopkins Metals Division are" a purchase of thirty ounces of gold. DDSC Position Reconciliation Statements, CFTC Ex. 44. Accordingly, as confirmed by information Hunter Wise provided, Mr. Metzger was the owner of the gold. In fact, Mr. Metzger did not own any gold since the gold did not exist; neither Hunter Wise nor his dealer bought gold in his name. Yet, Hunter Wise provided information to DDSC that misled Mr. Metzger, and others, to think they had.

As to the issue of omissions, the Eleventh Circuit, in *R.J. Fitzgerald*, found that claiming the certainty of receiving huge profits in the precious metals industry without informing the

prospective retail customers that "95 per cent of the firm's clientele lost money in the types of investments being advertised" was an omission that was fraudulent as a matter of law. 310 F.3d at 1332. In the instant matter, Hunter Wise tracked everything that went on with the retail customers' transactions. As Mr. Mawjood confirmed, nothing about a trade or account was official until it got to Hunter Wise. Mawjood Dep., (DE 191-1 at 56:12-20). Hunter Wise kept and managed meticulous records of all its downstream clients through the portal. Even with its knowledge of the clients' losses, Hunter Wise never updated the training materials or promotional brochures to indicate how poorly its downstream customers were doing in these commodities transactions. It did not modify those documents even as it continued to offer the documents to the dealers for their use to solicit prospective retail customers.

Hunter Wise investors, Mr. Jager, and Mr. Martin pocketed the interest Hunter Wise charged customers for loans it agreed to, but never did, provide, as well as the fees it charged for the storage of metals that did not exist. Hunter Wise did not inform its clients how it was using the funds it received. Instead of applying the funds to pay off interest on real loans or buying and storing metals, Hunter Wise used the funds to offset its obligations. The fees retail customers paid reduced their account funds greatly. Hunter Wise continued to charge interest and storage fees, even though the charges were for nonexistent services.

Mr. Martin and Mr. Jager, through Hunter Wise, willfully misrepresented or made omissions about the precious metal transactions at issue in this case. In addition, based on its misleading statements and willful omissions, I find that Hunter Wise provided an "overall message" that was in violation of Sections 4b. The evidence shows that Hunter Wise misled and deceived the retail customers into entering into its precious metals scheme.

(2)    *Scienter - "With any luck we will have adjoining cells."*

To prove scienter, the CFTC must show that the "[d]efendant intended to defraud, manipulate, or deceive, or [that the d]efendant's conduct represents an extreme departure from the standards of ordinary care." *R.J. Fitzgerald*, 310 F.3d at 1328. Conduct involving "highly unreasonable omissions or misrepresentations . . . that present a danger of misleading [retail customers] which is either known to the Defendant or so obvious that [the] Defendant must have been aware of it" have been found to meet the scienter requirement. *Id.* (internal quotation omitted).

Mr. Martin had day-to-day oversight over Hunter Wise's operations. Mr. Jager had the authority to sign contracts for Hunter Wise, helped with the strategic planning, and provided the contacts and capital necessary to keep the business running. To argue that they believed in good faith that Hunter Wise was making loans to the dealers or retail customers, that they owned any metals, and that their documents were not fraudulent is implausible. They were too knowledgeable and too involved in the process to plead ignorance. Hunter Wise acted recklessly and intentionally to deceive and defraud the retail customers.

Hunter Wise was the mastermind behind the multi-level scheme. Mr. Jager and Mr. Martin could have corrected the misrepresentations and deceptive omissions in the agreements they entered into with the dealers, the training materials it provided the dealers, and the many documents Hunter Wise sent to the retail customers, including the Position Reconciliation notices, the Transfer of Commodity forms, trade confirmations, and account statements. Hunter Wise allowed its dealers to defraud the retail customers and prospective customers they solicited for Hunter Wise's benefit. Since Hunter Wise oversaw all transactions, Mr. Jager and Mr. Martin had the ability to inform retail customers of the misrepresentations and deceptive statements, but

33

failed to do so. Instead, Hunter Wise continued the fraud on the customers while it reaped the benefits of their losses.

(a)   <u>Hunter Wise's Reliance Claims</u>

Mr. Jager and Mr. Martin seek to absolve themselves by claiming they reasonably relied on sources that allegedly affirmed Hunter Wise's scheme did not fall under the CFTC's jurisdiction because the transactions did not involve leveraged contracts or because the actual delivery exception and the line of business exception of the Act applied.[25] They claim that they relied on: (1) Hunter Wise's counsel; (2) the CFTC's 1985 Interpretative Letter, Bank Activities Involving the Sale of Precious Metals, Comm. Fut. L. Rep. (CCH) ¶ 22,673 (CFTC Aug. 6, 1985) (hereinafter "1985 Interpretative Letter"); and (3) the London Bullion Market Association and the Foreign Exchange Committee's 1994 International Bullion Master Agreement (hereinafter, "Master Agreement").

(i)   The Plain Meaning of the Act is Unambiguous

Before delving into their reliance claims, I first note that none of Mr. Jager and Mr. Martin's claims can be found reasonable because the plain meaning of the statutory language is unambiguous, as the Eleventh Circuit found in *Hunter Wise,* -- F.3d --, 2014 WL 1424435 (11th Cir. 2014). In *Hunter Wise,* the Eleventh Circuit analyzed the Act's wording, as well as Mr. Jager and Mr. Martin's arguments, to reach its findings.

As to the "leveraged or margined basis" or financed transaction on a similar basis language of Dodd-Frank, *see* 7 U.S.C. § 2(c)(2)(D)(i)(II), the Eleventh Circuit found that "leveraging refers generally to the ability to control high-value amounts of a commodity or a security with a comparatively small value of capital, known as the margin." *Hunter Wise,* at *5

---

[25] In my February 19, 2014 Order, I found that the exceptions under the Act did not apply to Hunter Wise's scheme. (DE 281).

34

(noting *Glossary*, Commodity Future Trading Commission, http://www.cftc.gov/ ConsumerProtection/EducationCenter/CFTCGlossary/index.htm (last visited Feb. 11, 2014)). The Eleventh Circuit stated that "Hunter Wise defined leverage similarly in a memorandum to its holding company's potential investors; it explained its operations by describing leverage as 'the use of a smaller amount of capital to do the work of a much larger amount.'" *Id.* (quoting Business Overview of Hunter Wise Commodities, LLC (DE 4-4 at 21)). In addition, the Eleventh Circuit found that Mr. Martin and Mr. Jager's attempt to read a specific durational requirement and to expand the definition of a "leverage contract" under 7 U.S.C. § 23[26] to the Dodd-Frank

---

[26] 7 U.S.C. § 23 provides, in pertinent part:

> **(a) Margin accounts or contracts and leverage accounts or contracts prohibited except as authorized**
>
> Except as authorized under subsection (b) of this section, no person shall offer to enter into, enter into, or confirm the execution of, any transaction for the delivery of any commodity under a standardized contract commonly known to the trade as a margin account, margin contract, leverage account, or leverage contract, or under any contract, account, arrangement, scheme, or device that the Commission determines serves the same function or functions as such a standardized contract, or is marketed or managed in substantially the same manner as such a standardized contract.

7 U.S.C. § 23(a). As the Eleventh Circuit explained, under CFTC regulations,

> [A] leverage contract has standardized terms and conditions and is "for the long-term (ten years or longer) purchase . . . or sale" of a leverage commodity by a leverage customer. 17 C.F.R. § 31.4(w). A leverage transaction, by extension, is a deal to exchange a leverage contract. 17 C.F.R. § 31.4(x). Martin and Jager insist the terms "leverage account" or "leverage contract," as used in 7 U.S.C. § 23 and defined in 17 C.F.R. § 31.4(w), and "contracts . . . entered into . . . on a leveraged . . . basis," as used in 7 U.S.C. § 2, have the same meaning and durational requirement.

*Hunter Wise*, at *4-5. Therefore, Mr. Martin and Mr. Jager were incorrect in arguing that since Hunter Wise's transactions mature in four years, the transactions do not constitute "leveraged" transactions or transactions financed on a similar basis, and that § 2(c)(2)(D) is inapplicable to Hunter Wise's operations. *Id.* at 5.

amendment in § 2(c)(2)(D), "tenuous, at best." *Id.* If Mr. Martin and Mr. Jager's suggested analysis applied, then § 23 would render § 2(c)(2)(D) meaningless; Section 2(c)(2)(D) would "only give[] the Commission authority over what § 23 already prohibits." *Id.* Lastly, even though it found the statutory text unambiguous and reviewing agency interpretation and legislative history was unnecessary, the Eleventh Circuit noted that both sources "harmonize[d]" with and "complement[ed]," respectively, its findings.[27]

As to the "actual delivery" exception, 7 U.S.C. § 2(c)(2)(D)(ii)(III)(aa), the Eleventh Circuit again applied the ordinary meaning of the term to hold that "delivery must be *actual*." *Hunter Wise*, at *9 (emphasis in original). The Eleventh Circuit explained, "The sequence of events contemplated by Martin and Jager – in which the electronic transfer of documents indicating control or possession effectuates delivery without physical transfer of the commodity – is by any definition constructive, rather than actual." *Id.* (citing *Black's Law Dictionary* 494 (9th ed. 2009) (defining "constructive delivery" as "[a]n act that amounts to a transfer of title by operation of law when actual transfer is impractical or impossible")). The Eleventh Circuit also found that other sources of analysis, including the CFTC's own interpretation, were unnecessary "because 'actual delivery' unambiguously excludes the constructive delivery Martin and Jager argue occurred." *Id.* at *10.[28]

---

[27] After *de novo* review, the Eleventh Circuit affirmed the legal conclusion in this Court's February 26, 2013 Order on Plaintiff's Motion for Preliminary Injunction that § 2(c)(2)(D) covers the transactions in dispute in this matter. *Hunter Wise*, at *6.

[28] The Eleventh Circuit found that "[b]ased on [this Court's] sound factual finding and after *de novo* review," this Court's February 26, 2013 Order on Plaintiff's Motion for Preliminary Injunction's "legal conclusion that the exception did not apply was not erroneous." *Hunter Wise*, at *7. The Eleventh Circuit also found that my finding that the enforceable obligation to deliver exception, *see* 7 U.S.C. § 2(c)(2)(D)(ii)(III)(bb), did not apply was not an error of law since I found that Hunter Wise did not own the metals. *Hunter Wise*, at *8.

For the same reasons, I find that Mr. Martin and Mr. Jager's claimed reliance on other sources to determine whether Hunter Wise's scheme, which involved misrepresentations and deceptive omissions, violated the Act is unreasonable. The plain reading of the statute demonstrates that the CFTC has jurisdiction over Hunter Wise and that Hunter Wise committed fraud that triggered CFTC enforcement proceedings.

(ii)     Hunter Wise's Counsel

Mr. Martin and Mr. Jager claim that Hunter Wise's legal counsel advised them that Hunter Wise owned and possessed metals and that the transactions it engaged in did not violate the Act. In light of all the evidence to the contrary, their purported reliance on counsel is disingenuous.

In the weeks leading up to July 16, 2011, the date the Dodd-Frank amendments to the Act became enforceable, Mr. Jager and Mr. Martin received clear warnings from Hunter Wise counsel Mr. Giovannone that Hunter Wise's operations were illegal under Dodd-Frank. Mr. Giovannone, in no uncertain terms, told Mr. Jager and Mr. Martin to shut down Hunter Wise until it complied with the Act. *See* E-mail from Giovannone to Jager and Martin (June 24, 2011) (CFTC Ex. 187 at 3). After learning that Mr. Martin and Mr. Jager had not acted upon the plans he had recommended to keep Hunter Wise from violating the law, he warned them that they could face criminal liability if they continued Hunter Wise's operations. *See* E-mail from Martin to Giovannone (July 12, 2011) (CFTC Ex. 169 at 4). Mr. Martin and Mr. Jager intentionally ignored Mr. Giovannone's advice, and they acted recklessly in continuing to defraud the retail customers after Dodd-Frank became effective.

Hunter Wise's other counsel warned Mr. Jager and Mr. Martin that Hunter Wise's documents regarding Hunter Wise owning and storing metals were false. *See* Taped Call

Between Grossman and Gaudino (Nov. 21, 2011 at 11:45 a.m.) (CFTC Ex. 227). Mr. Grossman explained to Hunter Wise the difference between the arrangement it had with the metal Suppliers (i.e., margin trading accounts meant to offset Hunter Wise's obligations to the retail customers) and possessing physical metals. E-mail from Grossman to Martin (July 24, 2011) (CFTC Ex. 238). Mr. Carey questioned Mr. Martin, in particular, about why he believed Hunter Wise had stored metals with each of the Suppliers "given what seemed to be the book entry obligations as opposed to something [he] could hold in [his] hand." Carey Depo. at 142:11-17.

Even Hunter Wise's counsel Mr. Carey, whom Mr. Jager and Mr. Martin claimed to rely on for their understanding of Dodd-Frank, testified that Mr. Martin's belief that Hunter Wise owned metals was wrong. Had he simply spoken to the metals Suppliers, Mr. Carey stated, Mr. Martin would have had to accept what everyone else already knew to be true: no metals existed. *See* Carey Depo. 62:19-24. The Suppliers' representatives confirmed the obvious understanding that Hunter Wise was trading in margin accounts. Ownership and delivery did not occur until Hunter Wise paid in full for the metals. The existence of Hunter Wise's trading accounts, with margin calls, counters Mr. Martin and Mr. Jager's unreasonable claim that it had the inventory on hand to deliver metals to retail customers.

Mr. Carey wrote a legal memorandum that he sent to Mr. Jager and Mr. Martin on August 11, 2011 in regards to Dodd-Frank enforcement. *See* Carey Depo. 146:22-147:17. Mr. Carey premised his analysis on certain material assumptions that were incorrect and that greatly influenced his finding that the Act did not apply to Hunter Wise. For example, the memorandum "anticipates," without investigating, that all of the dealers Hunter Wise dealt with were "eligible contract participants" and, therefore, not retail customers. *Id.* at 149:17-150:22. He was not aware that only after Hunter Wise received the retail customers' funds did Hunter Wise generate

an account for the retail customers and sent back the dealers' cut of the funds. *Id.* at 151:3-13. Further, Mr. Carey assumed that "Hunter Wise's contracts [were] not executed on a leveraged or margined basis." *Id.* at 153:19-155:14. Since Hunter Wise did interact with retail customers through the portal website and the dealers depended on Hunter Wise for financial aid and services, Hunter Wise knew Mr. Carey's assumptions were inaccurate.

Mr. Martin and Mr. Jager cite to legal analysis of Dodd-Frank prepared by Mr. Grossman on June 23, 2011 to support its legal reliance claim.[29] E-mail from Grossman to Jager and Martin (June 23, 2011) (Hunter Wise Ex. 54). Mr. Grossman represented Hunter Wise, Lloyds, and individual dealers, as well as Mr. Jager and Mr. Martin, individually, and his fingerprints are all over this scheme. Both his factual statements and legal opinions lack credibility.[30] Moreover, he explicitly noted in an e-mail that the plain meaning of the Act was the primary resource. *Id.* at 1. Considering the fact that the Eleventh Circuit found the statutory language unambiguous, it is unreasonable for Mr. Martin and Mr. Jager to claim to have believed Mr. Grossman's strained interpretation rather than the plain language of the Act.

Even assuming Mr. Jager and Mr. Martin believed Mr. Grossman's June 23, 2011 evaluation that the CFTC had no jurisdiction over Hunter Wise under Dodd-Frank, Mr. Grossman's analysis a month later calls into question their claims of good faith reliance. While editing the Transfer of Precious and Industrial Metal notice, which were meant to replace the Transfer of Commodity notice Hunter Wise sent to retail customers, Mr. Grossman explained that the form "lays out exactly what is being held, how and for whom. It nowhere says that HW and any of HW's customer dealers is (though they may be) holding any physical product that is

---

[29] Because Mr. Jager and Mr. Martin failed to show that Mr. Grossman was unavailable to testify at trial, Mr. Grossman's deposition was not admitted at trial.
[30] For further discussion of Mr. Grossman's contradictory and questionable conduct as Hunter Wise's counsel, see *supra* note 24.

required to meet obligations to HW's dealer customers or ultimately the retail customer." E-mail from Grossman to Martin (July 24, 2011) (CFTC Ex. 238). Mr. Grossman goes on to clarify that Hunter Wise was trading to offset its obligations; it was not in possession of any metals. *Id.* at 2. Furthermore, Mr. Grossman stated that the Position Reconciliation statement from DDSC could "potentially" be misleading to retail customers since it suggests Hunter Wise has physical metals and DDSC gives assurances of the commodities' existence without seeing them. *Id.* Mr. Grossman, knowing that there was "no metal at the end of the rainbow," advised Hunter Wise that it "would be better . . . to [provide] that honest explanation rather than some third parties' assurance that the account paper work designating a complete hedge balanced trading position exists." *Id.* Hunter Wise received an evaluation of what Hunter Wise's scheme really was, even from Mr. Grossman, yet it chose to ignore it.

Hunter Wise's counsel made Mr. Martin and Mr. Jager aware of the legality issues the precious metals transactions and language in Hunter Wise's documents presented. They were on notice of the deception, yet they decided to risk it, laughed about having "adjoining cells," and continued to mislead and deceive customers. There was no metal "at the end of the rainbow"— only offsetting transactions. Rather than rely upon the advice of counsel, Mr. Jager and Mr. Martin ignored it.

On top of the clear warnings and explanations from Hunter Wise's counsel, Mr. Martin's own statements contradict his claim that he actually believed that Hunter Wise possessed metals. In late June 2011, the FOFR served Hunter Wise with a subpoena for documents that related to its criminal investigation of one of Hunter Wise's dealers, Midas Asset Management. In explaining the request to Mr. Martin, Mr. Grossman stated that FOFR asked for the location of the allegedly stored metals. E-mail from Grossman to Martin (July 5, 2011) (CFTC Ex. 234 at 1).

The same day, Mr. Martin responded to Mr. Grossman, copying Mr. Carey, stating, "I believe our response to the question of where the metal is stored needs to be carefully thought out." *Id.* Mr. Martin's hesitancy to respond belies any claim that he actually believed Hunter Wise or its customers actually possessed anything.

(iii)   The CFTC's 1985 Interpretative Letter

To argue that they believed that they held title to the metals because of the CFTC's 1985 Interpretative Letter is highly unreasonable. The CFTC issued the 1985 Interpretative Letter after an unnamed bank requested legal clarification of potential liability under the Act regarding its proposed transaction. The CFTC explained,

> A bank transaction involving the purchase and sale of precious metals to be settled in two business days with the bank receiving payment in full from a dealer who would resell the metals to its own retail customer with direction for the bank to transfer ownership and title to the metals to the purchaser's name, would not be a leverage contract within the meaning of Commission Reg. § 31.4(w).

*Id.* at 1. The CFTC's 1985 Interpretative Letter was issued twenty-five years before Dodd-Frank was passed. It could not possibly interpret the impact Dodd-Frank would have on the legality of Hunter Wise's scheme.

In the 1985 Interpretative Letter, the CFTC found that the transaction was not a leveraged transaction under Regulation § 31.4(w). As the Eleventh Circuit found in *Hunter Wise*, a leveraged transaction under Regulation § 31.4(w) and under § 2(c)(2)(D)(i)(II) were not the same. Dodd-Frank broadened the CFTC's jurisdiction to include financed commodity transactions with consumers. *See* 7 U.S.C. § 2(c)(2)(D)(i)(II). Under the Dodd-Frank amendments, if the retail consumer was entering into a financed transaction, then the CFTC had

jurisdiction over the transaction; there were no time requirements as under Regulation § 31.4(w).[31]

(iv)    The Master Agreement

Mr. Jager and Mr. Martin failed to show how it was reasonable to rely on the Master Agreement to determine that the "actual delivery" exception applied to Hunter Wise's scheme. The Master Agreement was established so that parties seeking to enter precious metal transactions could use a uniform template. It provides no discussion of the legality of the transactions in the United States and does not detail how government regulators would enforce their laws. Moreover, the 1994 Master Agreement explains neither the CFTC's jurisdiction nor the legality of Hunter Wise's conduct, in light of the Dodd-Frank amendments. Therefore, to rely on a private agreement between two parties to determine whether Dodd-Frank applies to their scheme is highly unreasonable.

(b)    <u>Previous Allegation of Fraud against Mr. Martin</u>

That Mr. Martin had previous dealings with the FTC, a federal regulatory agency, regarding fraud at a precious metals firm further supports the indication that he was knowledgeable of the types of information and conduct that would constitute commodities fraud. The FTC alleged that Unimet, where Mr. Martin worked as an executive, defrauded its retail customers by "falsely representing, directly or by implication, that an investment in precious metals or currencies financed by defendants is low in risk" and "that it is highly likely that an

---

[31] Simply reading the 1985 Interpretative Letter disproves Mr. Martin and Mr. Jager's good faith reliance claim. In the Letter, the CFTC found that these transactions were not subject to regulation by the CFTC as "'transactions involving contracts of sale of a commodity for future delivery' as that term is used in Section 2(a)(1)(A) of the Act." *See* 1985 Interpretative Letter at 3. However, under the Act, the CFTC may regulate these transactions as "if the agreement, contract, or transaction was a contract of sale of a commodity for future delivery." 7 U.S.C. § 2(c)(2)(D)(iii). The plain language of the statute makes clear that the 1985 Interpretative Letter's findings would not apply.

42

investor will earn a high profit on an investment in precious metals or currencies financed by defendants within a few months of the time of the investment is made." Compl. CFTC Ex. 158, *FTC v. Unimet*, No. 92-5759, 7 ¶ D-E (CD Cal., Sept. 23, 1992). The FTC's action against Mr. Martin concluded with a Consent Order that permanently enjoined him from misrepresenting and failing to disclose material facts pertinent to a customer's decision to enter into any commodities transaction. *See* Consent Order as to Defendants E. Keith Owens, Ed Martin, and Ed Myers, CFTC Ex. 159, *Federal Trade Commission v. Unimet Credit Corp.*, No. 92-5759 (CD Cal., Dec. 20, 1994). The Consent Order also prevented Mr. Martin from helping others misrepresent and omit material facts to customers as well. *Id.*

Despite this Consent Order, of which Mr. Jager was aware, Mr. Martin entered into the Hunter Wise scheme to defraud retail customers. Mr. Martin and Mr. Jager attempted to remove Hunter Wise from direct interface with retail customers to insulate themselves from violating Mr. Martin's Consent Order and the Act.

(c)     General Disclosure Agreements

During the victims' testimony at trial, Mr. Jager and Mr. Martin pointed out that the retail customers signed documents that contained a risk disclosure, which in turn would indicate lack of scienter. The Eleventh Circuit has held, however, that a general disclosure is not enough when the defendant's overall message constitutes fraud. *R.J. Fitzgerald*, 310 F.3d at 1329-31 (citing *CFTC v. Sidoti*, 178 F.3d 1132, 1136 (11th Cir. 1999) ("We seriously doubt whether boilerplate risk disclosure language could ever render an earlier material misrepresentation immaterial.")). A retail customer cannot be accurately informed of the transaction when Hunter Wise's overall message was one of large profit gains and guaranteed metals. The misrepresentations and

omissions by Hunter Wise and the Dealer Defendants were too prevalent to overcome a general risk disclosure and an agreement to pay fees.

For all the aforementioned reasons, I find that Mr. Jager and Mr. Martin knew Hunter Wise's omissions and misrepresentations regarding the disputed transactions in this matter presented a danger of misleading retail customers. Therefore, the CFTC has met its burden in proving the scienter element under Section 4b of the Act.

       (3)    *Materiality*

The last element of a fraud claim is whether the misrepresentation, statement, or omission was material. "A representation or omission is 'material' if a reasonable investor would consider it important in deciding whether to make an investment." *R.J. Fitzgerald*, 310 F.3d at 1328-29 (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972); *R&W Technical Servs., Ltd. v. CFTC*, 205 F.3d 165, 169 (5th Cir. 2000)). Misleading information regarding the safety of the investment would be deemed material. *See, e.g.*, *Clayton Brokerage Co. v. CFTC*, 794 F.2d 573, 580–81 (11th Cir. 1986) ("the risk inherent in [commodity futures] trading is a material fact"). In *R.J. Fitzgerald*, the Eleventh Circuit found that failing to inform potential customers that nearly all of a firm's retail customers had lost money was material because a reasonable investor would want to know such information before investing. 310 F.3d at 1332.

Hunter Wise made numerous misrepresentations and deceptive omissions in connection with the sale of precious metals. A potential retail customer would find it to be a material fact that almost all of Hunter Wise's customers lost money. It failed to disclose in its training manuals and the documents it sent to retail customers the risk inherent in the precious metal

investments into which it knew retail customers were entering. As testified to by several Hunter Wise victims, this information was undoubtedly material.

Hunter Wise knowingly misrepresented the type of arrangement it had made with the metals Suppliers. Even though they were informed by Hunter Wise's counsel and they confirmed in e-mail communications that no metal existed on Hunter Wise's behalf, or on anyone else's behalf for that matter, Mr. Martin and Mr. Jager sought to deceive retail customers by wording their documents in such a way to make it seem like Hunter Wise had metals. Hunter Wise continued to send out Trade Confirmations and Position Reconciliation statements stating that retail customers owned metals.

Hunter Wise described its offsetting margin accounts as owning and delivering metal on its clients' behalf. Mr. Martin and Mr. Jager were aware this description was false. Retail customers thought they were purchasing metals. They were told they owned the metal and that, because storage was more efficient, they paid a storage fee to have the dealers and Hunter Wise keep their metals safe. Undoubtedly, knowing that they were not buying materials would have been crucial information to have and to consider. Perhaps some retail customers would have entered into this precious metals transactions with Hunter Wise had they known the true risk involved and the type of scheme Hunter Wise had set up. However, because Hunter Wise did not provide them with material information, the retail customers entered into these investments blindly, without an accurate and complete picture of the transaction. As a result, the "materiality" requirement is met.

Accordingly, the CFTC has met its burden in proving Hunter Wise is liable for fraud under Section 4b of the Act.

**B.  Section 6(c)(1) of the Act and Commission Regulation 180.1 - Fraud**

Count Three alleges that Hunter Wise committed fraud under Section 6(c)(1) of the Act and Commission Regulation 180.1, which makes it "unlawful for any person, directly or indirectly, to use or employ . . . in connection with . . . a contract of sale of any commodity in interstate commerce . . . any manipulative or deceptive device." 7 U.S.C. § 9(1). Because of the similarities between Section 6(c)(1) of the Act and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), the CFTC decided to "model final Rule 180.1 on [the Securities and Exchange Commission ("SEC")] Rule 10b-5. To account for the differences between the securities markets and the derivatives markets, the Commission will be guided, but not controlled, by the substantial body of judicial precedent applying the comparable language of SEC Rule 10b-5."[32] Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41399, 41401 (July 14, 2011). A defendant is liable for a Securities Exchange Act Section 10(b) violation if the SEC proves: "(1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) made with scienter." *SEC v. Goble*, 682 F.3d 934, 942-43 (11th Cir. 2012) (internal quotation omitted).[33] I will apply the same legal standard for

---

[32] In accordance with *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the Court should defer to an agency's interpretation of statutory language developed through rulemaking and case-by-case adjudication when Congress has given the agency the authority to administer the statute. *Mazariegos v. Office of U.S. Attorney Gen.*, 241 F.3d 1320, 1327 n.4 (11th Cir. 2001) ("Under *Chevron*, where Congress in a statute has not spoken unambiguously on an issue, the interpretation of the statute by an agency entitled to administer it is entitled to deference so long as it is reasonable. *Chevron* deference may be applied to agency interpretations arrived at through formal adjudication."). Congress granted the CFTC the authority to promulgate rules and regulations for Section 6(c)(1), *see* 7 U.S.C. § 9(1), and to enforce the Section, *see* 7 U.S.C. § 9(4)(A). Under its authority, the CFTC issued Commission Regulation 180.1. The CFTC's reliance on SEC Rule 10b-5 appears reasonable.
[33] The SEC is not required to prove reliance, damages, and loss causation. *See Goble*, 682 F.3d at 943 (citations omitted).

violations of Section 6(c)(1) of the Act. Accordingly, the CFTC must prove that Hunter Wise made (1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) made with scienter.

Because I found that Hunter Wise, through Mr. Jager and Mr. Martin, made material misrepresentations and materially misleading omissions with scienter regarding the risk of the commodities transactions, I need only determine whether it did so in connection with the purchase or sale of commodities. Again, I use Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5 as a guide. Section 10(b)'s "in connection with" requirement "should be construed not technically and restrictively, but flexibly to effectuate [its] remedial purposes." *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (internal quotations omitted). The "purchase" of security may involve a change of ownership or a promise to purchase a security. *See Goble*, 682 F.3d at 946. A defendant who accepted payment and then failed to deliver the security to a customer is liable under Rule 10b-5. *Id.* (citing *Grippo v. Perazzo*, 357 F.3d 1218, 1223-24 (11th Cir. 2004)). The Court may look to whether the defendant's action "would . . . impact an investor's decision to purchase a security." *Id*; *see also SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir. 1968) (holding that a Rule 10b-5 violation exists "whenever assertions are made . . . in a manner reasonably calculated to influence the investing public").

In the commodities context, I must determine whether Hunter Wise's conduct was in connection to the retail customers' decision to enter into the subject transactions. The CFTC has proven that Hunter Wise made countless misrepresentations and deceptive omissions in connection with the sale of the precious metals. As mentioned above, Hunter Wise, through Mr. Martin, Mr. Jager, its representatives, and the documents it provided to its dealers and sent to retail customers, confirmed falsely that it had physical metals for its customers and failed to

disclose Hunter Wise's involvement in the scheme. Hunter Wise failed to disclose that it only had "paper entries" regarding its inventory. Further, its documents and training material fraudulently claimed success in these transactions, even when Hunter Wise's own accounting showed that over 90% of its customers were losing money. Hunter Wise misrepresented the rate of return and risk of the transactions. Victims of Hunter Wise's scheme testified that this information would have influenced their decision to purchase commodities. Therefore, the CFTC's allegations satisfy the "in connection with" requirement.

Accordingly, the CFTC has met its burden in proving Hunter Wise is liable for fraud under Section 6(c)(1) of the Act and Commission Regulation 180.1.

**C. *Section 13(a) of the Act - Aiding and Abetting the Violations of the Act***

Count Thirteen of the Complaint claims that Hunter Wise aided and abetted the violations of the Act that were committed by other defendants in the instant matter. Therefore, because of Hunter Wise's actions, it is liable under Section 13(a) of the Act. 7 U.S.C. § 13c(a). A defendant will be found liable if it "knowingly associates [itself] with an unlawful venture, participates in it to bring it about, and seeks by [its] actions to make it succeed." *CFTC v. Trinity Fin. Grp., Inc.*, 1997 WL 820970 (S.D. Fla. Sept. 29, 1997) (internal quotations omitted), *rev'd on other grounds sub nom. CFTC v. Sidoti*, 178 F.3d 1132 (11th Cir. 1999); *see also Bosco v. Serhant*, 836 F.2d 271, 279 (7th Cir. 1987) (finding that section 13(a), like in criminal law, "requires not only knowledge of the principal's objective but a desire to help him attain it").

(1)    *Primary Violation*

The Court found previously that Lloyds and the Dealer Defendants violated Section 4(a) of the Act.[34] Lloyds acted as Hunter Wise's intermediary in the scheme. It accepted the information and funds the Dealer Defendants obtained from the retail customers in these commodities transactions and shared them with Hunter Wise. The Dealer Defendants helped further Hunter Wise's scheme by making material misrepresentations and failing to disclose material information to the retail customers, whom they solicited for Hunter Wise.

(2)    *Aider and Abettor's Knowledge of the Primary Violation*

Mr. Martin and Mr. Jager claim they were in charge of the scheme. In an e-mail boasting about Hunter Wise's business, Mr. Jager explained that Hunter Wise "investors are not players in the casino, instead they own the casino. . . . Put another way, our investors are not betting on the horses; we own the race track [sic]. The point is that we control the process, and stand to make money no matter where the markets shift." E-mail from Jager to Pandora Pang (June 1, 2008) (CFTC Ex. 180 at 1). Hunter Wise masterminded and facilitated this process of cheating retail customers.

Mr. Jager and Mr. Martin seem to argue that, because their Dealer Purchase & Sale Agreement and the Dealer Loan, Security & Storage Agreement disclaimed an agency relationship, they are not liable for assisting the Dealer Defendants in violating the Act. They claim that the Dealer Defendants had complete autonomy over their interactions with the retail customers. The evidence presented at trial exposes the inherent fallacies in their arguments. An agency relationship does not have to exist to find Hunter Wise liable for systematically

---

[34] As noted previously, on February 5, 2014, the Court entered a Consent Order as to Lloyds. (DE 254). The Court also entered a Consent Order as to (1) Newbridge (DE 289) and (2) USCT (DE 288). The Court shall enter default judgment against CD Hopkins and Blackstone under separate Order.

defrauding their downstream customers out of their funds. In fact, the Dealer Defendants had to inform Hunter Wise representatives of their retail customers' initial trades. This requirement was so because a retail customer's account could not be created until Hunter Wise set the prices and received the funds.

One of the "features" that Hunter Wise offered was that it would "generate[] all trade-related customer correspondences under a 'White Label' arrangement. . . . As an added bonus, both [the] Dealer and Client Portals are also branded with [the Dealer's] company name and logo." Hunter Wise's Dealer Portal User Guide, CFTC Ex. 126 at 4. Through Hunter Wise's maintenance of the portal website, through which Hunter Wise generated and sent documents to the retail customers, Hunter Wise was able to lead customers into believing there were metals stored on their behalf. During his deposition, Mr. Mawjood, a non-party dealer in this matter, confirmed how deceptive this "White Label" feature was in transactions. Mr. Mawjood stated, "Every - - every item that gets sent out to your individual clients ultimately comes from Hunter Wise." Mawjood Dep. (DE 191-1 at 170:16-18). Even more telling, Mr. Mawjood noted, "I never understood why they would use Blackstone Metals Group or any other name, because whenever we would ask that question, in the end it's Hunter Wise that's doing it, and that's why I never understood that." *Id.* at 174: 18- 175: 22.

Mr. Mawjood also testified that Hunter Wise would set the interest amounts on the purported loans and fees Hunter Wise and the Dealer Defendants would charge retail customers. *Id.* at 134:1-7 (stating that fees were set "by Hunter Wise directly. And then whatever is communicated, [Blackstone Metals Group owner Baris Keser] would probably have agreed with it"). Hunter Wise knew that the Dealer Defendants were lying to retail customers, as it was Hunter Wise that created the forms and material the Dealer Defendants used to do so.

(3)     *Aider and Abettor Intentionally Assisted in the Primary Violation*

Sylvia Williams, a former broker-dealer in Hunter Wise's scheme, and Frank Gaudino, owner of Lloyds, Hunter Wise's intermediary between it and the Dealer Defendants, both testified to how Hunter Wise helped and managed the scheme. Ms. Williams received aid from Hunter Wise's representatives on how to establish a foreign corporation so that she could be a Hunter Wise broker-dealer in Florida. Ms. Williams testified that her company depended on Hunter Wise for its anti-money laundering documents, compliance manuals, and related services. Williams Testimony, Feb. 27, 2014 (DE 300 at 24:16-23). She explained that her company only had approximately $100,000 in capital because Hunter Wise received all of the retail customers' money and she "would request a wire be sent back that was due back to [her] as far as the commissions and the service and any interest." *Id*. at 30:1-3. Mr. Gaudino testified about looking to Hunter Wise to provide the services Lloyds promoted as its own.

These witnesses described how Hunter Wise's conduct not only aided the Dealer Defendants' violations, but controlled their ability to execute them as well. Without Hunter Wise's help, the Dealer Defendants would not have been able to cheat the victims in this action. As the leader of the scheme, Hunter Wise did more than what its agreements with the dealers described. While Hunter Wise sought to hide behind the curtain of its dealers, the evidence shows Hunter Wise was conducting the entire orchestra. Indeed, the dealers played to the tune Hunter Wise chose, at its direction. Now it refuses to face the music.

Accordingly, the CFTC has met its burden in proving Hunter Wise is liable for fraud under Section 13(a) of the Act.

### D. *Controlling Persons*

The CFTC seeks to hold Mr. Jager and Mr. Martin liable for Hunter Wise's conduct because they controlled the corporation. In my February 19, 2014 Order (DE 281), I found Mr. Jager and Mr. Martin liable as controlling persons of Hunter Wise. According, I find that they are liable under Section 13c(b), 7 U.S.C. § 13c(b) as to Counts Two, Three, and Thirteen of the Complaint. Section 13c(b) explains:

> Any person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations, or orders issued pursuant to this chapter may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the acts or acts constituting the violation.

7 U.S.C. § 13c(b). The Eleventh Circuit has noted that Section 13(b) of the Act is "about power and imposing liability for those who fail to exercise it to prevent illegal conduct." *R.J. Fitzgerald & Co.*, 310 F.3d at 1334. The "fundamental purpose" of the statute is "to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as on the corporation itself." *Id.* (quoting *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1567 (11th Cir. 1995)). Under Section 13(b), to demonstrate that an individual defendant had control over the entity requires the CFTC to show the controlling individual: (1) had control and (2) lacked good faith or knowingly induced the acts constituting the violation. *See* 7 U.S.C. § 13c(b); *In re First Nat'l Trading Corp.*, [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) 26,142, at 41,787 (CFTC July 20, 1994), *aff'd without opinion sub nom.*, *Pick v. CFTC*, 99 F.3d 1139 (6th Cir. 1996).

As to the first prong, to establish control, the CFTC must show the individual possessed general control over the operation of the entity principally liable. *See R.J. Fitzgerald & Co.*, 310

F.3d at 1334. The Court may find control exists where evidence demonstrates that the individual is an officer, founder, principal, or the authorized signatory on the company's bank accounts. *See In re Spiegel*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep (CCH) 24,103, at 34767 (CFTC Jan. 12, 1988). As to the second prong, the CFTC must show the individual either lacked good faith or knowingly induced the acts. To establish good faith, the CFTC must show that the individual failed to maintain a "reasonably adequate system of internal supervision and control" or did not oversee the system "with any reasonable diligence." *Monieson v. CFTC*, 996 F.2d 852, 860 (7th Cir. 1993) (quoting *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992)). To establish the "knowing inducement" element, the CFTC has the burden of showing that "the controlling person had actual or constructive knowledge of the core activities that constitute the violations at issue and allowed them to continue." *JCC, Inc.*, 63 F.3d at 1568 (quoting *In re Spiegel*, 24,103, at 34,767). Controlling persons cannot avoid liability by deliberately or recklessly avoiding knowledge about potential wrongdoing. *In re Spiegel*, 24,103, at 34,767. Courts have found that constructive knowledge of wrongdoing is sufficient for a finding of knowing inducement. *See JCC, Inc.*, 63 F.3d at 1568. To support a finding of constructive knowledge, the CFTC must show that a defendant "lacked actual knowledge only because he consciously avoided it." *Id.* at 1569 (citations omitted).

The CFTC alleges that Mr. Jager and Mr. Martin controlled and knowingly induced the conduct of Hunter Wise. Mr. Jager was the Chairman and Chief Executive Officer of Hunter Wise, and Mr. Martin was the President and Chief Operating Officer. Although Mr. Martin oversaw the day-to-day business operations, Mr. Jager's position within Hunter Wise demonstrates he had knowledge of and "direct[ed] the economic aspects" of the entity. *Apache Trading Corp.* [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) 25,251, at 38,795

(CFTC Mar. 11, 1992). Both individuals were authorized to, and did, enter into agreements with the Suppliers for Hunter Wise's margin trading transactions. In signing the agreements and trading with the Suppliers, Mr. Jager and Mr. Martin were aware, or purposely avoided becoming aware, that Hunter Wise did not own or acquire the commodities. Furthermore, Hunter Wise counsel informed Mr. Martin and Mr. Jager of the differences between owning metal fully and the offset trading Hunter Wise was conducting with the Suppliers. As such, I find that the CFTC has met its burden in showing that Mr. Jager and Mr. Martin controlled Hunter Wise and knowingly induced Hunter Wise to violate Section 4(a) of the Act.

## IV.   RELIEF REQUESTED / DAMAGES

Because Hunter Wise committed fraud and aided others in violating the Act, the CFTC seeks a Court order authorizing: (1) a permanent injunction and trading and registration ban; (2) restitution; and (3) a Civil Money Penalty ("CMP") against Hunter Wise, Mr. Jager, and Mr. Martin.

### A. *Permanent Injunction and Trading and Registration Ban*

The Act allows a district court, "upon a proper showing," to grant a permanent injunction. *CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1346 (11th Cir. 2008). In reviewing the grant of an injunction, "the ultimate test . . . is whether the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." *Id.* (internal quotation omitted) (citing *Sidoti,* 178 F.3d at 1137). Specifically, the following factors should be considered:

> [T]he egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.

*SEC v. Carriba Air, Inc.,* 681 F.2d 1318, 1322 (11th Cir. 1982).

As to the first and second considerations, Hunter Wise's conduct was egregious and recurrent. For over a year and a half, Hunter Wise made material misrepresentations about the precious metal transactions, the risk involved, and the success of the investment, while, at the same time, using the funds to buy precious metals from the Suppliers on its own behalf. Hunter Wise did not use the retail customers' funds as they were supposed to be used: to buy precious metals on their behalf with loans. As I noted previously, the scheme Mr. Jager and Mr. Martin developed was calculated to deceive retail customers.

The evidence the CFTC presented at trial demonstrates that Hunter Wise acted with a high degree of scienter. It was aware that it was misleading its downstream customers, that it was not allocating the funds to purchase precious metals on the retail customers' behalf, that its training and promotional material were wrong, and that no loans were disbursed for the customers. It supported and controlled the Dealer Defendants and Lloyds in their solicitation of retail customers, took a commission, and received fees from every customer that was misled.

Furthermore, Mr. Jager and Mr. Martin have not recognized any wrongdoing. The likelihood of future violations is strong, especially because Mr. Jager and Mr. Martin argue that their conduct in defrauding retail customers out of millions of dollars was legitimate and both were aware of Mr. Martin's *Unimet* Consent Order prohibiting the exact fraud he committed here.

Therefore, I find that a permanent injunction is appropriate because Hunter Wise, Mr. Jager, and Mr. Martin's actions were repeated, callous, and blatant.

**B. *Restitution / Disgorgement***

The record contains sufficient evidence of the losses from Hunter Wise's actions.[35] Only sixty-four customers out of 3,283 total customers achieved a profit during their transactions through Hunter Wise between July 16, 2011 and February 25, 2013. Hunter Wise, on the other hand, benefitted greatly from these transactions. The CFTC seeks restitution from Hunter Wise, Mr. Martin, and Mr. Jager for proximately causing the retail customers' losses.

Under Section 6(c) of the Act, the Court is authorized to order restitution. *See* 7 U.S.C. § 13a-1. Section 6(c) allows the CFTC to request equitable remedies "on any person found in the action to have committed any violation," including:

(A) restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses); and

(B) disgorgement of gains received in connection with such violation.

7 U.S.C. § 13a-1(d)(3).

The systematic and pervasive nature of Hunter Wise's fraud necessitates restitution not only for the retail customers who testified to the losses they sustained due to Hunter Wise's scheme, but for all of Hunter Wise's customers as well. Hunter Wise developed a scheme that failed to disclose material information about the commodities transactions into which retail customers were entering. During the relevant period, Hunter Wise acted intentionally in deceiving the retail customers by generating and sending documents that misrepresented and omitted information regarding Hunter Wise's margin trading accounts with the metals Suppliers, the loans Hunter Wise offered, the high risks and low payouts involved in the transactions, and

---

[35] Mr. Martin and Mr. Jager attempted to argue that Special Monitor Melanie Damien's calculation of the losses, which the CFTC relied upon to calculate the retail customers' total losses, was incorrect. After reviewing the evidence and testimony, however, I find that the CFTC's calculations accurately reflect the losses sustained by the retail customers.

Hunter Wise's ownership of metals on the retail customers' behalf. Hunter Wise oversaw the whole scheme; a customer account could not be created without Hunter Wise's approval. It received the retail customers' funds and dispersed the dealers' profits, keeping the majority of the funds for itself. Without correcting the material information, retail customers faced the certain loss of the money they invested, and over 90% of them did, in fact, lose their funds.

Therefore, I find that restitution for all retail customer losses is an appropriate remedy, for which Hunter Wise, Mr. Martin, and Mr. Jager are jointly and severally liable.

### C. *Civil Money Penalty*

Along with restitution, the CFTC seeks a CMP against Hunter Wise, Mr. Martin, and Mr. Jager. The Court's authority to impose a CMP comes from Section 6c(d)(1), which provides that a monetary penalty "in the amount of not more than the higher of $100,000 or triple the monetary gain" may be imposed for each violation against any person found to violate the Act. 7 U.S.C. § 13a-1(d)(1)(A). The $100,000 amount was increased to $140,000 per violation, as adjusted for inflation. *See* 17 C.F.R. § 143.8. The district court's imposition of the civil penalty must be "rationally related to the offense charged or the need for deterrence." *CFTC v. Levy*, 541 F.3d 1102, 1112 (11th Cir. 2008).

Hunter Wise engaged in a well-thought out scheme to defraud approximately 3,200 retail customers, and it received $18,481,964.13 in profit due to spread charges, interest on loans Hunter Wise never executed, and fees for services Hunter Wise did not provide. *See* Summary Exhibit - Defendants' Financed Transactions with Retail Customers, CFTC Ex. 69. Because of its conduct, a CMP is warranted against Hunter Wise. The CMP against Hunter Wise is $55,445,892.39, which represents the product of triple Hunter Wise's monetary gain. Mr. Martin and Mr. Jager are jointly and severally liable for the CMP as controlling persons.

## V.    CONCLUSION

Based upon the Court's findings set forth above, the CFTC has established by a preponderance of the evidence that Hunter Wise, Harold Edward Martin, Jr., and Fred Jager committed fraud and aided and abetted Lloyds and the Dealer Defendants in defrauding the retail customers. For these reasons, Judgment is due to be entered in favor of the CFTC as to Counts Two, Three, and Thirteen of the Complaint. Judgment will be entered in favor of the CFTC against the Hunter Wise Defendants by separate order.

**DONE AND ORDERED** in Chambers in West Palm Beach, Florida, this _15_ day of May, 2014.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to:    Counsel of Record
              Melanie E. Damian, Special Monitor and Corporate Manager
              John A. King, II, *pro se* Defendant
              Chadewick Hopkins, *pro se* Defendant