**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**Case No. 12-81311-CIV-MIDDLEBROOKS/BRANNON**

UNITED STATES COMMODITY
FUTURES TRADING COMMISSION,

       Plaintiff,

vs.

HUNTER WISE COMMODITIES, LLC,
*et al.*,

       Defendants.

_____/

## RECEIVER'S EIGHTH STATUS REPORT

Melanie E. Damian, Esq., the court-appointed Special Monitor and Corporate Manager for the Entity Defendants and the Equity Receiver (the "Monitor" or "Receiver") for Defendants Hunter Wise Commodities, LLC, Hunter Wise Services, LLC, Hunter Wise Credit, LLC and Hunter Wise Trading, LLC in the above-captioned enforcement action, submits her eighth report (the "Report") concerning the status of the Monitorship and the Receivership.  This Report covers the period from December 1, 2014, through February 28, 2015 (the "Reporting Period").

### I.  INTRODUCTION

#### A.  *Commencement of the Monitorship*

On February 22, 2013, following a hearing on the CFTC's Motion for Preliminary Injunction and Appointment of a Receiver, the Court entered an Order Appointing Special Corporate Monitor, which, among other things, set forth the powers and duties of the Monitor with respect to the Entity Defendants (the "Appointment Order") [ECF No. 77].   The Appointment Order appointed the Monitor to oversee and preserve assets of the Defendant

Entities thereby creating the estate (the "Monitorship Estate" or the "Estate").  On February 25, 2013, the Court entered the Preliminary Injunction (the "Injunction Order") [ECF No. 78].

### B.   *Reporting on the Status of the Estate and the Activities of the Monitor*

Paragraph 24 of the Injunction Order requires the Monitor to "periodically … as directed by the Court, file with the Court and serve on the parties a report summarizing efforts to marshal and collect assets, administer the [Estate], and otherwise perform the duties mandated by [the] Order."  Accordingly, the Monitor has filed seven reports prior to the instant Report.  [ECF Nos. 102, 159, 213, 283, 302, 317 and 331, respectively].   Those reports cover the activities undertaken by the Monitor during the period from March 22, 2013, through November 30, 2014. During that period, the Monitor has carried out her duties under the Appointment Order, the Injunction Order, the Final Judgment (defined in section II.A) and the Restitution Orders (defined in section III.J.).  These duties include, among other things, the wind down of the Entity Defendants' operations, the marshaling of known assets of the Estate, the investigation into, and efforts to recover, additional assets of the Estate, the administration of recovered assets of the Estate and the collection of restitution.  *See* Injunction Order at ¶ 21(A) – (L), Final Judgment at ¶ 5 and Restitution Orders.

The Monitor continues to fulfill her duties under the Appointment Order, Injunction Order, Final Judgment and Restitution Orders and provides herein a detailed description of those efforts and accomplishments and her efforts to fulfill her additional duties as Receiver, as described below, during the current Reporting Period.

## II.   STATUS OF THE ENFORCEMENT ACTION

### A.   *Order of Final Judgment Against the HW Entities, Jager and Martin*

On May 16, 2014, this Court entered the *Order of Final Judgment, Permanent Injunction and Civil Monetary Penalty and Other Equitable Relief* in favor of the CFTC and against the HW Entities, Jager and Martin [ECF No. 306] (the "Final Judgment").

The Final Judgment also specifically grants the Monitor "full authority to act as an equity receiver for the Hunter Wise entity defendants." *See* [ECF No. 306 at ¶ 5].  As such, the Receiver is required to pursue and collect restitution payments from the Individual Defendants and make distributions to the defrauded creditors.  *See id.*

### B.   *Consent Orders and Default Judgment Against All Other Defendants*

During prior Reporting Periods, the Court entered Consent Orders or Default Judgments against each of the other Defendants to this action, requiring that they, among other things, pay restitution amounts to the Receiver [ECF Nos. 254, 288, 289 and 304].  The Receiver has determined that those Defendants are either defunct entities without assets or individuals who are insolvent or otherwise lack the resources to pay their debts.  Consequently, the Receiver has not collected any amounts from those Defendants.  Nevertheless, the Receiver will monitor those Defendants' assets and, to the extent any valuable assets are discovered, the Receiver will seek to recover those assets for the benefit of investors and creditors of the Estate.

### C.   *The Claims Administration Process*

On August 15, 2014, this Court approved the Receiver's proposed Claims Process [ECF No. 314], which Process is nearly concluded and the Receiver is ready to make the initial distribution of a significant portion of the Estate's cash on hand.

During the Reporting Period, on December 15, 2014, the Receiver filed responses to the appeals filed by nine (9) claimants who appealed the Receiver's final determinations of their

respective claims.  Subsequently, on December 17, 2014, the Receiver filed another response to an appeal filed by two related claimants who appealed the Receiver's final determination of their collective claim.  Those ten (10) appeals are ripe for this Court's determination.

On December 23, 2014, the Receiver filed a Motion to approve her initial distribution to the claimants with allowed claims.  *See* [ECF No. 345].  Based on the Receiver's final determinations as to approved claims and the estimated initial distribution amount of $5,008,175.49 (80% of the cash on hand in the Receivership Estate), the Receiver estimates that the initial distribution to claimants with allowable claims would be approximately 13.39% of the total amount of allowable claims.  Of course, the amount to be distributed to each claimant with an allowed claim and the percentage of that distribution would change in the event any of the appealing claimants prevail in its appeal.

No objection to the Receiver's Motion to approve her initial distribution has been filed, and that Motion is ripe for this Court's final determinations.

## III.  STATUS OF THE MONITORSHIP AND THE RECEIVERSHIP

### A.  *Ongoing Administration of the HW Entities*

i.   Continued Oversight of the Precious Metals

The precious metals, recovered from Entity Defendants, held at Baird & Associates ("Baird"), Delaware Depository Services ("DDS"), and International Depository Services of Canada ("IDS")[1] remained unchanged since the filing of the Initial Report.  A detailed report of the quantities and market values (as of March 16, 2015) of the precious metals stored at DDS is attached hereto as **Exhibit "A"**.

---

[1] The bulk of the physical precious metals are stored at DDS.  However, IDS and Baird each hold a single approximately 1000 oz. bar of silver, each of which has a present market value of approximately $15,580.00, as of March 16, 2015.

The precious metals previously held at the Irvine, California, office of the HW Entities remain stored at a secure Via Mat International ("Via Mat") facility in Miami, Florida. The quantity of the metals at Via Mat has remained the same since their arrival at the facility. The Receiver estimates that the current value of the metals at Via Mat is $129,624.14. This estimate is based on the spot prices of the metals as of March 16, 2015, and on the market values of the same or similar items currently for sale on various online metals retailers.[2]

As detailed in the Third Report, the Monitor secured and removed from Defendant Martin's Santa Ana Apartment a limited number of coins and precious metals (worth less than $5,000.00) that remain stored in a safe deposit box located at a bank in Miami, Florida.

  ii. Requests For Release of Metals and Funds Obtained or Transferred Through Hunter Wise International Commodities, Ltd. (Cayman)

As set forth in previous status reports, the Receiver received demands from three individuals for the return of certain precious metals held at a depository (DDS) or funds held at a trading firm (Baird), in accounts under the names of Hunter Wise or entities affiliated with the HW Entities. DDS and Baird froze these accounts, pursuant to the Injunction Order, and informed the Receiver's counsel that the accounts would remain frozen pending the Receiver's investigation into the ownership and source of the metals and funds.

During the Reporting Period, the Receiver completed her investigation into whether the individuals are indeed the true owners of the metals and funds they seek and whether the source of those metals and funds is any of the Defendants or any related or affiliated person or entity. The current status of each claim is set forth below.

---

[2] The Receiver utilized a methodology similar to that utilized by the appraiser to determine the current market value of the metals, rather than obtaining an updated formal appraisal, to minimize the expense to the Estate.

a.   The Silver Bars Frozen at DDS

With regard to the individual requesting the return of 10 silver bars held at DDS, he submitted a claim in the claims process.  The Receiver disallowed his claim and he filed with the Court a formal appeal of the Receiver's final determination, to which the Receiver responded during this Reporting Period.  The Receiver awaits this Court's final determination.

b.   The Funds Frozen at Baird & Associates

With regard to Fred Brett's claim for the return of funds held at Baird & Associates (approximately $98,000.00), because he had not provided all of the necessary records as the deadline to file a claim in the claims process was approaching, the Receiver's counsel encouraged him to submit a claim in the claims process.  Mr. Brett did not file a claim on behalf of himself nor on behalf of his company Global Commodity Investments, Ltd.

c.   The Gold Bars Frozen at DDS

With respect to Alan McGraw's request for the release of metals (7 1-kilogram gold bars worth approximately $284,140.89[3]) being held at DDS, during the prior Reporting Period, Mr. McGraw provided additional documents that established the final leg of the transfer from an intermediary entity to DDS for four (4) of the seven (7) gold bars.  Therefore, the Receiver requested that he continue to search for additional supporting documents and began revising an affidavit for Mr. McGraw to sign confirming the evidence he provided of his ownership of those four gold bars.  Upon receiving the signed affidavit from Mr. McGraw, the Receiver consulted counsel for the CFTC regarding the release of the four bars of which Mr. McGraw established his ownership.  Counsel for the CFTC had no objection to the Receiver's release of those bars from the account at DDS.  Accordingly, the Receiver's counsel notified DDS that it could release

---

[3] This is the approximate value as of March 16, 2015.

the bars to Mr. McGraw.  Subsequently, the Receiver's counsel received notice that DDS shipped the bars to Mr. McGraw who acknowledged receipt thereof.  With respect to the remaining three (3) gold bars, Mr. McGraw filed a claim in the Claims Process, and the Receiver carefully considered that claim and sent him a final determination letter, disallowing his claim based on the lack of sufficient evidence to support it.  Mr. McGraw did not appeal the Receiver's final determination.

### B.  Prospective Sale of Personal Property of the Receivership Estate.

On August 29, 2014, this Court approved the Receiver's proposed plan to sell all of the personal property held by the Receiver.  *See* [ECF No. 316].

During the prior Reporting Period, the Receiver conducted three auctions to sell the office furniture and equipment resulting in gross sale proceeds totaling $17,373.50 and eliminated the expense to the Estate of storing those items in three different facilities in three different states.  Further, with respect to the precious metals that the Receiver is storing at different depositories, the Receiver had previously determined that because the spot prices for gold and silver are at four-and-a-half-year lows and the spot price for platinum is at a five-year low, liquidation of the Estate's metals at that time was not in the best interest of the Estate.

During this Reporting Period, the Receiver continued to monitor the precious metals market and determined that the spot prices for gold, silver and platinum remained at multi-year lows.  The Receiver proposes to liquidate the metals when the prices rise.

The Receiver also continued to monitor the fair market value of, and compare different methods of selling, the jewelry being stored at a safe deposit box at a Miami Bank.  The Receiver's counsel solicited offers to purchase certain of the jewelry from reputable jewelers but did not receive any offers at fair market value.  The Receiver's counsel will explore selling the

items through online auctions, with which counsel has had much success receiving fair market value for jewelry items in other receivership matters.

### C. Asset Recovery from Defendant Jager, Hunter Wise Financial Group, LLC, Hunter Wise Holdings, LLC, Hunter Wise Securities, LLC, and South Peak Texas Investments, Inc.

After the entry of the Injunction Order, the Monitor and her professionals learned that, prior thereto, at least $2,659,804 in member distributions (the "Jager Transfers") were transferred from the HW Entities' accounts to Individual Defendant Fred Jager ("Jager") and his entities, South Peak Texas Investments, Inc. ("South Peak"), Hunter Wise Holdings, LLC ("HW Holdings") and Hunter Wise Financial Group, LLC ("HW Financial"). Subsequently, the Monitor entered into a stipulation with Jager, HW Holdings, and HW Financial (the "Jager Stipulation") [ECF No. 93], which this Court approved in an Agreed Order Unfreezing Certain Bank Accounts, entered on March 7, 2013 (the "Unfreeze Order") [ECF No. 94]. Pursuant to the Jager Stipulation and the Unfreeze Order, Jager, HW Financial, and HW Holdings agreed to pay back the Jager Transfers to the Receivership Estate, subject to final determination regarding the Defendants' liability, and agreed to submit disbursement requests to the Receiver for approval.

During the Reporting Period, Mr. Jager and HW Financial continued to submit disbursement requests to the Receiver, and the Receiver continued to carefully consider each one and, as appropriate, approved disbursements from Mr. Jager and HW Financial.

With respect to the payment requirements under the Unfreeze Order, Jager and his companies have made payments to the Receiver totaling $443,983.27. The Receiver, with the assistance of her forensic accountant, determined that Jager and his companies actually received a total of $4,222,673.61 from the HW Entities and that the amounts set forth in the Unfreeze Order, which reflected the CFTC's initial determination of the amounts transferred from the HW Entities, were not necessarily the total amounts transferred. Jager and his other companies have

not satisfied their debts to the Estate according to the Unfreeze Order and the Receiver's independent investigation, and Jager has not satisfied his restitution obligation under the Final Judgment.  Thus, during the Reporting Period, the Receiver continued to seek to collect the amounts that Jager and his companies owe to the Estate.

With respect to the debts of HW Financial and related companies, the Receiver negotiated a term sheet for the sale of Fred Jager's interest in HW Financial, with the proceeds going to the Receivership Estate.  The term sheet also provides that HW Financial will execute an Irrevocable Proxy and Voting Agreement transferring to the Receiver its voting rights with respect to an affiliate of Defendants.  Counsel for HW Financial has informed the Receiver's counsel that that term sheet was submitted to FINRA for approval and that FINRA is still considering that term sheet.  If FINRA approves the term sheet, counsel for HW Financial and counsel for the Receiver will execute an agreement and the proceeds of the sale of Jager's shares in HW Financial will be transferred to the Estate.

Also during the Reporting Period, the Receiver and the Jagers finalized the agreement regarding their turnover of funds and assets in partial satisfaction of Jager's restitution obligation under the Final Judgment (the "Jagers Agreement").  The Jagers Agreement also provides for the turnover of certain assets designated to Mrs. Jager as part of the Jagers' divorce proceedings pending in Orange County, California.

On December 26, 2014, the Receiver filed a Motion to Approve Agreement Regarding Execution of Judgment.  No objection to that Motion was filed and it is ripe for this Court's consideration.  *See* [ECF No. 346].  Time is of the essence with respect to the approval of the Jagers Agreement because, pursuant to that Agreement, the Jagers will turn over, among other assets,  shares of Facebook, Inc. which the Receiver would like to liquidate while their value are at historic highs.  In addition, approval of the Jagers Agreement is required before the Jagers and

their company will execute an Irrevocable Proxy and Voting Agreement, giving the Receiver the voting rights necessary to obtain for the benefit of the Estate substantial funds (in excess of $520,000) being held in accounts of affiliates of the Defendants.

Further, during the Reporting Period, the Receiver and certain other shareholders of an affiliate of the Defendants finalized the terms of similar Irrevocable Proxy and Voting Agreements (each a "Voting Agreement" collectively, the "Voting Agreements"), and executed Voting Agreements with certain of those shareholders.  In particular, the trustees of the three Martin family trusts, which are shareholders of that affiliate, have each executed a Voting Agreement, giving the Receiver control of 36.94% of the voting rights, and two individual shareholders of that affiliate signed Voting Agreements, giving the Receiver another 1.00% such that the Receiver now controls 37.94% of the affiliate's voting rights.

When the Court approves the Jagers Agreement, the Jagers will sign a Voting Agreement, and the Receiver will control another 40.82% of the voting rights of the Defendants' affiliate, giving her a majority of the voting rights of that company.  She can then direct that company's banks to turn over the funds to the Estate.

### D.  Asset Recovery from Defendant Martin

As previously reported, the Receiver and her counsel successfully obtained the turnover of the majority of Defendant Martin's assets (the "Martin Assets").  Pursuant to this Court's order, the Receiver liquidated the depreciating items of the Martin Assets, including the furnishings from the Santa Ana Apartment, a car and a boat.  The Receiver intends to liquidate the remaining Martin Assets, including jewelry and coins, pursuant to this Court's order approving the sale of the remaining personal property of the Estate.

In addition, during the Reporting Period, the Receiver negotiated with Martin regarding the transfer of his and his family members' shares in Great Western Iron Ore to the Receiver.

Martin has agreed to the transfer of shares but he has not yet completed the procedures required by the transferring agency.   The Receiver's counsel continues to follow up with him to assure that the transfer is completed.   Once the shares are transferred, the Receiver will investigate the best way to liquidate them in order to maximize the return for the Estate.

### E.   Asset Recovery from Defendant Burbage

The Receiver continues to monitor Burbage's assets and, to the extent any valuable assets are discovered, the Receiver will seek to recover those assets for the benefit of investors and creditors of the Estate.

### F.   Asset Recovery from Defendant Gaudino

During the Reporting Period, the Receiver's counsel sought out buyers for the Rolex Submariner watch recovered from Gaudino by contacting several jewelry stores and watch dealers in South Florida and monitored online auction sales of pre-owned Rolex Submariners in similar condition to gauge the marketability of Gaudino's watch and determine the optimal means of liquidating it and maximizing the recovery for the Estate.   The Receiver believes an online auction through Ebay may be the best means for the sale of the watch.   Ebay auction sale prices for similar watches remain stable at this time.

### G.   Efforts to Recover Funds Frozen in Accounts of Defendants' Affiliates

Pursuant to the Receiver's demand, Standard Bank and Baird & Associates froze all accounts in the name of the HW Entities and their subsidiaries and affiliates.   In particular, Standard Bank froze an account containing $19,478.54, and Baird & Associates froze an account containing in excess of $500,000.   Since then, the account holders ceased doing business. Standard Bank and Baird & Associates have indicated that they will continue to freeze those accounts until they receive instructions from authorized representatives of the account holders and the Receiver, or an order from a court of competent jurisdiction.   When the Jagers sign the

Voting Agreement and the Receiver obtains a majority of the voting rights of those account holders, the Receiver will become the authorized representative who can provide the necessary instructions to have the frozen funds transferred from those accounts to the Estate.

### H.  Recovery of Funds in Account of Defendants' and Their Companies

In total, $402,775.63 in funds and securities remains frozen in various accounts in the names of certain Defendants and their wholly owned entities and affiliates, as detailed in **Exhibit "B"** attached hereto.  The majority of those funds and securities will be transferred to the Estate following this Court's approval of the Jagers Agreement discussed above.

### I.  Asset Recovery from Members of the HW Entities

As previously reported, the Receiver will not be seeking to recover the distributions that members, who suffered net losses, had received from the HW Entities.  Other members, however, did not claim or demonstrate with documents or otherwise that they had invested more than they received back from the HW Entities in member distributions.  Therefore, the Receiver demanded the return of their net gains or documents that demonstrate that they did not receive net gains, and engaged in negotiations with certain of those members for the return of any net gains they had received on their investments with the HW Entities.

During the Reporting Period, the Receiver obtained documents from all but two of the members of the HW Entities, demonstrating that they did not realize net gains on their investments and, in fact, lost money.  One of the members, which had not yet demonstrated its claimed losses, continued to work with the Receiver's counsel to do so.  If that member is unable to demonstrate its claimed losses, the Receiver will pursue recovery of the net gain from that member.

The other member of the HW Entities who was unable to demonstrate that he did not realize a net gain from his investment is David Manners, who was a former director of the HW

Entities.  During the prior reporting period, counsel for the Receiver pursued the Receiver's claims against Mr. Manners and two other control persons of the HW Entities for breach of fiduciary duty and aiding and abetting breach of fiduciary duty (*see infra* Section M.i.), adding a fraudulent transfer claim against Mr. Manners to recover the member distributions he had received.

### J.  *Recovery of Restitution Obligations from Non-Defendant Dealers and Their Principals*

The CFTC has entered into consent judgments with various dealer entities and individual owners of those entities in administrative proceedings brought by the CFTC (collectively, the "Restitution Orders").  Those Restitution Orders require, among other things, the dealers and principals to pay certain restitution amounts and authorize the Receiver to collect the restitution amounts from them.  Accordingly, during the Reporting Period, the Receiver's counsel continued to investigate the assets and liabilities of the dealers and principals against which the Restitution Orders were entered to determine whether they have any unencumbered or non-exempt assets to seek to recover for the benefit of the Receivership Estate, recorded the Restitution Orders in the jurisdictions where the dealers and their principals reside, and sent demand letters and discovery in aid of execution to each of those dealers and principals.

Some of the dealers and principals responded to the Receiver's demand letters, claiming to lack assets to satisfy their restitution obligations, but failed to respond to the discovery in aid of execution.  One principal provided a financial affidavit, demonstrating his inability to immediately satisfy his restitution obligation, and offered to make payments over time towards that obligation.  The Receiver's counsel negotiated a payment plan with that principal, who will begin making payments during the next reporting period.

The Receiver will continue to seek to collect the restitution amounts from these dealers and principals, pursuant to her authority under the Restitution Orders, and will monitor their financial condition and operations, if any.  In the event unencumbered and non-exempt assets are discovered, the Receiver will seek to recover them for the benefit of the Estate.

### K. Recovery of Fraudulent Transfers from Non-Defendant Dealers and Their Principals

The Receiver and her forensic accountant have investigated the transfers that various non-defendant dealers (who are not the subject CFTC actions) received from the HW Entities. Those transfers represent commissions, spreads (price mark ups and mark downs for metals sales and purchases), fees and interest that the HW Entities paid to those dealers from funds received from defrauded customers.  Those transfers were paid without an exchange of reasonably equivalent value in order to perpetuate the HW Entities' fraudulent scheme at a time when the HW Entities were insolvent.  Accordingly, those transfers to dealers constitute fraudulent transfers under the Uniform Fraudulent Transfer Act.  During the Reporting Period, the Receiver sent demand letters to those dealers and their principals requesting that they return those transfers to the Estate.  The Receiver is currently engaged in settlement negotiations with several dealers.[4] Other dealers have responded requesting further proof of the transfers and/or agreeing to provide their own documentation showing that the funds were either never paid to them or subsequently transferred to customers.  Many dealers have not responded at all to the Receiver's demand letters.  As such, the Receiver has begun to draft and file complaints asserting claims for recovery of fraudulent transfers and unjust enrichment against those dealers and their principals. On March 11 and 13, 2015, the Receiver filed complaints commencing the following actions in this Court: *Damian v. Bullions Investment Corporation and Robert Roca*, Case No. 15-cv-80334;

---

[4] The Receiver recently filed a Motion to Approve Settlement Agreement with dealer U.S. Coin Bullion which, if approved, will provide recovery of $7,500 for the Estate.  *See* [ECF No. 348].

and   *Damian v. Liberty Trading Exchange, LLC, David Block and Keith Bresee*, Case No. 15-cv-21037.[5]

### L.   *Ancillary Litigation / Stay of Proceedings*

The Appointment Order provides for a stay of all litigation ("Ancillary Proceedings") against the Entity Defendants.  *See* Appointment Order at ¶ 25.  To date, the Receiver has negotiated stipulations for the dismissal of the Entity Defendants from the majority of the Ancillary Proceedings, as detailed in the Second Report and subsequently approved by this Court [ECF No. 151].  During the Reporting Period, the Receiver entered into a Stipulation with a plaintiff in one of the remaining Ancillary Proceedings involving the Lloyds Entities, pursuant to which the plaintiff would dismiss the Lloyds Entities from that proceeding and submit a claim in the claims process.  The plaintiff did submit a claim and the Receiver administered that claim in the Court-approved claims process.

Prior to the commencement of the Receivership, Lloyds Commodities, LLC commenced the action styled *Lloyds Commodities, LLC v. Sabertooth Interactive, LLC*, Case No. CV-13-00375-JEM (the "Sabertooth Litigation"), in the United States District Court for the Central District of California, against a media company that Lloyds had engaged to create an online game that the principals of Lloyds believed would generate substantial revenues.  That action was stayed pursuant to this Court's Appointment Order and Injunction Order.  After the entry of the Consent Order against the Lloyds Entities and their principals, the Sabertooth Litigation resumed.

---

[5] Although the Receiver noted on the Civil Cover Sheets that these actions relate to this Enforcement Action, they were assigned to other judges.  The Receiver will file a motion to transfer these cases to this Court in the event this Court prefers to preside over them and all other similar clawback actions the Receiver may file.

During the Reporting Period, the Receiver's counsel continued negotiating with counsel for Sabertooth a possible settlement of Lloyds Commodities LLC's claims, sought to schedule mediation, and investigated the financial condition and collectability of Sabertooth. Sabertooth had claimed that it lacks the financial resources to pay any settlement amount or even to pay a mediator to assist the parties to resolve the dispute. Therefore, the Receiver's counsel requested that Sabertooth provide a financial affidavit evidencing Sabertooth's financial condition and provided Sabertooth's counsel a detailed form affidavit to fill out. Counsel for Sabertooth indicated that Sabertooth would provide some form of affidavit though not necessarily the detailed form that the Receiver's counsel provided. In addition, to save the parties the mediator's fee, the parties have agreed to a settlement conference before a U.S. Magistrate Judge and, at a Status Conference in the Sabertooth action, the Court indicated that it would accommodate the parties and facilitate the scheduling of that settlement conference. In the event the parties reach a settlement, the Receiver will seek this Court's approval of such settlement. If the parties fail to reach a settlement and Sabertooth fails to demonstrate its inability to pay a reasonable settlement amount, the Receiver will pursue the litigation.

### M. Claims Against Third Parties

During prior reporting periods, the Receiver investigated, formulated her claims, and on September 19, 2014 filed complaints against third parties, including former directors and officers of the HW Entities and former counsel to the HW Entities to recover (i) the losses sustained by the HW Entities as result of their misconduct, and (ii) the funds paid to those parties by the HW Entities. The Receiver also investigated, submitted claims against, and made formal demand upon insurance policies covering such misconduct.

i.     Action Against Former Directors and Officers

During the last reporting period, the Receiver filed a complaint against directors and officers of the HW Entities -- David Manners (former Manager of HW Commodities), Tracy Luu (former CFO and Controller of the HW Entities) and Susan Morales (former Director of Operations of the HW Entities) -- for the total amount of the HW Entities' damages resulting from their breaches of their fiduciary duties and from their aiding and abetting others' breaches of fiduciary duties to the HW Entities, plus costs and interest, and attorneys' fees.

On February 10, 2015, during this Reporting Period, the Receiver and the parties to this action attended mediation, during which they reached a settlement of all claims in exchange for a lump sum payment of $750,000 from the directors and officers liability insurance carrier, Federal Insurance Company.[6]  Following mediation, the Receiver's counsel prepared and circulated to all parties' counsel a settlement agreement, counsel revised and finalized the terms of the agreement, and all parties signed the agreement.  Subsequently, on March 11, 2015, the Receiver filed with this Court an unopposed Motion to approve the agreement.  *See* [ECF No. 347].  No objection to that Motion was filed, and it is ripe for this Court's determination.

ii.     Action Against Former Counsel

During the last reporting period, the Receiver filed a complaint against former counsel to the HW Entities, Jay Bruce Grossman a/k/a J.B. Grossman, J.B. Grossman, P.A., Timothy Carey, and Winston & Strawn, LLP.  The HW Entities retained such counsel to guide and counsel them concerning the implications of changes to the Commodities Exchange Act (that became effective in July of 2011) for their business model and regarding the subsequent CFTC investigation and enforcement action against the HW Entities.

___

[6]  The Director Defendants were covered by a Federal Insurance Company $1 million wasting directors and officers liability insurance policy.

17

In her complaint, the Receiver asserts claims for legal malpractice, breach of fiduciary duty and breach of contract.  The Receiver demands judgment against the HW Entities former counsel for the total amount of damages resulting from (i) their legal malpractice, (ii) their breaches of their fiduciary duties to the HW Entities, and (iii) the breach of contract committed while acting as the HW Entities' counsel, plus all attorneys' fees and costs.

During the Reporting Period, the parties exchanged initial disclosures, Defendants filed motions to dismiss, and Defendants Timothy Carey and Winston & Strawn, LLP filed a motion to stay proceedings pending the Court's determination of their motion to dismiss.  Those motions are fully briefed and ready for this Court's determination.  The Receiver proposed to all Defendants that they participate in a mediation to facilitate the resolution of the Receiver's claims.  Defendants J.B. Grossman and J.B. Grossman, P.A. agreed to participate but Defendants Timothy Carey and Winston & Strawn, LLP refused to participate.  The mediation of the Receiver's claims against Defendants J.B. Grossman and J.B. Grossman, P.A. is scheduled for April 15, 2015.

## IV.  END-CUSTOMERS, CREDITORS AND DEALERS

During the Reporting Period, the Receiver and her professionals continued to receive numerous telephone calls, mail and e-mail correspondence from end-customers, creditors and dealers, and/or their respective counsel, seeking information concerning the status of the Receiver and the enforcement action.  The Receiver and her professionals have made every effort to answer their questions and address their concerns and continue to refer them to the Receiver website located at www.hunterwisemanager.com and send them periodic letters.  The website is regularly updated with recent court filings, including the Monitor/Receiver's Status Reports and the Court's orders, and the website and the Monitor/Receiver's periodic letters to end-customers and creditors provide information regarding the Monitorship, the Receivership

and the enforcement action, important dates and deadlines, questions frequently asked by end-customers, creditors and dealers, and the Receiver's answers thereto, and other updates regarding the Receiver's efforts to fulfill her duties under the Court's Orders.

The Receiver has updated her lists of all known end-customers, creditors and dealers of the HW Entities.[7]

## V.    ACCOUNTING OF RECEIVERSHIP FUNDS AND TOTAL VALUE OF ASSETS OF RECEIVERSHIP ESTATE

The Receivership Estate currently has cash on hand in the amount of $6,260,219.36,[8] which the Receiver is holding in the Estate's fiduciary accounts at Gibraltar Private Bank & Trust.   *See* Receivership Receipts and Disbursements attached hereto as **Exhibit "C"**.   Upon adding the cash on hand to the present market value of the metals being stored at DDS ($563,985.33[9]), the present market value of the two (2) silver bars being stored at IDS and Baird (together, approximately $31,160[10]), and the numismatic value of the metals being stored at Via

---

[7]   Although the Receiver has attached to her previous reports lists of end-customers who had active accounts with Hunter Wise's dealers at the time the Monitor was appointed, the Receiver is not attaching the updated list of all end-customers to this Report to protect those customers from potential telemarketing frauds.   The Receiver has posted a warning regarding telemarketing fraud to end-customers on the home page of the Receivership website (www.hunterwisemanager.com).

[8] This is the balance reported as of March 16, 2015.

[9] This is the approximate value as of March 16, 2015.

[10] This is the approximate value as of March 16, 2015.

Mat ($129,624.14[11]), the total value of the assets of the Receivership Estate is approximately $6,984,988.[12].

## VI.  ADMINISTRATIVE EXPENSES

The administrative expenses of the Receivership Estate comprise the expenses that the Estate has incurred in connection with marshaling, maintaining, and preserving the Defendants' assets, including the fees and costs incurred by the Receiver and her professionals.   All administrative expenses of the Estate are reflected in the Receivership Receipts and Disbursements (Exhibit "C").

On December 3, 2014, the Receiver filed her Seventh Status Report [ECF No. 331]. Also, on December 19, 2014, the Receiver filed an Unopposed Motion to Approve and Authorize Payment of Fees Reflected in Substitute August 2014 Invoice of Monitor's Forensic Accountant for Sixth Fee Application [ECF No. 344].  No objections to that Fee Application or Motion were filed, and they are ripe for this Court's consideration.

## VII.  CONCLUSION

The Receiver will continue to work with her team of professionals to locate, marshal, preserve, and liquidate all known and potential assets of the Receivership Estate.  Moreover, the Receiver will continue to investigate existing and potential claims against third parties and, as appropriate, will pursue those claims that are viable on behalf of the Estate.  The Receiver will also continue to investigate and gather information regarding the Defendants' assets and

---

[11]  The Receiver has estimated the value of these metals without obtaining another formal appraisal, using the spot prices of metals as of March 16, 2015, and the retail values of these items as listed for sale online through various internet retailers of precious metals.

[12] This amount does not include any of the frozen funds or the value of the frozen shares at South Peak, which have not yet been transferred to the Receivership Estate's fiduciary accounts, the $750,000 settlement amount from the D&O matter, or the nominal amounts frozen in accounts of certain individual Defendants.  *See* Exhibit B.

transactions, through subpoenas, depositions and other inquiries to persons and entities with any connection to the Defendants, to discover potential claims against third parties and other sources of recovery for the Estate.  Further, the Receiver and her professionals will continue to analyze the documents obtained from the Defendants and third parties and will pursue recovery of all fraudulent transfers to dealers and their principals.  In addition, the Receiver will continue her efforts to collect restitution amounts from Defendants as well as from the non-Defendant dealers and their principals against which Judgments or CFTC Consent Orders were entered.  The Receiver will also continue to prosecute the malpractice action against the HW Entities' former counsel.  Once the Court has determined the appeals of the Receiver's final determinations of certain claimants claims, the Receiver will administer those claims in accordance with the Court's ruling.  The Receiver is prepared to make an initial distribution to claimants holding allowed claims as soon as the Court approves the proposed distribution.  Finally, the Receiver will liquidate all remaining personal property of the Estate in accordance with the Court-approved proposal for doing so.  Of course, the Receiver will continue to perform all other duties as mandated by the Appointment Order, the Injunction Order, the Final Judgment, the Default Judgments, and the Restitution Orders and will continue updating the Court on a regular basis as to the status of the Monitorship and the Receivership.

Respectfully submitted this 20th day of March, 2015.

**DAMIAN & VALORI, LLP**
Counsel for Monitor / Receiver
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965

*/s/ Kenneth Dante Murena*
KENNETH DANTE MURENA, P.A.
FLORIDA BAR NO. 147486

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of Receiver's Eighth Status Report was served upon all counsels of record via CM/ECF, and via Email and/or U.S. MAIL, to all parties listed in the Service List below, this 20th day of March, 2015.

/s/ Kenneth Dante Murena
KENNETH DANTE MURENA, P.A.
FLORIDA BAR NO. 147486

## SERVICE LIST

**Attorney for the CFTC**
Carlin Metzger
525 West Monroe Street, Suite 1100
Chicago, IL 60661
Telephone: (312) 596-0536
cmetzger@cftc.gov
*Via CM/ECF*

**Attorneys for Fred Jager and Ed Martin**
Gregory A. Baldwin
Holland & Knight
701 Brickell Avenue, Suite 3000
Miami, Florida 33131
(305) 789-7745
Gregory.Baldwin@hklaw.com
*Via CM/ECF*

Harris L. Kay
Henderson & Lyman
175 West Jackson Boulevard, Suite 240
Chicago, Illinois 60604
(312) 986-3982
Hkay@henderson-lyman.com
*Via CM/ECF*

**John King**
517 Rachel Lane
Royal Palm Beach, FL 33411
Jaking82@me.com
*Via E-mail*

**Attorney for Baris Keser**
Richard B. Carey, Esq.
1711 Worthington Rd, Ste. 107
West Palm Beach, FL 33409
richard@rcareylaw.com
*Via CM/ECF*

**Attorney for James Burbage and Frank Gaudino**
James D. Sallah
jds@sallahcox.com
Joshua Katz
JKatz@SallahCox.com
Sallah Astarita & Cox, LLC
2255 Glades Road, Suite 300E
Boca Raton, Florida 33431
*Via CM/ECF*

**Attorneys for David A. Moore**
Gary Sinclair
2043 N. Mohawk Street
Chicago, IL 60614
Telephone: 773-871-4389
gary@garyslaw.com
*Via CM/ECF*

Bradford M. Cohen
1123 SE 3rd Ave,
Fort Lauderdale, FL 33316
Telephone: 954-523-7774
Fax: 954-253-2656
lawronin@aol.com
*Via CM/ECF*

Harold Edward Martin, Jr.
5952 Vizzi Court
Las Vegas, NV 89131-2858
*Via U.S. Mail*

Fred Jager
53 S. Peak
Laguna Niguel, CA 92677-2903
*Via U.S. Mail*

James Burbage
1915 Washington Avenue
Santa Monica, CA 90403-3305
*Via U.S. Mail*

Frank Gaudino
1312 Sonoma Court
Palm Beach Gardens, FL 33410-1517
*Via U.S. Mail*

Baris Keser
4008 40th Way
West Palm Beach, FL 33407-6828
*Via U.S. Mail*

Chadewick Hopkins (Last Known Address)
646 Flower Ave., Apt. 3
Venice, CA 90291-6711
*Via U.S. Mail*

David A. Moore
144 Silver Lake Road 1
Staten Island, NY 10301-2734
*Via U.S. Mail*